# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., | |
| Movant, | Case No. _____ |
| v. | Related Case No.: 1:21-cv-00447 (W.D. Tex.) |
| VITAL FARMS, INC., | |
| Respondent. | |

### BRIEF IN SUPPORT OF PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.'S MOTION TO QUASH NONPARTY SUBPOENA

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Fed. Election Comm'n*,
    333 F.3d 168 (D.C. Cir. 2003) ...............................................................20

*In re Am. Nurses Ass'n*,
    643 F. App'x 310 (4th Cir. 2016) ...........................................................16

*Chestnut v. Kincaid*,
    No. CV LKG-20-2342, 2022 WL 350117 (D. Md. Feb. 4, 2022)...........26

*Cook v. Howard*,
    484 F. App'x 805 (4th Cir. 2012) .............................................................9

*In re eBay Seller Antitrust Litig.*,
    No. C09-735RAJ, 2009 WL 5205961 (W.D. Wash. Dec. 23, 2009) ....................27

*Eshelman v. Puma Biotechnology, Inc.*,
    No. 7:16-CV-18-D, 2017 WL 5919625 (E.D.N.C. Nov. 30, 2017) ........13

*Gilmore v. Jones*,
    339 F.R.D. 111 (W.D. Va. 2021)........................................................9, 14

*LaRouche v. Nat'l Broad. Co.*,
    780 F.2d 1134 (4th Cir. 1986) .........................................................25, 26

*Legal Voice v. Stormans Inc.*,
    738 F.3d 1178 (9th Cir. 2013) ................................................................15

*Med. Components, Inc. v. Classic Med., Inc.*,
    210 F.R.D. 175 (M.D.N.C. 2002) ..........................................................28

*Micro Motion, Inc. v. Kane Steel Co.*,
    894 F.2d 1318 (Fed. Cir. 1990)...............................................................27

*NAACP v. Alabama*,
    357 U.S. 449 (1958).......................................................................7, 19, 20

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964)...............................................................................20

*Nicholas Usler, et al. v. Vital Farms, Inc*,
    Case No. 1:21-cv-00447 (W.D. Tex.)........................................................1

i

*Perry v. Schwarzenegger*,
    591 F.3d 1147 (9th Cir. 2010) ......................................................................... *passim*

*Pulte Home Corp. v. Montgomery Cnty. Maryland*,
    2017 WL 1104670 ............................................................................................ *passim*

*Singletary v. Sterling Transp. Co.*,
    289 F.R.D. 237 (E.D. Va. 2012) .....................................................................7, 8, 9

*In re Subpoena Duces Tecum to AOL, LLC*,
    550 F.Supp.2d 606 (E.D.Va. 2008) ............................................................................9

*Vengosh v. Jacobs Eng'g Grp., Inc.*,
    No. 5:20-MC-20, 2020 WL 5709256 (E.D.N.C. Sept. 24, 2020)...........................27

*Virginia Dep't of Corr. v. Jordan*,
    921 F.3d 180 (4th Cir. 2019) ......................................................................... *passim*

**Other Authorities**

U. S. Const. amend. I ........................................................................................ *passim*

Fed. R. Civ. P. 26 ............................................................................................................7

Fed. R. Civ. P. 26(b)(1).............................................................................................7, 9, 14

Fed. R. Civ. P. 26(g)(1)(B)(ii) ...................................................................................8, 26

Fed. R. Civ. P. 45 ...................................................................................................7, 14, 16

Fed. R. Civ. P. 45(d)(1).............................................................................................7, 30

Fed. R. Civ. P. 45(d)(3).............................................................................................1, 7

Fed. R. Civ. P.45(d)(2)(B)(ii) ....................................................................................15

Fed. R. Civ. P. 45(d)(3)(A) ...........................................................................................7

Fed. R. Civ. P. 45(d)(3)(A)(iii) ...................................................................................19

# TABLE OF CONTENTS

I.      OVERVIEW .................................................................................................. 1

II.     FACTUAL BACKGROUND ......................................................................... 2

        A.      RELATIONSHIP OF PETA AND PETA FOUNDATION ................................. 2

        B.      THE UNDERLYING LAWSUIT ......................................................................... 3

        C.      THE SUBPOENA ................................................................................................. 4

        D.      MEET AND CONFER ......................................................................................... 6

III.    LEGAL STANDARD .................................................................................... 7

IV.     ARGUMENT ................................................................................................. 8

        A.      THE SUBPOENA IS UNDULY BURDENSOME ............................................. 9

                1.      THE SUBPOENA IS OVERBROAD ......................................................... 9

                2.      COMPLIANCE WITH THE SUBPOENA WOULD IMPOSE A
                        SUBSTANTIAL AND DISPROPORTIONATE BURDEN .................... 14

                3.      THE SUBPOENA SEEKS IRRELEVANT MATERIALS .................... 16

        B.      THE SUBPOENA SEEKS PRIVILEGED MATERIAL ..................................... 19

        C.      THE SUBPOENA WAS INTERPOSED FOR AN IMPROPER PURPOSE ...... 27

        D.      VITAL FARMS' ABUSIVE SUBPOENA SHOULD BE SANCTIONED ........ 28

V.      CONCLUSION .............................................................................................. 29

People for the Ethical Treatment of Animals, Inc. ("PETA") brings this Motion to Quash under Federal Rule of Civil Procedure 45(d)(3), respectfully requesting that this Court issue an order quashing the nonparty subpoena *duces tecum* issued by Vital Farms, Inc. ("Vital Farms") dated November 18, 2022 (with all attachments, the "Subpoena"; attached hereto as Ex. A[1]), in connection with an ongoing civil lawsuit to which PETA is not a party: *Nicholas Usler, et al. v. Vital Farms, Inc.*, Case No. 1:21-cv-00447 (W.D. Tex.) ("*Usler*" or "the Lawsuit").

## I.    OVERVIEW

This is one of two plainly improper subpoenas that Vital Farms has issued in a coordinated campaign to target PETA, its perceived adversary, and the Foundation to Support Animal Protection d/b/a PETA Foundation ("PETA Foundation"), which Vital Farms alleges is PETA's "captured legal arm."  *Usler* Dkt. 56-1 at 3.[2]  Crucially, PETA Foundation lawyers represent the plaintiffs in the underlying Lawsuit against Vital Farms, a putative class of consumers who allege that Vital Farms falsely advertises its eggs as "humane."  PETA is not a party to the suit, but a well-known animal protection organization, who Vital Farms has identified as a corporate and political adversary, and who is also another legal client of PETA Foundation.  Vital Farms targets both entities for their perceived slights against Vital Farms' business—either through advocacy efforts (PETA) or through prosecution of the Lawsuit (PETA Foundation).

Both subpoenas reflect Vital Farms' improper campaign to harass, burden, and seek

---

[1] All references to Exhibits herein refer to the Exhibits to the Alpert Declaration filed herewith.

[2] "*Usler* Dkt. __" refers to the corresponding docket entry in the underlying lawsuit, *Nicholas Usler, et al. v. Vital Farms, Inc.*, Case No. 1:21-cv-00447 (W.D. Tex. May 20, 2021). For the Court's convenience, key filings are attached to the Alpert Declaration to this Memorandum. The Complaint (Dkt. 1) is attached as Exhibit E; the Motion to Dismiss (Dkt. 17) is attached as Exhibit F; the Response to Motion to Dismiss (Dkt. 22) is attached as Exhibit G; the Report and Recommendation (Dkt. 26) is attached as Exhibit H; the Rule 26(f) Report (Dkt. 36) is attached as Exhibit I; the Memorandum in Support of Motion to Quash (Dkt. 56-1) is attached as Exhibit J; the Response to Motion to Quash (Dkt. 60) is attached as Exhibit K.

1

confidential information from political and legal adversaries.  In this Motion, PETA moves to quash the Subpoena issued against it, which demands production of every single PETA file related to its vegan advocacy against egg consumption, and expressly demands all of its confidential internal strategy planning and deliberation documents.  Separately, PETA Foundation will be moving to quash the subpoena issued against it, which demands the production of its entire litigation file in the Lawsuit, along with other privileged communications.

## II.     FACTUAL BACKGROUND

### A.     RELATIONSHIP OF PETA AND PETA FOUNDATION

PETA is an animal protection organization that advocates for a vegan diet, and has commented publicly on the cruel conditions of animals raised for food, including egg-laying hens. *See, e.g.*, The Egg Industry, PETA.ORG, https://www.peta.org/issues/animals-used-for-food/factory-farming/chickens/egg-industry/ (last accessed Dec. 13, 2022).  As a result of this advocacy, Vital Farms has identified PETA as a corporate adversary and threat to its egg-selling business. *See, e.g.*, *Usler* Dkt. 56-1 at 3 ("PETA actively advocates to steer Vital Farms' customers away from their products and toward PETA-approved products through the use of PETA's services, and in so doing actively competes against Vital Farms' commercial interests").[3]

PETA Foundation is a separate corporate entity.  It is a tax-exempt public charity that provides legal and administrative support services to various animal protection organizations,

---

[3] *See also* Alpert Decl. Ex. C, Meyer Letter to Alpert ("Letter") at 9 (alleging PETA, in conjunction with PETA Foundation, "seeks to shape consumer demand for eggs, including Vital Farms' eggs"). Vital Farms' 10-K similarly reports facing "pressure from animal rights groups to require all companies that supply food products to operate their business in a manner that treats animals in conformity with certain standards developed or approved by these animal rights groups," and warns that "[i]f consumer preferences shift away from animal-based products for these reasons, because of a preference for plant-based products or otherwise, our business, financial condition and results of operations could be adversely affected."  Vital Farms, Annual Report (Form 10-K) (March 10, 2022), at 25, https://investors.vitalfarms.com/static-files/7ef846bd-cebd-45eb-bc7f-ec04b9f01d86.

including PETA.  *See* Smith Decl ¶ 4.  For instance, PETA Foundation provides IT, Audio/Visual, Human Resources, mailroom, and other administrative functions, as well as legal services.  *Id.* PETA Foundation litigators function similarly to a boutique law firm in furtherance of its mission of animal protection, serving as litigation counsel in numerous lawsuits to various plaintiffs, including as counsel to PETA and to individual plaintiffs.  *Id.* ¶ 5.  In this respect, the PETA Foundation is similar to a number of other entities associated with advocacy nonprofits whose functions include commercial and noncommercial strategic impact litigation, such as the AARP or the ACLU.  As relevant here, PETA Foundation lawyers represent plaintiffs against Vital Farms.

## B.    THE UNDERLYING LAWSUIT

In the Lawsuit, a putative class of consumer plaintiffs allege that Vital Farms, an egg producer, falsely advertises its eggs as "humane" while engaging in numerous practices that harm and kill the animals used for egg production, including grinding male chicks to death shortly after birth; searing off chicks' beaks without anesthesia; housing animals at high density; and selling prematurely "spent" hens to painful slaughter.  *Usler*, Dkt. 1.  In light of the Lawsuit's allegations that Vital Farms falsely advertised its products as "humane" while utilizing cruel and abusive animal practices, facts relevant to the case include: (i) whether Vital Farms advertised its products as "humane"; (ii) whether Vital Farms used the alleged cruel practices; (iii) whether use of those practices is "humane," a term that plaintiffs allege they define consistent with relevant caselaw, *Usler* Dkt. 22 at 13–14, *Usler* Dkt. 26 at 8–9, and that Vital Farms alleges is defined by its third-party certifier HFAC, *Usler* Dkt. 17 at 4–5, *Usler* Dkt. 26 at 7; and (iv) whether the plaintiffs and consumers purchasing Vital Farms' products were deceived by Vital Farms' representations of "humane" treatment into paying premium prices.

Vital Farms moved to dismiss the suit, alleging erroneously that suit was a "wolf in sheep's clothing" brought by PETA, in furtherance of "PETA's extremist agenda" and "PETA's demands

[that] hens have equal rights with humans." *Usler*, Dkt. 17 at 1–2.  Vital Farms provided no basis

for these claims, and could not. PETA is not a party; the suit was brought by individual consumers

on behalf of a putative class (also represented by additional non-PETA Foundation counsel).  The

court denied Vital Farms' motion, and observed that Defendant "misse[d] the gravamen of

Plaintiffs' claim[.]"  *Usler*, Dkt. 26 at 6.  Vital Farms continued to rail against PETA (still not a

party to the suit) and the PETA Foundation, the plaintiffs' lawyers, seeking to prevent PETA

Foundation attorneys from viewing materials produced in discovery because, they allege, PETA

Foundation is a "captured services provider" who shares "a social advocacy mission to publicly

dissuade people from eating eggs," and who they allege will use materials from the suit

"collaterally to advance PETA's anti-egg stance."  *Usler* Dkt. 36, at 6. Vital Farms has provided

no substantiation nor good faith basis for any of these accusations, and continues to find

opportunities to unjustifiably attack PETA Foundation counsel.  *See, e.g.*, *Usler* Dkt. 60 at 10

(Vital Farms incorrectly attributed a statement to PETA Foundation counsel).

If anything, it appears that Vital Farms was projecting its concerns about discovery-related

malfeasance.  Unsuccessful in its verbal attacks on PETA and PETA Foundation, Vital Farms has

sought a new outlet that can impose a far greater burden on the entities: issuing expensive,

burdensome, and irrelevant subpoenas under the guise of third-party discovery.

### C.    THE SUBPOENA

The Subpoena served on PETA seeks, through eleven broad document requests, essentially

all of PETA's files related to its vegan and animal protection advocacy efforts regarding eggs—

including its most confidential internal documents discussing and deliberating advocacy strategy.

Request 1 demands "All DOCUMENTS and COMMUNICATIONS concerning,

constituting or reflecting any tactics or strategies YOU have employed, participated in, or provided

assistance in to dissuade consumers from buying or eating EGGS."  Ex. A.  This would require the

disclosure of every single document in PETA's files (a vegan advocacy organization) related to its vegan advocacy regarding eggs, including *e.g.* internal deliberations, strategy, and planning documents, including those related to both planned and completed confidential undercover investigations; campaigns; publications; advocacy correspondence; and far more.

The Subpoena also requires production of any document that mentions the conditions faced by animals raised (or killed) for egg production; which again likely appear in substantial amounts of PETA's vegan advocacy related materials, and would require review of essentially all such materials. Ex. A Requests 9–11 ("All DOCUMENTS and COMMUNICATIONS concerning, constituting or reflecting" the conditions under which eggs-laying hens are treated in the United States: "farm conditions for raising HENS for the purposes of EGG production in the United States"; "HATCHERY conditions in the United States"; and "the use of CULLING or BEAK TRIMMING in the EGG production industry in the United States.").

The Subpoena also requires the production of "All DOCUMENTS and COMMUNICATIONS concerning, constituting, or reflecting any studies," or analyses or surveys, depending on the request, "YOU have conducted, funded, participated in, or provided assistance in" related to a variety of egg-related topics, such as "EGG production," "EGG pricing," or "consumer preferences regarding EGGS," and also "treatment of chickens" generally.  Ex. A Requests 2–7.  This would require not only producing of the results of any such studies, analyses, or surveys—conducted by PETA or by any third party, if PETA or any employees ("agents") happened to participate in such studies, analyses, or surveys—but also any internal documents or correspondence discussing or referencing such studies, analyses, or surveys.  Again, given PETA's mission and day-to-day operations, it is hard to imagine how this would not require review of essentially all internal correspondence relating to PETA's vegan advocacy.  The Subpoena also

5

requires the production of "All DOCUMENTS and COMMUNICATIONS concerning VITAL FARMS," *id.* Request 8.  This would require disclosure of any PETA document that so much as mentions "Vital Farms," and would, by design, allow Vital Farms or its lawyers access to all internal records showing how a perceived competitor has or may investigate and respond to it.

All requests were issued with extremely broad definitions of defined terms, such as YOU (which includes separate entity PETA Foundation) and DOCUMENTS,[4] with no limitation as to time period, or in the case of several requests, geographic scope.

### D.    MEET AND CONFER

PETA timely provided Vital Farms with objections on December 2, 2022, identifying among other concerns, objections on relevance, overbreadth, and attorney-client and First Amendment privilege grounds.  Ex. B.   Vital Farms eventually offered to (i) apply a time limitation to its requests, and (ii) to remove the phrase "provided assistance in" from Requests 2–7; but otherwise refused to narrow its demands.   In a further good-faith attempt to narrow the dispute, without waiving its objections, PETA conducted a reasonable review of its records and reported to Vital Farms that it did not believe it had conducted any formal studies into any of the topics identified at Requests 2–7, and inquired as to whether this information would satisfy Vital Farms' demands as to these Requests.  Ex. D.  Vital Farms responded after the close of business on Friday, December 30, pushing an even more expansive scope, stating that "studies" should include informal public outreach and requiring PETA (and the PETA Foundation) to, among other

---

[4] YOU is defined to include *e.g.* agents, affiliates, any entity that has ever acted on PETA's behalf, *and PETA Foundation*, an entity Vital Farms already separately subpoenaed. Ex. A. The requests are particularly overbroad and burdensome if read to include these entities, and in light of PETA Foundation's status as employer of *opposing counsel* in the Lawsuit, would implicate substantial attorney-client and work-product privilege issues as well, especially for Request 8.   PETA interprets "YOU" to mean PETA, and responds accordingly here.  DOCUMENTS is defined to include essentially any conceivable material ever created.  Ex. A.  Neither is tailored to reducing the burden of compliance on PETA or identifying relevant information.

things, search for and produce all documents reflecting the "research" or other evaluative use of any third party "studies, reports, analyses, evaluations, etc.," broadly defined.  *Id.*  PETA therefore informed Vital Farms that its demands would require it conduct an onerous and exorbitantly expensive search through essentially all emails, folders, and documents created in support of its vegan advocacy mission, and that, given the timing and overbreadth of Vital Farms' demands, further meet and confer would be futile.  *Id.*

Unable to secure protection from the unduly burdensome, irrelevant, invasive, overbroad, intentionally harassing and improper Subpoena, PETA timely files this Motion to Quash in the court in the district where compliance is required.  Fed. R. Civ. P. 45(d)(3).

## III.   LEGAL STANDARD

The issuer of a nonparty subpoena must "reasonable steps to avoid imposing undue burden or expense" on the recipient, by tailoring its request to relevant, nonprivileged facts at issue in the underlying litigation.  Fed. R. Civ. P. 45(d)(1); *Virginia Dep't of Corr. v. Jordan*, 921 F.3d 180, 190 (4th Cir. 2019).  Failure to avoid imposing an undue burden may result in sanctions, including reasonable attorney's fees.  Fed. R. Civ. P. 45(d)(1).  A nonparty subpoena *must* be quashed if it imposes an undue burden, or invades privilege.  *Id.* 45(d)(3)(A).  A nonparty subpoena may be quashed if it requires the disclosure of confidential information.  *Id*. 45(d)(3)(B).

A Rule 45 subpoena is also subject to the Rule 26 limitations applicable to all discovery. *Singletary v. Sterling Transp. Co.*, 289 F.R.D. 237, 240–41 (E.D. Va. 2012). A party may only "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case," giving consideration to "the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).  Privileged material includes not only attorney-client or work-product privileged materials, but also materials protected by the First

Amendment.  *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010); *NAACP v. Alabama*, 357 U.S. 449, 460 (1958).  Discovery is also not available where the request was "interposed for any improper purpose, such as to harass . . . or needlessly increase the cost of litigation," or to "annoy[ ], embarrass[ ], or oppress[ ]" the recipient.  Fed. R. Civ. P. 26(g)(1)(B)(ii) & *id.* 26(c)(1).

"Nonparties faced with civil discovery requests deserve special solicitude"; they "should not be drawn into the parties' dispute unless the need to include them outweighs the burdens of doing so, considering their nonparty status." *Jordan*, 921 F.3d at 194.  To assess whether a nonparty subpoena is proper, "courts should consider not just the relevance of information sought, but the requesting party's need for it": "[t]he information sought must *likely* (not just *theoretically*) have marginal benefit in litigating important issues," and that benefit must be more than *de minimis*.  *Id.* at 189.  Courts must consider "what information is available to the requesting party from other sources," including whether the party can obtain the "same" or "comparable information" from a party to the litigation or another source.  *Id*. at 189.  "A nonparty should not have to do the work of tailoring a subpoena to what the requesting party needs; the requesting party should have done that before serving it."  *Id.* at 190; *see also Singletary*, 289 F.R.D. at 244.

While the moving party bears the burden of proof and persuasion on a motion to quash, "they are not terribly difficult burdens to meet if the requesting party cannot articulate its need for the information and address obvious alternative sources."  *Id.* at 189 n.2.

## IV.    ARGUMENT

This Subpoena is an ill-disguised attempt to convert Vital Farms' status as a defendant in a lawsuit into a pretext for looking "under the hood" of its perceived adversary.  The Subpoena is plainly designed to obtain PETA's internal advocacy strategy materials, which have nothing to do with the Lawsuit, and in retribution for the underlying suit because PETA Foundation attorneys are among the counsel representing plaintiffs.  Far from tailored to seeking relevant discovery, its

overbroad requests sweep in substantial quantities of protected and irrelevant material, and would require an enormous investment of resources (measured in attorney-*years*).   It is unduly burdensome, as well as simply improper, and must be quashed.

### A.       THE SUBPOENA IS UNDULY BURDENSOME

Discovery must be "proportional to the needs of the case, considering . . . whether the burden or expense of the proposed discovery outweighs its likely benefit."   *Id.* 26(b)(1)   This is particularly true here: "when a subpoena is directed to a nonparty, 'courts must give the recipient's nonparty status "special weight," leading to an even more "demanding and sensitive" inquiry than the one governing discovery generally.'" *Gilmore v. Jones*, 339 F.R.D. 111, 120 (W.D. Va. 2021) (quoting *Jordan*, 921 F.3d at 189).   Where "the subpoena seeks information irrelevant to the case or [ ] would require a non-party to incur excessive expenditure of time or money," it is unduly burdensome.   *Cook v. Howard*, 484 F. App'x 805, 812 n.7 (4th Cir. 2012).   Here, the Subpoena is facially overbroad and disproportionately burdensome, requiring an enormous investment of resources to comply while offering no corresponding "benefit" of relevant materials.

### 1.       THE SUBPOENA IS OVERBROAD

A subpoena is overbroad where is "does not limit the [documents] requested to those containing subject matter relevant to the underlying action," *In re Subpoena Duces Tecum to AOL, LLC*, 550 F.Supp.2d 606, 612 (E.D.Va. 2008), or is "likely to require production of a massive number of wholly irrelevant documents," *Gilmore*, 339 F.R.D. at 125 (internal quotation omitted). As numerous courts have held, "[a] subpoena imposes an undue burden on a party when a subpoena is overbroad." *In re Subpoena*, 550 F.Supp.2d at 612; *see also Singletary*, 289 F.R.D. at 241.   Here, the Subpoena's requests "are both overbroad and not tailored to a particular purpose." *See Singletary*, 289 F.R.D. at 241.

Vital Farms has made no efforts to tailor its requests to the facts at issue in the Lawsuit. Its Subpoena seeks from PETA essentially all of its files related to its vegan advocacy efforts regarding eggs.  It is hard to imagine a more expansively written Subpoena, or one less tethered to the issues in the underlying Lawsuit.  Moreover, its most recent correspondence, pushing for an even more expansive definition of the terms in its already overbroad Subpoena, confirms that it has no interest in tailoring its requests.  *See* Ex. D.

Request 1 demands "All DOCUMENTS and COMMUNICATIONS concerning, constituting, or reflecting any tactics or strategies YOU have employed, participated in, or provided assistance in to dissuade consumers from buying or eating EGGS."  Ex. A. The purpose of this request is clear on its face, and it is *not* the identification of materials relevant to the Lawsuit. Documents "concerning, constituting, or reflecting" all of PETA's "tactics or strategies" "to dissuade consumers" from egg consumption would not provide relevant information about the issues in dispute in the Lawsuit.[5]  But they would include basically any PETA document related to its egg advocacy, and require review of practically every document PETA has created relating to its vegan advocacy regarding eggs for over seven and a half years.

Request 1 would encompass essentially any communication, effort, campaign, or publication PETA has ever created (and all the planning leading thereto) in connection with its vegan advocacy regarding eggs.  It would include, among many others: documents containing PETA's internal deliberations about strategy; selection of messaging; discussion of past strategies and future planned strategies; reflections on past and plans for future campaigns; messages to members with action alerts or petitions; discussion of plant-based egg substitute recipes to include

---

[5] The expansive "concerning, constituting, or reflecting" (a catchall used in every request except number 8) ensures that any document even remotely related to the topic would be included.

in publications to members; and methods of conducting undercover investigations.  It would include drafts and final versions, and any and all correspondence discussing or commenting on anything conceivably related to these "tactics or strategies," which in turn includes essentially any effort undertaken by PETA in relation to its vegan advocacy about eggs.   It is hard to conceive of documents related to PETA's vegan advocacy on eggs that would not be included.

Relatedly, Requests 9 through 11 demand "All DOCUMENTS and COMMUNICATIONS concerning, constituting or reflecting farm conditions for raising HENS for the purposes of EGG production in the United States"; " HATCHERY conditions in the United States"; and "the use of CULLING or BEAK TRIMMING in the EGG production industry in the United States."  Ex. A. Since PETA's animal protection and vegan advocacy mission includes education about conditions of animals used for food, documents "concerning, constituting, or reflecting" various conditions under which animals used for egg production are treated would encompass a substantial portion of PETA's communications, internal deliberation, outreach, campaigns, and other efforts in furtherance of its vegan advocacy regarding eggs.

But PETA's advocacy methods are not at issue in the Lawsuit.  Vital Farms' methods of using animals for egg production, and statements about that egg production, are.  Vital Farms has articulated two arguments to manufacture some relevance for these document requests: (i) "they pertain to the information available to or known by the reasonable consumer;" (ii) they "are relevant to understanding that industry generally." Letter at 2–3.  These alleged justifications are specious; but even accepting them *arguendo*, the requests are not sufficiently tailored.

First, the Subpoena seeks documents reflecting PETA's *internal* strategy, tactics, and correspondence, including *e.g.* its deliberations, communications, strategy assessments, and plans. "[I]nformation available to or known by the reasonable consumer" is, by definition, available to

the consumer—meaning, public.  PETA's documents, by the very nature of their private, *internal* status, would not qualify.  Vital Farms has not alleged that PETA is a "reasonable consumer" of eggs (as a vegan advocacy organization, it is no consumer of eggs); and a "reasonable consumer" would not have access to PETA's internal files.  Therefore, PETA's comprehensive internal strategy files are not relevant to assessing what a "reasonable consumer" would know, and these requests are not tailored to identifying a "reasonable consumer's" knowledge.

Second, a vague and general relevance claim ("understanding the industry generally") cannot justify an overly expansive nonparty subpoena request.  There is no connection to the issues in the suit.  Read charitably, Vital Farms may mean that information about other egg producers' practices is relevant to assess (i) knowledge available to an alleged "reasonable consumer," or (ii) Vital Farms' relative "humaneness" by comparison.  Again, claim (i) is inapplicable because Vital Farms's broad request seeks copious amounts of PETA's *internal* files.  And the far-reaching demands of these requests (along with their recipient) belie any tailoring to claim (ii).  The Subpoena sought any PETA document conceivably mentioning or discussing those conditions ("concerning, constituting or reflecting" practices).

The Subpoena as revised also demands production of "All DOCUMENTS and COMMUNICATIONS concerning, constituting or reflecting" studies, analyses, or surveys (depending on the Request) that "YOU have conducted, funded, [or] participated in," on a wide variety of topics related to eggs and treatment of animals used for egg production.  Ex. A Requests 2–7.  Vital Farms demands not merely PETA-conducted studies (which, to its knowledge it has not conducted in the time period, as PETA informed Vital Farms), but also any third-party informal analyses any PETA employee participated in, informal PETA analyses or surveys, any materials PETA looked at as part of those informal analyses, and any documents related to, referencing, or

merely mentioning any of these.[6]  *See supra* § II.D.  When PETA sought to discuss these Requests, Vital Farms demanded still more expansive definitions of "studies" to include "research, studies, evaluation, etc.," and "analyses" to be an even "broader term than surveys and studies, to include research, findings (raw data results of surveys), and actual analysis of findings."  Ex. D.  Vital Farms' Requests are overbroad by design.  Compliance would require extensive, burdensome review of huge quantities of documents; to produce documents reflecting PETA employees' internal assessments of various formal or informal analyses, which have no bearing on the case.

The  Subpoena  also  demands  production  of  "All  DOCUMENTS  and COMMUNICATIONS concerning VITAL FARMS."  Request 8.  This would require review and production of every document in PETA's possession that so much as mentions Vital Farms.  But a document in a nonparty's possession mentioning a defendant does not, by dint of referencing the name, become relevant to the litigation; it must have some bearing on the facts at issue in the case.

Vital Farms asserts that this request is relevant because PETA has "inserted itself" into the litigation, either through making public statements about the case, or through alleged affiliation with the employer of the *lawyers* for plaintiffs.  Letter at 3.[7]  As explained *infra* § IV.A.3, that is not a basis for relevance.  But even still, the request is not tailored to yield documents related to PETA's public statements about the Lawsuit (which, in any case, would be irrelevant)—it seeks any document mentioning Vital Farms in any context for any reason.

---

[6] This request is ironic, since Vital Farms itself has commissioned studies about egg labels and perceptions (indicating that it already has this kind of information in its own possession).  *See, e.g.*, Adele Douglass, *New Research: Consumers Confused by Egg Carton Labels*, CertifiedHumane.org  (July  11,  2014)  https://certifiedhumane.org/new-research-consumers-confused-egg-carton-labels/ (reporting on a poll commissioned by Vital Farms).

[7] Vital Farms has even admitted that PETA's affiliation with the PETA Foundation is among the bases for its issuance of this Subpoena.  Letter at 4 ("PETA's affiliation with the Foundation was *not* the *sole* reason for its service of the Subpoenas") (emphasis on "sole" added).

Vital Farms' unconvincing relevance claims implicate, if at all, a small subset of the materials encompassed in their wide-ranging Requests. They remain patently overbroad. Where a "small percentage of the requests . . . could possibly turn up some information that could theoretically support [defendant's] defenses to th[e]action," "[b]ut the requests are also likely to require production of a massive number of 'wholly irrelevant documents,'" a subpoena is overbroad. *Gilmore*, 339 F.R.D. at 125; *see also Eshelman v. Puma Biotechnology, Inc.*, No. 7:16-CV-18-D, 2017 WL 5919625, at *7 (E.D.N.C. Nov. 30, 2017) (subpoena request for "an entire file" is "overbroad" "where that file likely contains both relevant and irrelevant information").

Finally, read literally, the Subpoena demands production of attorney-client privileged material. Its broad definitions would sweep in any discussions between PETA and its counsel related to *e.g.* exploring legal avenues related to mistreatment of animals used for egg production. Smith Decl. ¶ 24; Nachminovitch Decl. ¶ 22. If "YOU" is given the improper meaning the Subpoena demands, which defines the term to include separate entity PETA Foundation, it would also sweep in a wide set of legally privileged materials related to the prosecution of the Lawsuit, particularly for Request 8 (demanding any document mentioning Vital Farms).[8]

### 2.    COMPLIANCE WITH THE SUBPOENA WOULD IMPOSE A SUBSTANTIAL AND DISPROPORTIONATE BURDEN

The touchstone of a discovery analysis is relevance and proportionality. Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case.") Proportionality considerations

---

[8] Vital Farms simultaneously subpoenaed the entire litigation file of PETA Foundation attorneys. That demand is the subject of a separate motion to quash, but it should be noted here that courts generally do not require logging of privileged documents where the demands are so sweeping. *See, e.g., Frye v. Dan Ryan Builders, Inc.*, No. 3:10-CV-39, 2011 WL 666326, at *7 (N.D.W. Va. Feb. 11, 2011) (finding "no privilege log is necessary" where Rule 45 subpoena would require production of "entire litigation file," as "[b]oth attorney-client privilege and work product doctrine are in the entire litigation file").

include, among others, "the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id*. "This relieves parties from the burden of taking unreasonable steps to ferret out every relevant document." *Jordan*, 921 F.3d at 189. Moreover, proportionality and relevance considerations are heightened where, as here, the discovery is sought from a nonparty. *Id.* Here, not only is the Subpoena extraordinarily burdensome, but it is also very disproportionate to the needs of the case. It seeks irrelevant information only tenuously connected to the issues in the Lawsuit, through requests not reasonably calculated to lead to admissible evidence.

Compliance with the subpoena would require substantial investment of resources and a substantial invasion of PETA's privacy interests. The Subpoena demands production of all of PETA's files related to its vegan advocacy efforts regarding eggs, including *e.g.* its internal strategy and deliberations, its public efforts to dissuade consumers from purchasing eggs, and its internal planning and deliberation in pursuit and in furtherance of those efforts. As an animal protection organization that has campaigned for the reduction of egg consumption and switch to plant-based alternatives, it is little surprise that such sweeping requests would implicate a huge amount of PETA's files, including private and privileged files related to PETA's protected advocacy efforts and requests for legal advice.

Over one and a half attorney ***years*** would be required to review only one of the likely multiple search terms required to identify potentially responsive documents. Smith Decl. ¶ 17. This would require a diversion of PETA's regular counsel from their existing work, including providing PETA legal advice and legal representation on matters in pursuit of PETA's mission, to instead reviewing documents and facilitating a production in compliance with the Subpoena. *Id.* ¶¶ 19–20. Given the volume of work required, this diversion of resources would be a substantial

15

loss to PETA, which would receive reduced legal services and may need to delay or reduce projects or advocacy efforts as a result. *Id.* ¶ 20; Nachminovitch ¶ 14. Alternatively, if PETA were to instead retain an outside law firm to respond to the subpoena, given the massive amount of files at issue, PETA would face an expenditure of over $450,000. Smith Decl. ¶ 21; Nachminovitch Decl. ¶¶ 9, 16. Either resource expenditure is astronomical for a nonparty, and far out of proportion to the needs of the case, or any anticipated relevant materials.[9]

### 3.   THE SUBPOENA SEEKS IRRELEVANT MATERIALS

The Lawsuit is a false advertising case based on Vital Farms' treatment of its egg-laying hens and its representations of those conditions as "humane." *See supra* §§ II.2 & II.3. But the Subpoena is not directed at information relevant to these claims. It is directed at information revealing the inner workings of PETA's vegan advocacy efforts, strategies, and tactics.

As explained *supra* § IV.A.1, the Subpoena seeks all documents related to PETA's vegan advocacy efforts regarding eggs. Ex. A Request 1. This includes internal documents discussing egg-related practices and internal comments on third-party studies. Requests 2–7, 9–11. However, PETA's advocacy strategies are not at issue in, and are not relevant to any issue in, the Lawsuit. PETA's internal strategy documents about advocating a vegan lifestyle and abstention from egg

---

[9] While PETA urges this court to quash the Subpoena in its entirety, if the Court requires compliance with the Subpoena or any portion thereof, PETA requests this Court also order Vital Farms to pay for the cost of compliance, particularly in light of the significant expenses likely to be incurred. Rule 45(d)(2)(B)(ii) requires that, where a court orders compliance with a subpoena over objections, "the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance." Here, PETA faces the likelihood of "significant expense" if required to comply with the Subpoena. *See Legal Voice v. Stormans Inc.*, 738 F.3d 1178, 1184 (9th Cir. 2013) (nonparty's expense of $20,000 was significant and required compensation under Rule 45). The costs required to review, withhold and log for privilege, and produce materials pursuant to the Subpoena are exactly the expenses eligible for compensation under this Rule. *In re Am. Nurses Ass'n*, 643 F. App'x 310, 314 (4th Cir. 2016) ("attorney's fees incurred by the non-party that are necessary to a discovery proceeding under Rule 45 are expenses that may be shifted to the discovery-seeking party").

consumption provide no information about, *e.g.*, whether Vital Farms engages in the accused cruel practices, advertises its products as "humane," or deceived plaintiffs.

Vital Farms claims that its request for all documents reflecting PETA's vegan advocacy strategies is relevant because it "pertain[s] to the information available to or known by the reasonable consumer whose preferences, buying habits, and knowledge are directly at issue." Letter at 3.  As noted *supra* § IV.A.1, this does not explain why Vital Farms requires PETA's *internal deliberations, tactics, and strategies*, which are not "available to or known by" the public and which no "reasonable consumer" is privy to.  The knowledge of the "reasonable consumer" is by definition public knowledge, and Vital Farms can readily obtain that information without resort to a subpoena from publicly available information.  Indeed, to the extent that Vital Farms specifically wants to understand what information PETA has made available to the "reasonable consumer" to "dissuade consumers from buying or eating eggs," that information is all readily available on PETA's website, which includes numerous web pages describing and visually depicting the egg industry and the treatment of egg-laying hens.[10]

Vital Farms also claims that this information is relevant to "understanding [the] industry generally, and for comparing Vital Farm's practices to other market participants' practices." Letter at 3.  This does not explain why PETA's internal files are relevant, or why Vital Farms cannot obtain information about "the industry generally" elsewhere.  *See Jordan*, 921 F.3d at 189 (courts must consider "what information is available to the requesting party from other sources").  PETA has published numerous statements, articles, and even exposés, about the treatment of animals

---

[10]  *See, e.g.*, *The Egg Industry*, PETA.org, https://www.peta.org/issues/animals-used-for-food/factory-farming/chickens/egg-industry; *21 Things the Egg Industry Doesn't Want You to See*, PETA.org, https://www.peta.org/features/egg-industry-cruelty; *Exposés and Undercover Investigations*, PETA.org, https://www.peta.org/investigations/.

raised for food, including raised for egg production.  *See infra* n.10.  Numerous other entities have also published information about the conditions under which eggs are produced.[11]  This public information is readily available without a subpoena.

Vital Farms also seeks "All DOCUMENTS and COMMUNICATIONS concerning VITAL FARMS."  Request 8.  But PETA's—a nonparty's—internal documents mentioning "Vital Farms" have no bearing on any fact at issue in the Lawsuit.  This request would sweep in any document that so much as a reference to Vital Farms, including for instance any documents discussing Vital Farms' *own commissioned study* about egg labels.  Documents simply mentioning Vital Farms do not, by dint of including the term, have any bearing on the issues in the Lawsuit, such as whether Vital Farms engages in the alleged cruel practices toward egg-laying hens and chicks, and whether consumers were deceived by its advertisement of its products as "humane."

Vital Farms actually takes the baffling position that PETA's public statements make this demand relevant: "PETA has taken a position and a public stance against Vital Farms, putting PETA and any relevant information it possesses squarely in the middle of this litigation."  Letter at 3.  An entity "tak[ing] a position and public stance" regarding a litigant to a lawsuit does not make everything in that party's possession relevant and discoverable.  Under this logic, if the *Washington Post* decided to run a story about a lawsuit, or an advocacy group posted an approving article on its website reporting on a lawsuit, it would be "putting [itself] . . . squarely in the middle of [the] litigation," rendering it liable to retaliatory subpoena.  But "having an opinion about a lawsuit" does not render a person or entity presumptively in possession of relevant information;

---

[11] *See, e.g., Cruelty-Free Eggs?*, HumaneFacts.org, https://humanefacts.org/eggs/; *9 Reasons Eggs Are the Cruelest Food on the Planet*, Mercy for Animals, https://mercyforanimals.org/blog/9-reasons-eggs-are-the-cruelest-food-on-the/.

nor does it render their comments or documents mentioning a litigant relevant.[12]

### B.    THE SUBPOENA SEEKS PRIVILEGED MATERIAL

A subpoena must be quashed under Rule 45(d)(3)(A)(iii) where it "requires disclosure of privileged or other protected matter, if no exception or waiver applies."  Here, the Subpoena seeks disclosure of materials protected by the First Amendment—confidential material core to PETA's exercise of its First Amendment rights—and offers no justification for that invasion.  PETA's internal files are not relevant to, let alone crucial to, the issues in the Lawsuit, and the information that Vital Farms claims to seek is readily available elsewhere.  The real aim of this Subpoena is clear: to uncover PETA's protected, private internal files from and chill its exercise of First Amendment rights (which PETA wields in direct opposition to Vital Farms' business model).

The Subpoena specifically demands production of all of PETA's confidential advocacy tactics and strategies regarding its advocacy against egg consumption.  As explained *supra* § IV.A.1, Request 1 plainly requires production of essentially all files related to PETA's vegan advocacy regarding eggs.  The request could not be more clear that it seeks PETA's confidential files regarding its "tactics or strategies" to discourage egg consumption.  Other requests also implicate PETA's confidential tactic and strategy documents.  For instance, Requests 9–11 require production of all PETA documents "concerning, constituting, or reflecting" the conditions under which egg-laying hens and chicks are treated on egg-production facilities.  Ex. A.  Requests 2–7, as expanded by Vital Farms in its meet and confer correspondence, similarly require production of a huge range of documents related to the analyses of any egg-related issues.  *See supra* § II.D.

But courts universally recognize a privilege against forced disclosure of documents that

---

[12] Moreover, Vital Farms' tautological reference to "any relevant information it possesses" begs the question: Vital Farms alleges that PETA must have "relevant information" precisely because, according to Vital Farms, it has an *opinion* about the Lawsuit.  That is not enough.

infringe a civil subpoena recipient's First Amendment rights.  *See, e.g.*, *Perry*, 591 F.3d at 1160*; Pulte*, 2017 WL 1104670, at *3.  The First Amendment's guarantees include freedom of speech, assembly, and petition for the redress of grievances, since "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association."  *NAACP*, 357 U.S. at 460; *Pulte*, 2017 WL 1104670, at *3.  Civil subpoenas that "have a deterrent effect on the exercise of First Amendment rights," including freedom of association, are subject to exacting scrutiny.  *Perry*, 591 F.3d at 1160.

Courts use a two-part test to evaluate First Amendment privilege claims in the context of civil discovery.  *Id*.  First, the party asserting the privilege must make a "prima facie showing of arguable first amendment infringement," *Perry*, 591 F.3d at 1160, by showing "an objectively reasonable probability that compelled disclosure will chill associational rights," *Pulte*, 2017 WL 1104670, at *4.  Second, the court will engage in a balancing test to understand whether the benefit (demonstrated need) justifies the substantial burden.  *Perry*, 591 F.3d at 1161.

Courts have found the *prima facie* test met by subpoenas that compelled disclosure of an organization's internal strategy documents, or communications with third-parties that would reveal internal strategy.  *See, e.g.*, *Perry*, 591 F.3d at 1162–63 (disclosure of internal strategy documents would inhibit "participation and formulation of strategy" and have "a deterrent effect on the free flow of information within campaigns"); *Pulte*, 2017 WL 1104670, at *11 (disclosure of communications with third parties "could illuminate the groups' strategies to their political opponents"); *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Fed. Election Comm'n*, 333 F.3d 168, 177 (D.C. Cir. 2003) (compelled disclosure of "internal planning materials" would "frustrate" the group's internal decisionmaking).  "Compelling disclosure of internal campaign communications can chill the exercise of [First Amendment] rights." *Perry*, 591 F.3d at 1162–63.

"A chilling effect need not be established with mathematical certainty, and it need not be as compelling of an effect as in *NAACP* [*v. Alabama*]." *Pulte*, 2017 WL 1104670, at *7.

Here, PETA can make a *prima facie* showing that the Subpoena infringes on its First Amendment rights. PETA's advocacy in pursuit of its members' animal protection and vegan advocacy goals are core First Amendment protected activity. *See NAACP*, 357 U.S. at 462 ("Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs."); *New York Times Co. v. Sullivan*, 376 U.S. 254, 271 (1964).

The requests threaten PETA's associational rights by requiring the disclosure of all of PETA's internal deliberation and planning documents related to its advocacy tactics and strategies about eggs. For instance: communications discussing effective or ineffective vegan campaign strategies, communications concerning messaging strategies to best educate the public about conditions egg-laying hens face in order to encourage plant-based alternatives; and communications concerning planning of future campaigns. Nachminovitch Decl. ¶¶ 27–32. They would also implicate PETA's speech rights by sweeping in highly confidential documents pertaining to PETA's undercover investigations, which have in the past and may in the future expose the conditions of animals raised for food, including for eggs; including documents revealing and related to past or present undercover investigations into egg production operations. *Id.* ¶¶ 41–45.

Materials revealing an advocacy organization's internal strategy, tactics, and deliberations are exactly the type of materials that have been held protected under the First Amendment. For instance, in *Perry v. Schwarzenegger*, the court held that a political advocacy group which campaigned for Proposition 8 in California could not be required to disclose internal drafts of

campaign communications and "internal strategy documents" in discovery.  In *Pulte Home Corp. v. Montgomery Cnty. Maryland*, the court held that the First Amendment privilege protected from disclosure advocacy groups' third-party communications that could "illuminate the groups' strategies to their political opponents."  *Pulte*, 2017 WL 1104670, at *11.  "Implicit in the right to associate with others to advance one's shared political beliefs is the right to exchange ideas and formulate strategy and messages, and to do so in private."  *Perry*, 591 F.3d at 1162.

   Forced disclosure of these confidential communications will substantially burden PETA's First Amendment rights.  If PETA employees know or expect that PETA's internal deliberations regarding and honest assessments of proposed strategy and tactics will be laid bare in subsequent discovery—to an egg producer, no less—then it is self-evident that they will self-censor: it may be deemed safer to hold one's tongue than to openly identify weaknesses in strategy that a PETA opponent could exploit.  Nachminovitch Decl.¶¶ 28–32.  The disclosure of these materials will also directly hinder the PETA's efficacy by giving its opponents an unfair window into planned campaigns and internal assessments of strategy and messaging weaknesses.  *Id.* ¶ 33.  Courts have recognized discovery requests which have "a deterrent effect on the free flow of information within campaigns," *Perry*, 591 F.3d at 1162–63, or "could illuminate the groups' strategies to their political opponents," *Pulte*, 2017 WL 1104670, at *11, burden First Amendment rights.

   The Subpoena would also hinder PETA's associational rights by deterring membership, participation, fundraising, and advocacy efforts.  *Id.* ¶¶ 34–40.  The broad Subpoena requests are likely to sweep in any communications to and from members, to the extent they reference advocacy related to eggs or conditions of animals raised for egg production: such correspondence would "concern" or "relate to" PETA's vegan advocacy tactics, Ex. A Request 1, and may also "concern" or "reflect" various farm conditions, Ex. A Requests 9–11.  Forced disclosure of these materials

(particularly to an egg producer and PETA opponent) would discourage member engagement and membership, particularly for those members whose interest in veganism or whose affiliation with PETA is not publicly known. *Id.* ¶ 39. Similarly, some of the documents swept into the Subpoena likely include communications with persons who donate money to PETA on the condition of anonymity. *Id.* ¶ 40. These individual similarly may be discouraged by fear of public disclosure, and as a result withdraw not only membership but also donations. *Id.*

These deterrent risks are particularly strong where, as here, the Subpoena demands production to an egg producer, whose business operation (the sale of eggs) is directly challenged by PETA's advocacy efforts. Moreover, if this Subpoena is enforced, there is a substantial risk of future required disclosures to other opponents: given the attenuated nature of the Subpoena's requests to the content of the underlying lawsuit, allowing this Subpoena would give carte blanche to any meat- or animal-product producer sued for falsely advertising their animals' conditions to similarly issue a subpoena on PETA to learn their opponent's advocacy strategy under the guise of discovery. "[D]isclosure would have the practical effects of discouraging political association and inhibiting internal campaign communications that are essential to effective association and expression." *Perry*, 591 F.3d at 1163. The First Amendment harm is "self-evident." *Id.*

Since PETA has established a *prima facie* case, the Court will use a balancing test to determine whether Vital Farms' interest in disclosure is sufficient to justify this intrusion. Vital Farms has advanced no interest, let alone a compelling interest, in disclosure to outweigh the impact on PETA's rights. Each balancing test factor weighs heavily against disclosure.

Courts have identified several relevant factors. Crucially, the propounding party must show that "the information sought is *highly relevant* to the claims or defenses in the litigation." *Perry*, 591 F.3d at 1161 (emphasis added); *see also Pulte*, 2017 WL 1104670, at *8 (assessing "the

23

relevance of the information sought and whether it is of central or crucial importance to the case," and "the necessity of the information sought," including whether it is sought "out of an actual need or because of improper ulterior motives"). As explained *supra*, the materials sought in the Subpoena are not relevant to the Lawsuit at all, let alone "highly relevant," or of "central or crucial importance" to the case. The case concerns Vital Farms' husbandry practices and representations, not PETA's vegan advocacy strategies and internal assessments.

Vital Farms argues that a subset of the documents implicated by the Subpoena could potentially reveal information available to a "reasonable consumer" and about "industry practices" generally. That vague generalization is not enough to establish relevance under this heightened standard. PETA's internal assessments—even of these alleged topics—would be neither highly relevant, nor of crucial importance, to Vital Farms establishing its defenses in the Lawsuit.

The proponent must also show that the information is "otherwise unavailable." *Perry*, 591 F.3d at 1161; *Pulte,* 2017 WL 1104670, at *4 (proponent must show "the information is not available from an alternative source"). Vital Farms can make no such showing. The information it claims to seek is readily available from alternate sources. To identify the "the information available to or known by the reasonable consumer," Letter at 3, Vital Farms can look at publicly available information, including but certainly not limited to the information PETA makes publicly available on its website. To "understand[ ] [the] industry generally," and "compar[e] Vital Farm's practices to other market participants' practices," *id.* at 2, Vital Farms again has access to a multitude of public sources, including PETA's publicly available website and publications. Vital Farms can also directly subpoena the industry participants themselves, who should be in the best

24

position to describe their own practices to Vital Farms.[13]

Finally, the proponent must show that its requests are "carefully tailored to avoid unnecessary interference with protected activities." *Perry*, 591 F.3d at 1161.  As noted *supra* § VI.A.1, the Subpoena is not tailored to information relevant to the Lawsuit, but instead appears purposefully drafted to sweep in all of PETA's confidential strategy, deliberation, and planning files—as well as any other PETA file that happens to relate to its vegan advocacy regarding eggs.

The balance on the Vital Farms ledger is nil.  Vital Farms can demonstrate no interest, let alone a compelling interest, in the demanded disclosure of PETA's files.  No balancing test factor weighs in favor of disclosure.  Meanwhile, as explained *supra*, the First Amendment impact of requiring PETA to disclose this wide-ranging set of confidential materials is substantial.  Therefore, PETA's First Amendment privilege weighs against disclosure.

Finally, Requests 1 and 9–11 of the Subpoena would also require disclosure of PETA's confidential newsgathering efforts: highly confidential documents related to its undercover investigations.  It is no secret that PETA has engaged in and publicized undercover investigations of agricultural operations.  *See Exposés and Undercover Investigations,* PETA.org, https://www.peta.org/investigations/.  PETA publishes its investigations to help educate the public about conditions in which animals are raised or used, in furtherance of its advocacy mission.  Nachminovitch Decl. ¶ 42.  Its investigations reveal newsworthy information that is regularly reported on by other news organizations.  *See id.*  Since undercover investigations are among the methods that PETA uses to educate the public about abusive farm animal practices in furtherance

---

[13] *See also Jordan*, 921 F.3d at 189 ("the requesting party should be able to explain why it cannot obtain the same information, or comparable information that would also satisfy its needs, from one of the parties to the litigation—or . . . from other third parties that would be more logical targets for the subpoena").

of its mission to end animal abuse and promote a vegan lifestyle, documents pertaining to such investigations on egg-producing facilities would be related to its strategy and tactics, as well as related to various conditions of animals raised for egg production. *See* Ex. A Requests 1, 9–11.

Vital Farms is not only aware that its Subpoena requires disclosure of confidential materials related to PETA's undercover investigations—it actively seeks those materials. *See* Letter n.2 ("The 'Investigations' section of PETA's website (https://www.peta.org/investigations/) identifies numerous PETA investigations into the treatment of chickens, including specific issues presented in this case . . ."); *id.* at 8 ("To the extent that PETA has investigated Vital Farms' egg practices and pricing . . .").

But PETA's confidential files related to its undercover investigations are protected from disclosure by the First Amendment. *See LaRouche v. Nat'l Broad. Co.*, 780 F.2d 1134, 1139 (4th Cir. 1986). Newsgathering files cannot be the subject of compelled disclosure in civil discovery unless the party issuing the subpoena demonstrates that the information is (1) relevant, (2) cannot be obtained by alternative means, and that (3) the party has a compelling interest in the information. *Id*. PETA's confidential files relating to its undercover investigations, including *e.g.* the methods by which those are conducted, are irrelevant to the issues in the Lawsuit. At most, Vital Farms argues that information about farm conditions is generally relevant to assessing what the "reasonable consumer" knows, and learning about competitors' or the industry's typical practices. But this information is readily obtainable by alternate means. Finally, because the confidential PETA files are not relevant to the issues in the Lawsuit, Vital Farms has no compelling interest in their production. Failing to meet their burden, Vital Farms' Subpoena should be quashed. *See, e.g.*, *LaRouche*, 780 F.2d at 1139 (affirming denial of motion to compel where issuing party had not shown information unavailable through alternate means); *Chestnut v. Kincaid*, No. CV LKG-

20-2342, 2022 WL 350117, at *4 (D. Md. Feb. 4, 2022) (granting motion to quash where issuing party had not shown information unavailable through alternate means); *Vengosh v. Jacobs Eng'g Grp., Inc.*, No. 5:20-MC-20, 2020 WL 5709256, at *6 (E.D.N.C. Sept. 24, 2020) (same).

### C.    THE SUBPOENA WAS INTERPOSED FOR AN IMPROPER PURPOSE

Discovery must not be "interposed for any improper purpose, such as to harass . . . or needlessly increase the cost of litigation," or to "annoy[ ], embarrass[ ], or oppress[ ]" the recipient. Fed. R. Civ. P. 26(g)(1)(B)(ii) & id. 26(c)(1).   Here, the context of the Subpoena and its plain language make clear that it was issued for an improper purpose: to peer "behind the curtain" at its adversary PETA's most confidential strategy files, and to retaliate against PETA for its perceived relation to the lawyers representing plaintiffs in the underlying Lawsuit.  *See* Ex. A Request 1; Letter at 8. ("PETA and the Foundation are inherently intertwined") & 4 ("PETA's affiliation with the Foundation was *not* the <u>*sole*</u> reason for its service of the Subpoenas") (emphasis on "sole" added).  The history makes Vital Farms' aim abundantly clear.  Vital Farms has railed against PETA throughout the Lawsuit, *supra* § II.2, despite the fact that PETA is not a party to the suit. Vital Farms has railed against PETA Foundation throughout the Lawsuit, erroneously accusing its lawyers of using their consumer plaintiffs as "unsuspecting proxies" and alleging a nefarious and unfounded conspiracy with PETA.  *Usler*, Dkt. 56-1 at 4-5.  It has subpoenaed both entities in a targeted campaign.  And the plain text of its Subpoena confirms this improper purpose.  Its requests are plainly overbroad and burdensome, untethered to the issues in the Lawsuit and untailored to the discovery of relevant information.  Common sense leads to only one reasonable conclusion: Vital Farms issued this Subpoena to seek a new means to punish a perceived rival.

Even Vital Farms' own claimed (and pretextual) bases for its Subpoena reflect improper purposes.  One claimed reason for Vital Farms' issuance of the Subpoena is PETA's *public statements* about the Lawsuit.  Letter at 8 ("PETA inserted itself into the public discussion about

this litigation by posting about it on its own website."). It is hard to imagine a clearer example of retaliation for the exercise of free speech. Another claimed reason is PETA's status as a "market competitor" who "seeks to shape consumer demand for eggs." *Id*. at 3, 9. But even if that were true, it would be no justification for a subpoena: a litigant does not have an automatic right to conduct burdensome discovery through competitors' files, or to punish a perceived adversary for threatening its profits. *See, e.g., Micro Motion, Inc. v. Kane Steel Co.*, 894 F.2d 1318, 1324–25 (Fed. Cir. 1990) (plaintiff was not entitled to discovery of competitors' businesses "simply because it may seek to prove lost profit damages. If this position were correct, a patentee could, in virtually every infringement suit, immediately obtain discovery from all possible competitors by merely filing a complaint asking for damages against one."); *In re eBay Seller Antitrust Litig*., No. C09-735RAJ, 2009 WL 5205961, at *1-*4 (W.D. Wash. Dec. 23, 2009) (granting motion to quash and observing, that while the nonparty may "ha[ve] information that would be of value to the parties in the antitrust litigation," nothing "compels a competitor who wishes to stay outside the fray of antitrust litigation to let the litigants rummage through its files").

Vital Farms' actions speak loudly, but the plain text of its Subpoena speaks loudest of all. Both make clear that this discovery was propounded on PETA for improper purposes, designed to punish and quell its advocacy in the marketplace of ideas; and also its alleged (though entirely unsubstantiated) role in the Lawsuit through affiliation with plaintiff's counsel.

### D.   VITAL FARMS' ABUSIVE SUBPOENA SHOULD BE SANCTIONED

"A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply." Fed. R. Civ. P. 45(d)(1).

In light of the facially invalid and improper Subpoena, which as explained *supra* was specifically drafted to seek irrelevant material that would require an extreme and disproportionate burden to comply with, Vital Farms failed to comply with its basic duty "to avoid imposing undue burden or expense on" nonparty PETA, even after PETA's objections and meet and confer communications plainly laid out the impropriety of the Subpoena.  And Vital Farms exacerbated its violation by refusing to withdraw or narrow the subpoena in any meaningful way after the flaws and costs of compliance were brought to its attention.

Attorney fees incurred in opposing this improper Subpoena are an appropriate sanction. *See Med. Components, Inc. v. Classic Med., Inc.*, 210 F.R.D. 175, 179 (M.D.N.C. 2002) (awarding attorney fees where party issued overbroad nonparty subpoena, "breached its duty" under Rule 45 "and unreasonably imposed a substantial and unnecessary burden on [the nonparty] and this Court").

## V.    CONCLUSION

For the above-stated reasons, this Court should grant PETA's Motion to Quash.


Respectfully submitted,

Dated: December 30, 2022               */s/ D. McNair Nichols*
                                       D. McNair Nichols (VA Bar No. 92431)
                                       K&L GATES LLP
                                       430 Davis Drive, Suite 400
                                       Morrisville, NC 27560
                                       P: (919) 466-1117
                                       F: (919) 831-7040
                                       McNair.NicholsJr@klgates.com

                                       Edward P. Sangster (CA Bar No. 121041)[14]
                                       K&L GATES LLP
                                       Four Embarcadero Center
                                       Suite 1200

---

[14] *Pro Hac Vice Motion forthcoming*.

San Francisco, CA 94111
Telephone:  (415) 882-8200
Facsimile:  (415) 882-8220
Edward.Sangster@klgates.com

Melissa R. Alpert (Pa. I.D. 330638)[15]
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
P: (412) 355-3779
F: (412) 355-6501
Melissa.Alpert@klgates.com

*Counsel   for   People for the Ethical Treatment of Animals, Inc.*

---

[15] *Pro Hac Vice Motion forthcoming.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 30, 2022, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  A copy, including supporting declarations, was served by email to the following:

Abby Meyer
SHEPPARD MULLIN
650 Town Center Drive
Tenth Floor
Costa Mesa, CA 92626
P: (714) 513-5100
F: (714) 513-5130
ameyer@sheppardmullin.com

Alyssa Sones
SHEPPARD MULLIN
1901 Avenue of the Stars
Suite 1600
Los Angeles, CA 90067
P: (424) 288-5305
F: (310) 228-3980
asones@sheppardmullin.com

*Counsel for Vital Farms, Inc.*

/s/ D. McNair Nichols
D. McNair Nichols (VA Bar No. 92431)
K&L GATES LLP
430 Davis Drive, Suite 400
Morrisville, NC 27560
P: (919) 466-1117
F: (919) 831-7040
McNair.NicholsJr@klgates.com

*Counsel for People for the Ethical Treatment of Animals, Inc.*