# Exhibit G

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| NICHOLAS A. USLER, JON EVANS, ANDREW ANDRADA, HANNAH VOSSEN, NOAH TANZ, KENNY KIERMAN, CHARLES SANKOWICH, BURCU KARACA, and KARA GOZDE, on behalf of themselves and a class of similarly situated individuals, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| | §<br>§ | CIVIL ACTION NO. 1:21-CV-00447-RP |
| *Plaintiffs*, | §<br>§ | |
| v. | §<br>§ | |
| VITAL FARMS, INC., MATTHEW O'HAYER, RUSSELL DIEZ-CANSECO, and SCOTT MARCUS, | §<br>§<br>§<br>§ | |
| *Defendants*. | §<br>§ | |

**PLAINTIFFS' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS FILED BY
<u>VITAL FARMS, INC. AND THE INDIVIDUAL DEFENDANTS</u>**

## <u>TABLE OF CONTENTS</u>

I.     PRELIMINARY STATEMENT ............................................................................... 1

II.    INTRODUCTION ................................................................................................. 3

III.   FACTUAL BACKGROUND ................................................................................ 7

IV.   STANDARD OF REVIEW ................................................................................ 11

V.    ARGUMENT ..................................................................................................... 11

       A.    Plaintiffs Adequately Alleged Material, Precise Falsehoods in Vital Farms' Product Packaging and Marketing. ....................................................... 11

       B.    Defendants' Contentions that Their Multiple Misrepresentations Are "Vague, Imprecise, Aspirational, Unspecific, and General," and Therefore Inactionable, are Baseless and Inconsistent with Precedent.......................................................... 12

       C.    Vital Farms' Purchased Certification is Not Relevant to Plaintiffs' Claims. ....... 16

       D.    The Mosaic of Words and Images on and in Each Carton of Vital Farms Eggs Conveys a Clear Misleading Message About Purported Humane Practices and Level of Outdoor Access. ................................................................... 18

       E.    Minimal, Limited Disclosures Regarding Certain of Defendants' Misrepresentations Offer No Defense to Plaintiffs' Claims. ............................... 24

       F.    Plaintiffs' Allegations Establish Their Standing to Pursue Injunctive Relief....... 26

       G.    Plaintiffs' Fraud By Omission Claim is Sufficiently Pleaded. ............................ 29

       H.    Rule 9(b) Has Limited Application Here and Is Easily Satisfied. ....................... 30

            i.     Most of Plaintiffs' Claims Are Not Subject to Rule 9(b) ........................ 30

            ii.    The Complaint's Allegations Satisfy Rule 9(b).......................................... 33

       I.     The Individual Defendants Can Be Held Directly Liable for the Misrepresentations Alleged in Plaintiffs' Complaint. ......................................... 37

            i.     New York Law.......................................................................................... 39

            ii.    Florida Law .............................................................................................. 40

            iii.   Texas Law ................................................................................................ 40

            iv.   Michigan Law ........................................................................................... 41

            v.     California Law .......................................................................................... 42

       J.     The Court Should Reject Defendants' Request to Rewrite the Law of Limitations Such That Inquiry Notice Permits Causes of Action to be Extinguished Before They Even Accrue............................................................................................... 42

VI.   CONCLUSION.................................................................................................. 45

# I.   **PRELIMINARY STATEMENT**

Plaintiffs Nicholas Usler, Jon Evans, Andrew Andrada, Hannah Vossen, Noah Tanz, Kenny Kierman, Charles Sankowich, Burcu Karaca, and Kara Gozde, individually, and on behalf of a proposed Class and/or Subclasses (the "Class" and "Plaintiffs"), file this Consolidated Response to the Motions to Dismiss filed by Defendant Vital Farms ("MTD I," Dkt. 17) and Defendants O'Hayer, Diez-Canseco, and Marcus ("MTD II, Dkt. 18).

Defendant Vital Farms, Inc.'s ("Vital Farms") **entire business model** is premised upon convincing consumers that it is an ethical and humane egg producer so that it can sell them eggs at a super-premium price. But, as alleged, Vital Farms' practices are neither ethical nor humane, and its representations, made to Plaintiffs and the Class, were materially misleading.

Consumers from across the country, including Plaintiffs, purchased eggs marketed and sold by Defendants Vital Farms and its executives Mathew O'Hayer, Russell Diez-Canseco, and Scott Marcus (the "Individual Defendants," and together with Vital Farms, "Defendants") at super premium prices. Plaintiffs did so because they reasonably believed—based on the combination of text and photographs accompanying every carton of Vital Farms eggs and Defendants' consistent marketing and other public statements—that Defendants employed farming practices that provided chickens freedom from undue pain and distress.

Each carton of Vital Farms eggs comes with guarantees that Vital Farms provides "humane treatment of farm animals" resulting in "ethically produced food" from hens who go outside "[e]very day."[1] These are not empty or vague or indefinite slogans. Courts evaluating terms, such as "humane" and "ethical" in the context of animal products, have consistently found that they

---

[1] Complaint (Dkt. 1, "Compl.") at ¶¶ 8, 4, 45.

have specific meanings and lend themselves to reasonable consumer understanding of animal husbandry practices not causing unnecessary pain, suffering, and death.

Moreover, cartons of Vital Farms eggs include additional context, such as photographs of Vital Farms chickens frolicking outdoors.[2] This product packaging creates a mosaic of words and images that is even more precise and definite than similar egg cartons evaluated by the Southern District of New York last year, in a decision finding that "images of hens frolicking in elysian pastures" provide enough specificity to allow reasonable consumers to conclude chickens have "space to move around both indoors and outdoors" and that "hens have significant access to the outdoors." Defendants repeat these words and images in social media posts and in other extensive marketing viewed by Plaintiffs.[3]

Each of the Individual Defendants oversaw, participated in and/or made the misrepresentations at issue—and are individually liable therefore—including those made in Vital Farms' public filings with the SEC, including its S-1 Registration statement filed July 9, 2020, and each subsequent amendment thereto. As signers of those registration statements, Diaz-Conseco and O'Hayer are liable for misstatements contained therein.

Defendants' complained-of representations are literally false and misleading because Vital Farms does not provide chickens freedom from unnecessary pain, suffering, or death. As Plaintiffs allege, Defendants, rather than adhering to humane or ethical stocking practices that might allow for realistic outdoor access for all hens, adhere to the far less favorable standards —cramming hens indoors with only 1.2 to 1.5 square feet of space each. At this density, as Plaintiffs allege, many hens will never venture outdoors.[4] Defendants also engage in the otherwise-unnecessary practice

---

[2] *Id.* at ¶ 45 & Exhibits 7 and 8.

[3] *Id.* & *id.* at ¶¶ 15-23.

[4] *Id.* at ¶ 46.

of cutting hens' highly sensitive beaks, causing more undue acute and chronic pain and disability.[5]

Likewise, instead of engaging in humane or ethical practices with respect to male chicks, who are

not used for meat or egg production, Defendants condone and financially support the unnecessary

killing of new-born male chicks in devices resembling meat grinders.[6] Vital Farms also forces

laying hens into an unnatural rate of egg laying.[7] As a result, laying hens at Vital Farms' facilities

become painfully "spent" after only 20 months—at which point, rather than retiring them to other

facilities or sanctuaries, Defendants, as alleged, sell them to be killed at commercial

slaughterhouses in a process which Defendant O'Hayer admits is inhumane.[8]

## II.  INTRODUCTION

Defendants' motions lead with an unfounded diatribe against People for the Ethical

Treatment of Animals, Inc. ("PETA"), an entity that is not involved in this lawsuit.[9] This

vociferous attack on a non-party appears to be an attempt to deflect attention from the complete

lack of merit of Defendants' motions.

---

[5] *Id.* at ¶ 11(a), 43(b) & Exhibit 1.

[6] *Id.* at ¶ 11(d).

[7] *Id.* at ¶ 11(c).

[8] *Id.* & *id.* at ¶ 43(a) & Exhibit 4.

[9] Plaintiffs are individuals represented by Richard L. Stone with Blackner Stone & Associates, Jesse Z. Weiss with Edmundson Shelton Weiss PLLC, and Asher Smith with the Foundation to Support Animal Protection (d/b/a "PETA Foundation"). PETA is a distinct corporate entity from the PETA Foundation and the former is not involved in this lawsuit. Defendants offer no legitimate argument that a press release by non-party PETA, cited at MTD I at 1 n.1, or PETA's historical efforts to improve the lives of laying hens, *id.* at 2 n.2, relate in any way to facts alleged in Plaintiffs' Complaint. Plaintiffs are entitled to all reasonable inferences that can be drawn from their factual allegations, even though they chose to employ, as co-counsel, counsel also employed by the PETA Foundation with experience in litigation relating to laying hen welfare. Because Defendants' tirade against PETA is entirely extrinsic to the pleadings, this Court should disregard it. *See Zuniga v. Yeary*, 2020 WL 1329908, at *2-3 (W.D. Tex. Mar. 20, 2020) (adopting recommendation to grant motion to strike defendant's submission of documents that were not referred to in the complaint).

Defendants' primary argument is that this Court should rule as a matter of law that their gross misrepresentations with respect to their purported ethical, humane, and transparent farming practices are **true** because (according to Defendants) they meet the standards prescribed by a third-party entity, Humane Farm Animal Care ("HFAC"), which they financially support. First, Defendants' arguments relying upon HFAC's standards for validation are legally insufficient and inappropriate and inconsistent with practice on a motion to dismiss. Second, HFAC does not establish legal standards as to what a reasonable consumer would believe is ethical, humane, and transparent conduct with respect to the treatment of chickens. Defendants do not represent merely that they comply with HFAC's standards. Instead, they represent boldly, consistently, and prominently that their egg production practices are ethical, humane, and transparent, and that they are stewards of animals.[10]

Moreover, as alleged, Defendants themselves have publicly acknowledged that certain of their ongoing practices are inhumane.[11] Plaintiffs further allege that Defendants have also acknowledged that their disclosures with respect to the humane and ethical treatment of chickens were false by materially amending those disclosures immediately after receiving a draft of Plaintiffs' proposed Complaint.[12] In any event, Defendants cannot redefine the standards of what a reasonable consumer would believe based upon their ubiquitous marketing by referring to HFAC standards. *See* Sections V(A) & (C) below.

Defendants also offer six equally baseless scatter-shot arguments in support of their motions to dismiss the claims against Vital Farms and the Individual Defendants. First, they argue

---

[10] Stating a deceptive trade practice claim requires alleging a misrepresentation that a reasonable, objective consumer would find misleading. *See infra* at Section V(C). Vital Farms' purported compliance with undefined HFAC standards does not change this burden.

[11] Compl. at ¶ 43(a) & Exhibit 4.

[12] *Id.* at ¶¶ 50-55.

that their misrepresentations concerning their ethical and humane treatment of farm animals—*i.e.*, the entire basis for their business model—are vague, aspirational, and not precise, and therefore cannot be treated as misrepresentations for purposes of the state law deceptive trade practices claims pled or Texas common law fraud. But as shown herein, federal courts have consistently interpreted such language as specific statements of fact which are actionable as material misrepresentations under such statutes and common law. *See* Section V(B) below.

Second, Defendants ask this Court to find as a matter of law—based upon inapplicable HFAC standards—that their killing of young "spent" hens through practices which Defendant O'Hayer has admitted are inhumane, as well as their practices involving the cutting of sensitive chicken beak organs, are in fact humane and ethical. This is demonstrably incorrect, but it is also a factual issue which cannot be resolved on a motion to dismiss. *See* Section V(C) below.

Third, Defendants argue that Plaintiffs' Texas common law fraud by omission claim is legally untenable. Defendants' reliance on a single district court case, which narrowly interpreted fraud by omission in a fashion inconsistent with established Texas state law, is misplaced. *See* Section V(G) below.

Fourth, Defendants argue that statutes of limitations bar certain of Plaintiffs' claims. This argument is premised upon Defendants' apparent misunderstanding of statutes of limitations and would, if given credence, fundamentally rewrite the law of statutes of limitations. Defendants contend that limitations can start to run long before the actual cause of action arose and therefore limitations could actually expire before a plaintiff purchased the subject eggs or other products. This argument would eliminate causes of action before they even arose. Moreover, even in states which adopt an inquiry notice standard and have a statute of limitations which runs from inquiry notice, the "notice" must be based upon a reasonable person's understanding of available

information in the marketplace. Defendants have made no showing of inquiry notice and cannot do so on a motion to dismiss in any event.[13] *See* Section V(J) below.

Fifth, Defendants argue that certain of Plaintiffs' claims fail under Rule 9(b). Defendants argue, without citation, that all of the state law claims are subject to Rule 9(b)'s pleading standards. While the Texas fraud claim and fraud by omission claim are subject to Rule 9(b), the New York, Florida, California, and Michigan Deceptive Trade Practices claims, and all warranty claims, are not. Moreover, to the extent that a small number of the claims are subject to Rule 9(b), Defendants have clearly been apprised of the nature of Plaintiffs' claims. The Complaint pleads an ongoing scheme whereby Defendants through various sources, including SEC financial filings, the internet, and other social media platforms as well as their own website and print advertising promulgate these consistent misrepresentations on a regular and continued basis. In such cases, courts do not require pleading of each and every instance of Defendants' misrepresentations, but instead deem sufficient merely a statement of such misrepresentations with exemplars. Plaintiffs have complied with this standard.[14] *See* Section V(H) below.

Sixth, Defendants argue that Plaintiffs cannot obtain injunctive relief, but as shown herein, Plaintiffs have specifically pled that they would buy the subject eggs if the representations with respect to their inherent qualities were correct. Thus, they have standing to seek injunctive relief under well-established law. *See* Section V(F) below.

---

[13] Indeed, Defendant O'Hayer acknowledged publicly that he was not even aware of maceration (*i.e.*, the grinding of male chicks immediately upon their birth as a means of euthanizing them), until he was told about it by PETA in or about 2016. *See infra*, n.65.

[14] Defendants' argument is also belied by the fact that Plaintiffs and Defendants engaged in exhaustive correspondence with respect to this action prior to the official filing of the Complaint as is contemplated under the Texas Deceptive Trade Practices Act ("DTPA"). The parties corresponded no less than 17 times, discussing and describing the Complaint, the claims, the nature of the claims, the damages at issue, and potential settlement. Clearly, Defendants are well aware of the nature and scope of the claims pled.

Finally, the Individual Defendants offer a series of arguments as to why they do not have individual liability. All of these arguments rely either upon a misstatement of fact or of law. Defendants O'Hayer, Diez-Canseco, and Marcus are alleged to have made and/or overseen, prepared, and promulgated the complained-of misrepresentations, and, as such, can be held directly liable for those misrepresentations. *See* Section V(I) below.

## III.    <u>FACTUAL BACKGROUND</u>

Defendants' business model is only possible because they charge super-premium prices to a niche consumer market—buyers who will pay **many times** the typical price of a carton of eggs for eggs they believe to be the product of humane and ethical animal husbandry practices.[15]

Defendants repeated their misrepresentations regarding their ethical and humane farming practices in numerous places, including social media and internet marketing, egg cartons, and even in Vital Farms' S-1 Registration Statement, publicly filed with the SEC on July 9, 2020.[16] Vital Farms' Registration Statement, and amendments thereto, were signed by Defendants Diaz-Conseco and O'Hayer, who are therefore individually liable for any misstatements contained in the Registration statement. The Registration Statement even includes a letter from Defendant O'Hayer that repeats these misrepresentations.[17] Further, Plaintiffs have also alleged that each of the Individual Defendants controlled, directed, participated in, and/or made each of the complained-of misstatements.[18]

---

[15] Compl. at ¶ 34.

[16] *Id.* at ¶¶ 4, 5, 9, 11, 38-40, 42, 45.

[17] Vital Farms Form S-1 at 93 (Letter From Our Founder & Executive Chairman). https://www.sec.gov/Archives/edgar/data/0001579733/000119312520190455/d841617ds1.htm#rom841617_11.

[18] *See, e.g.,* Compl. at ¶¶ 25-27.

In addition to their public disclosures filed with the SEC,[19] Defendants brand each carton of Vital Farms eggs with statements and images designed to appeal to this consumer niche.[20] Each carton, for example, comes with an insert (the "Vital Times") explaining: "OUR MISSION is to bring ethically produced food to the table by coordinating a collection of family farms to operate with a well-defined set of agricultural practices that accentuates the humane treatment of farm animals as the central tenet."[21] To provide further context, this text is accompanied by photos of (named) hens outdoors as well as additional language suggesting—and often explicitly stating—that hens producing Vital Farms eggs go outside "every day."[22]

This marketing is promulgated in other mediums. As Vital Farms explains in public filings, it uses "digitally integrated media campaigns, social media tools and other owned media channels" to "educate consumers on our ethical values" in order to "generate further demand for our products and ultimately expand our consumer base."[23] These include photographs and captions published to Instagram showing hens outdoors frolicking in large, verdant pastures.[24]

Plaintiffs, on behalf of putative nation-wide and state-wide classes, are nine consumers from California, Florida, Michigan, New York, and Texas who were tricked by Defendants' product packaging and easily accessed social media marketing content into believing that Vital Farms engages in animal husbandry practices that provide chickens meaningful access to the outdoors as well as freedom from inhumane practices.[25] Plaintiffs' detailed allegations include

---

[19] *Id.* at ¶¶ 40-41.

[20] *Id.* at ¶ 42.

[21] *Id.* at Exhibit 7.

[22] *Id.*

[23] *Id.* at ¶ 42.

[24] *Id.* at Exhibit 8.

[25] *Id.* at ¶¶ 15-23.

admissions by Vital Farms and its officers, evidence of the actual husbandry standards applied by Vital Farms, and media reports, and court documents establishing that:

- Vital Farms, rather than adhering to actually humane or ethical densities for chickens in barns, crams hens indoors with only 1.2 to 1.5 square feet of space each.[26] This means that many hens never access outdoor space because doing so would require fighting past other hens—who are stressed and frantic from dense confinement that prevents them from engaging in natural behaviors that are key to preventing undue physical and psychological pain, and spurs distressing behavior such as excessive vocalization, painful self-mutilation, and physical harm to themselves and other hens.[27]

- Vital Farms condones the cutting of hens' sensitive beaks, despite the fact this causes both acute and chronic pain and inhibits necessary behaviors, because doing so—rather than engaging in humane husbandry practices that prevent extreme density and stress—apparently allows it to preserve its uniquely high profit margins.[28]

- Vital Farms, despite the fact the practice has been banned in several European countries, condones, and financially supports the unnecessary, uniform killing of almost all new-born male chicks in devices resembling meat grinders.[29] Defendants attempt to deflect market scrutiny of this massacre by stating that they currently have a "close connection" to a team of scientists developing new technology to end

---

[26] *Id.* at ¶ 46(b).

[27] *Id.*

[28] *Id.*

[29] *Id.* at ¶ 43(c).

this inhumanity.[30] This is misleading and false. Vital Farms' has in fact become embroiled in a lawsuit over its past efforts on this front, such as they are, and alleged therein that it had been defrauded by these scientists, who never even possessed the capacity to develop this technology.[31]

- Vital Farms chooses outsized profits by forcing hens into the unnatural rate of egg laying of an egg per day, every day.[32] This excessive rate of egg laying depletes the hens of calcium and substantially decreases their egg production after only 13 to 24 months, while also causing undue pain via conditions stemming from hypocalcemia such as osteoporosis, bone fractures, weakness, paralysis, and sudden death.[33]

- Vital Farms, rather than committing to treating these adolescent "spent" hens humanely by feeding and caring for them for their natural lives (approximately 10 years)—or even taking the minimal effort to euthanize hens using humane methods—sells them to be densely packed into crates and shipped hundreds of miles to be killed at commercial slaughterhouses using standard industrial practices, a practice Defendant O'Hayer admits is inhumane.[34]

In late 2020, counsel for Plaintiffs sent Defendants' then-counsel in Boston notice of Plaintiffs' anticipated lawsuit pursuant to the Texas DTPA, including an earlier draft of Plaintiffs' Complaint.[35] Soon after, Vital Farms secretly revised the FAQ page buried on its website to acknowledge (for the first time) that Defendants "retire" all laying hens supplying Vital Farms

---

[30] *Id.* at ¶ 43(c)(ii).

[31] *Id.*

[32] *Id.* at ¶ 43(a).

[33] *Id.*

[34] *Id.* at ¶ 43(a) & Exhibit 4.

[35] *Id.* at ¶ 51.

eggs via commercial slaughter and use hatcheries that kill (macerate) all new-born male chicks.[36] Plaintiffs have not viewed these updated FAQs.[37] Vital Farms does not sell products directly to consumers from its website.[38]

## IV.   STANDARD OF REVIEW

On a motion to dismiss, this Court must assume that all of the facts alleged in Plaintiffs' complaint are true, construe those facts in the light most favorable to Plaintiffs, and draw all reasonable inferences in favor of Plaintiffs. *See White v. U.S. Corr., L.L.C.*, 996 F.3d 302, 306–07 (5th Cir. 2021); *Haas Outdoors, Inc. v. Dryshod Int'l, LLC*, 2019 WL 3130231, at *2 (W.D. Tex. July 15, 2019). Motions to dismiss under Rule 12(b)(6) are "viewed with disfavor and . . . rarely granted." *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011). A court's review under Rule 12(b)(6) is limited to the complaint, any documents attached to the complaint, and documents attached to the motion to dismiss that are central to the claim *and* referenced by the complaint. *See Zuniga v. Yeary*, 2020 WL 572724, at *3 (W.D. Tex. Feb. 5, 2020), *report and recommendation* adopted, 2020 WL 1329908 (W.D. Tex. Mar. 20, 2020); *Haas Outdoors*, 2019 WL 3130231, at *2.

## V.   ARGUMENT

### A.   Plaintiffs Adequately Alleged Material, Precise Falsehoods in Vital Farms' Product Packaging and Marketing.

Defendants' primary arguments under Rule 12(b)(6) mischaracterize Plaintiffs' Complaint, proceeding as if Plaintiffs allege only that Vital Farms does not satisfy the requirements of its third-party certifier. *See, e.g.*, MTD I at 10. This is not Plaintiffs' Complaint. Instead, Plaintiffs

---

[36] *Id.* at ¶¶ 52-54.
[37] *Id.* at ¶ 54-55.
[38] *Id.* at ¶ 55.

allege that Vital Farms is engaged in "humane-washing" to convince consumers, via half-truths and falsehoods, that they are more humane and ethical than all of their competitors, in order to achieve super-premium pricing.[39] As explained below, ample precedent supports a finding that Defendants' misrepresentations, taken in context, are actionable false advertising.

**B.      Defendants' Contentions that Their Multiple Misrepresentations Are "Vague, Imprecise, Aspirational, Unspecific, and General," and Therefore Inactionable, are Baseless and Inconsistent with Precedent.**

Plaintiffs' Complaint alleges in detail that Vital Farms is a voracious advertiser of its egg products in print, internet, social media, and other forms of advertising.[40] The Complaint also alleges that "Vital's ubiquitous advertising made clear that its principal financial goal was tapping into the market of American consumers who believe in and would pay super premium prices for food that is the result of humanely and ethically treated farm animals.…"[41] Vital Farms itself concedes that its entire brand and business model was designed to convince consumers that it employed humane and ethical standards in its production of eggs:

- "We have designed our brand and products to appeal to this consumer movement for ethically produced foods."

- We employ an "ethical decision-making model"

- "We believe consumers have grown to trust our brand because of our adherence to our values and a high level of transparency."[42]

Despite specifically acknowledging in the Vital Farms Registration Statement and elsewhere that Vital Farms' entire business model is premised upon convincing consumers

---

[39] *See, e.g.*, Compl. at ¶¶ 2, 38.

[40] Compl. at ¶ 15.

[41] *Id.* at ¶ 42.

[42] *Id.* at ¶¶ 17-18.

successfully that it is an ethical and humane egg producer, which treats farm animals ethically and humanely, Defendants now contend that their marketing statements, including those incorporated in the Vital Times Supplement (contained in each box of eggs), are "vague, imprecise, aspirational, unspecific and general," and therefore inactionable as "puffery."[43] Defendants' argument is undermined by their own statements as well as consistent case law.

Defendants concede that their ubiquitous advertising has been successful in convincing purchasers to pay a premium price for Vital Farms eggs in order to achieve their own ethical goals, and that this success is evidenced by Vital Farms' own detailed study showing that at least "31% of our consumers insist on purchasing our egg brands and would not purchase another in its place."[44] Moreover, as discussed below, case law has consistently held that defendants who employ a marketing strategy alleging that their business practices are humane and/or ethical are in fact making ascertainable factual statements, which can serve as the predicate for UDAP, warranty and fraud claims. Defendants failed to cite to any of these cases. Instead, they improperly rely on cases addressing only generalized imprecise comparison statements, such as "better than."[45] That is not what is at issue in this case: Here, Plaintiffs are challenging a consistent business model of misrepresentations to gain competitive market share from ethically conscious consumers and Vital Farms has conceded its success in doing so.

Courts have found, for example, that the word "humane" and/or "the humane choice" has a specific factual meaning and "reference[s] treatment that does not cause undue pain to an animal." *Animal League Defense Fund v. HVFG LLC*, 939 F.Supp.2d 992, 1002 (N.D. Cal. 2013) (finding based upon the terms used in various statutes and regulations, that a clam that a product

---

[43] MTD I at 9.

[44] Compl. at ¶ 15

[45] MTD I at 9.

is "the humane choice" constitutes a statement that could either be proved false and is 'reasonably interpreted as a statement of objective fact.'"). Similarly, in *Hemy v. Perdue Farms, Inc.*, 2013 WL 1338199, at *7-10 (D.N.J. Mar. 31, 2013), the court addressed nearly identical "end of life" practices as are challenged in this case, finding that deceptive trade practices claims alleging that defendants were not humanely raising chickens as advertised were actionable misrepresentations. In *Perdue*, plaintiff alleged that defendants' statements that the chickens were humanely raised were false because a reasonable consumer would not believe that humanely raised chickens would be shackled upside down, electronically shocked, or bled to death, while fully conscious and in intense prolonged pain. *Id.* at 7. Like Defendants here, Perdue Farms argued that its challenged statements were not objective statements of fact and that "humanely raised" did not have a specific meaning. This argument was rejected by the court finding that a reasonable consumer would expect that humanely raised chickens would not be subject to such horrific end of life practices. *Id.*

Defendants' arguments that their representations with respect to their humane and ethical practices and stewardship of animals are not actionable misrepresentations is also belied by statements made by Defendant O'Hayer and Vital Farms itself. Defendant O'Hayer himself has described the Vital Farms end-of-life practices outlined in the Complaint as "not very humane".[46] Accordingly, Vital Farms' primary spokesman has acknowledged that Vital Farms' humane/ethical representations are false. Plaintiffs also allege that Defendants buried still-misleading fine print (via a FAQ link on their website) about the killing of newborn male chicks and the commercial extermination of 'spent' hens shortly after receiving a draft of Plaintiffs' Complaint indicates that their prior representations were misleading.[47]

---

[46] Compl. at ¶ 43(a) & Exhibit 4.
[47] *Id.* at ¶¶ 50-55.

In the context of animal products, a representation that products are "ethical" has consistently been held to mean the same thing as humane and to be actionable as an objective statement of fact. In the recently decided case of *Lee v. Canada Goose US, Inc.*, 2021 WL 2665955 (S.D.N.Y. June 29, 2021), Plaintiffs alleged that the use of the words "ethical" and "sustainably produced" are reasonably interpreted by consumers to mean that Canada Goose prioritizes humane treatment of animals. *Id.* at *2. Defendant Canada Goose argued that these statements were "too general" for their truth or falsity to be determined and that they were not objective statements of fact actionable as deceptive trade practices. *Id.* at *4. Plaintiffs met their burden, however, by describing the effects of these traps, which "cause severe distress and injury to animals, including bone fractures, tendons, and ligament damage … swelling and hemorrhaging" (*i.e.*, allegations similar to the end-of-life allegations pleaded in the Complaint). *Id.* at *7. The court found that the alleged misrepresentations were actionable and that defendant's statements with respect to its ethical and sustainably produced/humane practices "had a tendency to mislead." *Id.* at *1, 7.

The same result was reached several months ago in *Myers v. Starbucks*, 2021 WL 1921120 (C.D. Cal. 2021), wherein defendant Starbucks represented that its cocoa products were made with "ethically sourced cocoa." *Id.* at *5. The court held that these statements were sufficient to state a claim based upon their allegations that it was impossible to source cocoa beans that did not involve child slavery, and that a reasonable consumer "would consider ethically made chocolate and reliance on child slavery mutually exclusive." *Id.* at *6. Defendants' misrepresentations are not puffery.[48]

---

[48] Defendants do not contend that Plaintiffs' claims based upon Defendants' alleged role in the practice of maceration of newborn male chicks or based upon their misrepresentations concerning laying hens' everyday outdoor access are puffery.

**C.    Vital Farms' Purchased Certification is Not Relevant to Plaintiffs' Claims.**

Defendants attempt to sow confusion over the fact that their purchased HFAC certification[49] mark also contains the word "humane," and that "the complaint does not include any allegations showing that Vital Farms' or its farmers' practices conflict with the [HFAC] Humane Standards." MTD I at 12. This is irrelevant.[50]

Plaintiffs do not allege violations of HFAC standards. As alleged by Plaintiffs, and as shown, for example, in Exhibit 7 to Plaintiffs' Complaint, Defendants make use of the term "humane," and not humane as defined by HFAC.[51] The issue for this Court is not compliance with third-party-defined external standards, but whether Plaintiffs have alleged Defendants' animal welfare practices are inhumane, unethical, or were misrepresented to a reasonable consumer, a question of fact not resolvable on a motion to dismiss. *Burton v. Pret A Manger (USA) Ltd.*, --- F.Supp.3d ---, 2021 WL 1664319, at *5-6 (S.D.N.Y. Apr. 27, 2021) (to state a claim for false advertising or deceptive business practices under New York law, one must plausibly allege statements likely to mislead a reasonable consumer; and because this inquiry is a factual one, it is not suitable for resolution on a motion to dismiss); *Newton v. Kraft Heinz Foods Co.*, 2018 WL

---

[49] *See Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 193 F.Supp.3d 556, 571 (E.D. Va. 2016) ("[T]he economic reality is that HFAC's relationship with egg producers is that of a licensor; its product is a license. … [To be certified by HFAC] producers must pay an annual inspection fee, annual application fee, and a licensing fee that is a small percentage of products sold.").

[50] Because Plaintiffs do not allege that compliance with HFAC standards is relevant for any purpose other than as a window into Vital Farms' practices, Vital's reliance on them for validation is inappropriate and baseless. If the Court takes these standards into consideration to determine whether Defendants' practices are ethical and humane as a matter of law, then it must convert Defendants' motions into motions for summary judgment. *See* Rule 12(d); *Snider v. L-3 Comms. Vertex Aerospace, L.L.C.*, 946 F.3d 660, 666 (5th Cir. 2019). And, if the Court sees fit to so convert Defendants' motions, Plaintiffs are entitled to take discovery before responding. *See* Rule 56(d); *VDF Futureceuticals, Inc. v. Freed Foods, Inc.*, 2021 WL 1667129, at *2-3 (W.D. Tex. Apr. 27, 2021).

[51] Compl. at ¶¶ 39, 42 & Exhibit 7.

11235517, at *3 (E.D.N.Y. Dec. 18, 2018) (whether a deceptive advertisement would have misled a reasonable consumer is not a question for resolution on a motion to dismiss); *Perdue Farms*, 2013 WL 1338199, at *10 (reasonable consumer standard); *Akkawi v. Sadr*, 2021 WL 3912151, at *7 (E.D. Cal. Sept. 1, 2021) (California "reasonable consumer" test); *Lombardo v. Johnson & Johnson Consumer Cos.*, 124 F.Supp.3d 1283, 1290 (S.D. Fla. 2015) (objective reasonable person test); *Dix v. American Bankers Life Assurance Co.*, 415 N.W.2d 206, 209 (Mich. 1987) (same); *In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*, 275 F.Supp.3d 910 , 920-921 (N.D. Ill. 2017) (generally all state consumer protection statutes apply a reasonable consumer standard).

Here, Defendants' purported compliance with standards of a third-party entity that it funds is not a defense. *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 349 F.Supp.3d 881, 910-11 (N.D. Cal. 2018) (allegation of deviation from federal standards not necessary to support challenge to material misrepresentations or omission that vehicles were environmentally friendly and "low-emission"); *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prod. Liab. Litig.*, 295 F.Supp.3d 927, 993-94 (N.D. Cal. 2018) ("[T]he wrongful conduct being targeted by [consumers] is not [Fiat Chrysler's] failure to comply with federal law (the CAA), but rather [Fiat Chrysler's] deceit about the vehicles' emissions.... Plaintiffs could prove that the Class Vehicles are not environmentally friendly (contrary to the 'EcoDiesel' label) by offering evidence as to how much NOx is spewed into the air when the vehicles are in regular use and then offering expert testimony as to how that amount of NOx poses risks to health and safety."); *In re Duramax Diesel Litig.*, 298 F.Supp.3d 1037, 1062 (E.D. Mich. 2018) ("The gravamen of their state law claims is that they purchased a vehicle which polluted at levels far greater than a reasonable consumer would expect. . . . And, importantly, Plaintiffs allege that this

disparity results from a nondisclosed vehicle component which is inherently deceptive . . .").

Plaintiffs' claims require evaluation of Defendants' guarantees of "humane" and "ethical" treatment of farm animals, not what may be implied by a purported third-party certification mark.[52]

*See Canada Goose*, 2021 WL 2665955, at *7 (fur sourcing claims could be actionable as misleading even if "trappers . . . abide by the standards cited by Canada Goose"); *see also Animal Legal Def. Fund*, 939 F.Supp.2d at 1002 (applying objective standards); *Perdue Farms*, 2013 WL 1338199, at *7 (denying motion to dismiss claims that chicken products sourced from a seller certified by a third party were "shackled upside-down, electronically shocked, or bled to death while fully conscious and in intense prolonged pain"); *Starbucks*, 2021 WL 1921120, at *5-6.

**D.    The Mosaic of Words and Images on and in Each Carton of Vital Farms Eggs Conveys a Clear Misleading Message About Purported Humane Practices and Level of Outdoor Access.**

Plaintiffs all allege that they relied on photographs of hens outdoors contained within each carton of Vital Farms eggs,[53] accompanied by language stating that these hens go outdoors daily.[54] Two Plaintiffs allege that they viewed social media advertising containing the same images and messages.[55] This mosaic—photographs of hens frolicking outdoors alongside Vital Farms' explicit promises that hens go outdoors daily, and that they treat hens and all farm animals in an "ethical"

---

[52] While not necessary to a finding in favor of Plaintiffs on Defendants' motions to dismiss, this Court may take judicial notice of facts publicly available and not subject to reasonable dispute, *see* FED. R. EVID. 201(b), such as the fact that Defendants' third-party certifier has been criticized as not providing for humane treatment of laying hens, and that the extent to which it does or does not adequately provide for humane treatment of laying hens is a matter of public dispute, not suitable for adjudication on this motion. *See, e.g.*, Elizabeth Buff, *5 Shocking and Cruel Practices That Are Allowed at 'Certified Humane' Chicken Farms*, One Green Planet, *available at* https://www.onegreenplanet.org/animalsandnature/shocking-and-cruel-practices-that-are-allowed-at-certified-humane-chicken-farms/.

[53] Compl. at ¶¶ 15-23.

[54] *Id.* at ¶ 45, Exhibit 7.

[55] *Id.* at ¶¶ 19-20.

and "humane" manner—makes the message sent by Vital Farms even more precise than those evaluated by the Southern District of New York last year in *Lugones v. Pete & Gerry's Organic, LLC.*, 440 F.Supp.3d 226 (S.D.N.Y. 2020). There the court considered product packaging including "images of hens frolicking in elysian pastures," alongside slogans invoking "green grass," and found that it reasonably communicated to consumers that laying hens have "space to move around both indoors and outdoors," and that "hens have significant access to the outdoors," and thus conveyed actionable misrepresentations. *Id.* at 241-42.

Plaintiffs assert similar claims here.[56] As alleged, Defendants—rather than adhering to actually humane or ethical practices that might allow realistic outdoor access for all hens—instead cram hens indoors with only 1.2 to 1.5 square feet of space each.[57] This means that many hens never access outdoor space because doing so would require engaging in a prohibitively difficult fight past other hens, who are themselves stressed and frantic from the conditions of their confinement.[58]

The Southern District of New York's contextual analysis in *Lugones* is consistent with Fifth Circuit precedent. In *Pizza Hut, Inc. v. Papa John's Intern., Inc.*, the Fifth Circuit deemed "Better ingredients. Better Pizza" standing alone to be a subjective statement, 227 F.3d 489, 449 (5th Cir. 2000), but also found that, as "expanded and given additional meaning when . . . used as the tag line in the misleading sauce and dough ads" the slogan was actionable. *Id.* at 501-502 ("[A] reasonable consumer would understand the slogan, when considered in the context of the comparison ads, as conveying the following message: Papa John's uses 'better ingredients,' which produces a 'better pizza' because Papa John's uses 'fresh-pack' tomatoes, fresh dough, and filtered

---

[56] *See id.* at ¶ 45.

[57] *Id.* at ¶ 46(b).

[58] *Id.*

water. In short, Papa John's has given definition to the word 'better.' Thus, when the slogan is used in this context, it is no longer mere opinion, but rather takes on the characteristics of a statement of fact.").

*Lugones* and *Pizza Hut* are also consistent with precedent from around the country, including states in which other Plaintiffs reside. *See, e.g.*, *Osmose, Inc. v. Viance*, LLC, 612 F.3d 1298, 1308, 1312 (11th Cir. 2010) (affirming that advertising references to 'decay findings' can be understood to refer to results of field testing because courts "must analyze the message conveyed in full context" and "[v]iewing the 'entire mosaic,' the references to the decay findings were linked to the expressions of safety concerns in a way that clearly indicated that the findings were the basis of and support for the expressions of safety concerns") (citations omitted); *Williams v. Gerber Prod. Co.*, 552 F.3d 934, 939 (9th Cir. 2008) (pictures of fruits on "fruit juice snacks" suggest those fruits were contained in the product); *Time Warner Cable, Inc. v. DIRECTV*, Inc., 497 F.3d 144, 158 (2d Cir. 2007) (claim that "settling for cable would be illogical" conveyed a claim that could be proven false when considered in light of surrounding words and images regarding HD picture quality because "[i]f the words or images, considered in context, necessarily imply a false message, the advertisement is literally false"); *Gonzalez v. Costco Wholesale Corp.*, 2018 WL 4783962, at *4 (E.D.N.Y. Sept. 29, 2018) (allowing a false advertising claim by plaintiff who "reviewed and relied on [a product's] 'environmentally responsible' labeling and images, such as icons resembling recycling symbols, water drops, leaves, and a central image of a leaf floating in pristine water"); *Shank v. Presidio Brands, Inc.*, 2018 WL 510169, at *9 (N.D. Cal. Jan. 23, 2018) ("Presidio labels its products as containing 'only naturally derived ingredients'; this statement, taken with the use of words such as 'natural,' 'naturally,' and 'naturally-derived' and plant imagery, gives the false impression that the products do not contain synthetic ingredients.");

*Brenner v. Procter & Gamble Co.*, 2016 WL 8192946, at *5 (C.D. Cal. Oct. 20, 2016) ("The Pampers Natural Clean product packaging—which includes the phrase 'Natural Clean' in large, greenish text against a green background and individual green packages labeled 'Natural Clean' with depictions of flowering plants—reinforces the inference that a consumer could be misled."); *Jou v. Kimberly-Clark Corp.*, 2013 WL 6491158, at *10 (N.D. Cal. Dec. 10, 2013) ("[B]y labeling these wipes as 'Natural Care,' and superimposing that term on an image of a green leaf, it is plausible that a reasonable consumer would likely be led to believe that the wipes contained only natural ingredients."); *Verizon Directories Corp. v. Yellow Book USA, Inc.*, 309 F.Supp.2d 401, 407 (E.D.N.Y. 2004) (holding that even though commercials depicting more customers choosing one phone book brand over another "are merely playful and absurd" taken literally, they "subtly but firmly communicate an idea—that … advertisers will reach more potential consumers if they put their names and money in the former rather than the latter").

The inapposite precedent Defendants gesture at in support of the proposition that their advertising is "vague, imprecise, aspirational, unspecified, and general," MTD I at 9, are in fact consistent with the *Pizza Hut* standard. These cases concern advertising language, using only superlatives, providing no baseline—either from precedent recognizing existing consumer expectations or from surrounding words or images—that consumers could use to calibrate their expectations. *See, e.g.*, *Presidio Enterprises, Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 679 (5th Cir. 1986) (prediction that a movie would be a "blockbuster" and "the most 'want-to-see movie of the year'" deemed inherently vague); *Thompson v. Procter & Gamble Co.*, 2018 WL 5113052, at *2 (S.D. Fla. Oct. 19, 2018) (slogans describing dish soap as gentle on skin provided no basis for evaluating presence of potential allergen in product—unlike a scenario in which these "terms were incorporated in the packaging of a bleach product, or a product otherwise known to

21

be potentially harmful to the touch"); *Humble Nat. Bank v. DCV*, Inc., 933 S.W.2d 224, 231 (Tex. App.—Houston [14th Dist.] 1996, writ denied) (slogans "A Tradition of Excellence" and "knowing its customers," absent more, were slogans "any commercial enterprise might adopt").[59] Other cases cited by Defendants for this point concern superlative advertising language that, unlike here, could not be proved true or false.[60] Finally, many of Defendants' cited cases, including some

---

[59] *See also Lipton v. Nature Co.*, 71 F.3d 464, 474 (2nd Cir. 1995) (assertion that research informing nature book was "thorough" provided no content for consumers to evaluate); *In re Nexus 6P Prod. Liab. Litig.*, 293 F. Supp. 3d 888, 937 (N.D. Cal. 2018) (slogans suggesting a battery would last "into the night" provide no "baseline against which to measure the rest of the statement"); *Markman v. Whole Foods Mkt., Inc.*, 2016 WL 10567194, at *6 (W.D. Tex. Aug. 19, 2016) (isolated, generalized statements to investors that grocery chain was committed to "quality and transparency" were nonactionable in the context of allegations concerning specific mispriced prepackaged foods); *Aprigliano v. Am. Honda Motor Co.*, 979 F.Supp.2d 1331, 1341 (S.D. Fla. 2013) ("unbelievably smooth, quiet and vibration free" slogan created no baseline for consumer expectations because no consumer could expect a motorcycle to be completely free of vibration and the amount of vibration that would be unbelievable is inherently subjective); *Neu v. Terminix Int'l, Inc.*, 2008 WL 2951390, at *3 (N.D. Cal. July 24, 2008) (calling extermination services a "unique plan" and "best defense" against termite infestation lacked factual elements); *Best Way Expediting, LLC v. Navistar, Inc*, 2018 WL 2067789, at *7 (Mich. Ct. App. May 3, 2018) (statements such as "[a]lways performing, "enhanced performance," "uptime for you is top of mind for us, "low cost of ownership," "ease of service," "maximum reliability and durability," and "years and years of service," by themselves, were no more than "advertising hype" and "immeasurable"); *Bank of Michigan v. CLMIA, LLC*, 2015 WL 630259, at *8 (Mich. Ct. App. Feb. 12, 2015) (financial advisor statements that client would likely benefit from contract not actionable as they did not imply knowledge of future financial events); *Autohaus, Inc. v. Aguilar*, 794 S.W.2d 459, 464 (Tex.App.—Dallas 1990, writ denied) (statements that a Mercedes was the "best engineered car in the world" and "probably" would not have mechanical difficulties lacked basis for comparison); *Jeffcoat v. Phillips*, 534 S.W.2d 168, 171–72 (Tex.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.) (opinion that a surgeon had a positive reputation found to be nonactionable).

[60] *See Marcus v. Apple Inc*, 2015 WL 151489, at *5 (N.D. Cal. Jan. 8, 2015) (superlatives in computer advertising, such as that they were "faster" and "state of the art," contained no representations relevant to allegations regarding durability of devices' logic boards); *Fraker v. KFC Corp.*, 2007 WL 1296571, at *3 (S.D. Cal. Apr. 30, 2007) (statements that KFC provided the "best food" and used the "highest quality ingredients" provided no basis for evaluating healthiness of products); *Williams v. Scottrade, Inc.*, 2006 WL 2077588, at *7 (E.D. Mich. July 24, 2006) (generalized allegations that online trading platform claimed on website to be reliable and advanced provided no basis for evaluating accuracy of average price share information found on platform).

finding actionable misrepresentations, are off-point because they concern disclosures in private negotiated transactions among sophisticated or represented parties.[61]

Indeed, many cases cited by Defendants found actionable misrepresentations based upon relevant context. *See USA Nutraceuticals Grp., Inc. v. BPI Sports LLC*, 2016 WL 4250668, at *3 (S.D. Fla. Apr. 12, 2016) (denying motion to dismiss claim evaluating products advertised as "BEST" because plaintiffs raised "measurable claims of product superiority based on product testing"); *Fink v. Time Warner Cable*, 810 F.Supp.2d 633, 644 (S.D.N.Y. 2011) (statements that Time Warner internet was "blazing fast" and the "fastest" and the "easiest" were deemed inactionable puffery because they were non-specific and generalized, but more fact based claims—such as "always-on connection"—were found to be non-puffing); *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 331-39 (Tex. 2011) (lessor's "one-sided knowledge of past facts" regarding restaurant space condition made representations that location was "problem-free . . . actionable under the circumstances"); *Dowling v. NADW Mktg., Inc.*, 631 S.W.2d 726, 729 (Tex. 1982) (newspaper ad not puffery because the phrase "firm buy back agreement" was understood by consumer to be a factual guarantee).

---

[61] *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 331-39 (Tex. 2011); *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768 (Tex. 2009) (affirming lower court finding of fraud in a private real estate venture); *Basquiat ex rel. Est. of Basquiat v. Sakura Int'l*, 2005 WL 1639413, at *5 (S.D.N.Y. July 5, 2005) (summary judgment denied because whether statements in private transaction implying that merchandise distribution network operated "through small boutiques" were negotiating ploys or factual misrepresentations would depend on specific disputes of fact); *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 163 (Tex. 1995) (concerning "as is" transaction of commercial real estate between sophisticated parties); *Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 278 (Tex. 1995) (concerning liability insurer's valuation of wrongful death settlement); *Kulesza v. Wyhowski*, 182 N.W. 53, 53-54 (Mich. 1921) (representation by seller that timber tract would be a good investment that "could not fail" provided no basis for evaluating the portion of the tract populated by oak grubs lacking value).

As discussed above, context sufficient to allow consumers to calibrate their expectations is present here, where Defendants tell consumers with their product packaging that ethical and humane treatment includes, *e.g.*, the ability to roam freely between barns and pastures and includes humane/ethical treatment of male chicks.[62]

## E. Minimal, Limited Disclosures Regarding Certain of Defendants' Misrepresentations Offer No Defense to Plaintiffs' Claims.

The purported disclosure of certain of Defendants' husbandry practices in the published standards of their third-party certifier, or in two isolated media reports in limited circulation trade journals, does not negate the impact of Vital Farms' product packaging, or serve to undermine any of Plaintiffs' claims, much less mandate their dismissal. *See* MTD I at 14-17. The appropriate context for evaluating advertising is what reasonable consumers would have actually seen and understood from the allegedly-false advertising content—a fact issue also not resolvable on this motion. *See supra* at Section V(B); *see also Mantikas v. Kellogg Co.*, 910 F.3d 633, 637 (2nd Cir. 2018) (finding that Nutrition Facts Back Panel did not override more prominent advertising); *Gerber Prod. Co.*, 552 F.3d at 939 (finding that reasonable consumers should not "be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box"); *University Loft Co. v. Blue Furniture Solutions, LLC*, 2017 WL 876312, at *4 (W.D. Tex. Mar. 3, 2017) (finding that explanatory text appearing pages before allegedly misleading statement does not make statement non-actionable without analyzing additional facts about the text's impact on consumers); *Marty v. Anheuser-Busch Companies, LLC*, 43 F.Supp.3d 1333, 1341 (S.D. Fla. 2014) (applying *Gerber*).

---

[62] Compl. at ¶¶ 39, 42, 45, Exhibits 7-8.

Defendants suggest that their practices are "made clear" in the non-public 46-page standards of their third-party certifier. MTD I at 11. These materials are inaccessible from the grocery aisle and were not explicitly cited in Defendants' advertising. They are not relevant to this analysis of whether Defendants falsely represented their products and business as humane and ethical. *See Canada Goose*, 2021 WL 2665955, at *7 (disregarding third party standards); *Mantikas*, 910 F.3d at 637.

For this reason, cases cited by Defendants involving prominent qualifiers alerting consumers to the truth at the point of sale, or otherwise during the transaction, are entirely inapplicable. *See, e.g.*, *Mazella v. Coca-Cola Co.*, 2021 WL 2940926, at *3 (S.D.N.Y. July 12, 2021) (finding "Slightly Sweet" slogan could not provide measurable baseline for consumer expectations regarding sugar content "when viewed in the context of the Product's full label and Nutrition Fact Panel" because the actual sugar content was listed elsewhere on product packaging and plaintiff had not alleged that a reasonable consumer would interpret sweetness as a measure of sugar content); *People for the Ethical Treatment of Animals v. Whole Foods Mkt. California, Inc.*, 2016 WL 1642577, at *4 (N.D. Cal. Apr. 26, 2016) (statements on signage and napkins that meat was from "Healthy Animals" was qualified by accompanying statements on same materials explaining this referred to lack of added hormones or antibiotics).[63] As Plaintiffs allege, Defendants' advertising takes advantage of their lack of issue-area expertise and inability to

---

[63] *See also Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 480 (Tex. 1995) (statement that a staff member supervising children "seemed to be okay" was nonactionable because it was qualified by statement explaining it was based on the fact "[t]hey had never seen him do anything wrong"); *Autohaus, Inc.*, 794 S.W.2d at 464 (plaintiff admitted that statements that a car probably would not require excessive maintenance were made jokingly). *Cf. Marcus*, 2015 WL 151489, at *5 (plaintiff alleged that representations that computers were "state of the art" should be read alongside technical specifications but made no attempt to establish the context of the representations).

conduct their own pre-purchase investigation.[64] Here, neither of the purported qualifiers (two obscure articles not specific to Vital Farms and private rating standards) were reasonably available to Plaintiffs. Defendants cannot assert knowledge of these "limited qualifiers" here.  *See Lugones*, 440 F.Supp.3d at 244 (finding that the plaintiffs sufficiently alleged reasonable reliance because they had "no reason to be on alert as to potential misrepresentations" and "had no independent means of ascertaining the truth of Defendant's misrepresentations—short of driving themselves to Defendant's facilities (chicken farms) and sleuthing about the grounds for the truth").[65]

## F.    Plaintiffs' Allegations Establish Their Standing to Pursue Injunctive Relief.

Defendants mischaracterize both Plaintiffs' allegations and the law in arguing that Plaintiffs lack standing for injunctive relief, because they will purportedly not suffer future imminent harm.  Plaintiff in this lawsuit have standing for injunctive relief under prevailing standards. Consumer plaintiffs can show they will suffer imminent harm by pleading they will purchase a product in the future if it is not mislabeled. *See, e.g.*, *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969-70 (9th Cir. 2018) ("[T]he threat of future harm may be . . . the consumer's

---

[64] *See, e.g.*, Compl. at ¶ 47.

[65] Although not relevant at the pleading stage, Defendant O'Hayer—although then CEO of Vital Farms—professed to not understand until well into his tenure that Defendants condoned the uniform killing of newborn male chicks—and to be "horrified" by this revelation. *See* Dan Charles, *Technology May Rescue Male Baby Chicks From the Grinder*, NPR (Oct. 28, 2016) ("Until a few years ago, he never thought about where those hens come from, or what happened to their male siblings. Then he ran into a couple of people from the animal rights group PETA. 'I told them what I was doing for a living, and they said, 'Oh, that's horrific,'' O'Hayer recalls. 'And I said, 'Why's that?' And they said, 'Because of what happens to the male chicks!'' That's when O'Hayer learned about something that happens at the hatcheries that supply his farmers with hens…. O'Hayer was horrified."), *available at* https://www.npr.org/sections/thesalt/2016/10/28/499613622/technology-may-rescue-male-baby-chicks-from-the-grinder. If Mr. O'Hayer himself, with his intimate familiarity with Vital Farms' advertising, could be in the dark about this practice, it would foreclose a conclusion that exposure to Defendants' advertising presumptively places even savvy (let alone reasonable) consumers on notice.

plausible allegations that she might purchase the product in the future . . . as she may reasonably, but incorrectly, assume the product was improved."); *Petrosino v. Stearn's Prod., Inc.*, 2018 WL 1614349, at *4–5 (S.D.N.Y. Mar. 30, 2018) (plaintiff's willingness to purchase products "again if the ingredients were changed so that they indeed were 'Natural' . . . demonstrate[s] an intent to purchase products in the future that subjects them to future harm."); *Leiner v. Johnson & Johnson Consumer Companies, Inc.*, 2016 WL 128098, at *1 (N.D. Ill. 2016) ("[T]he injunctive provisions of consumer protection statutes such as ICFA could never be invoked to enjoin deceptive practices if the complaining consumer's standing dissipated the moment she discovered the alleged deception and could no longer be fooled."); *Kay v. Copper Cane, LLC*, --- F.Supp.3d ---, 2021 WL 2953241, at *7 (N.D. Cal. July 14, 2021) ("Discovering via litigation the true nature of an allegedly mislabeled product is not analogous to gaining external information that contextualizes the label in a way that avoids deception."). Some courts have required a more "'substantial risk' that the future injury will occur," such as an intent to use the product in the future. *Lugones*, 440 F.Supp.3d at 238.

Here, four Plaintiffs allege that they would consider purchasing Vital Farms eggs again if Defendants "were to treat farmed animals in a manner consistent with Vital's advertising, or if the eggs were sold without super-premium prices."[66, 67] Because, as Plaintiffs allege, Defendants' super-premium prices necessarily depend on their "appear[ing] more humane and ethical than any of their competitors," a condition the instant lawsuit seeks to remedy, Plaintiffs have alleged imminent harm.[68] In addition, these and four other plaintiffs, who allege they would consider

---

[66] Compl. at ¶¶ 15, 17, 18, 20.

[67] Defendants misquote the relevant text of Plaintiffs' Complaint, cutting off Plaintiffs' allegations that they would again be potential customers for Vital Farms eggs absent super-premium prices. *Compare* MTD I at 20 *with* Compl. at ¶¶ 15-18, 20.

[68] Compl. at ¶ 38.

purchasing Vital Farms eggs again if Defendants changed their animal welfare practices, satisfying the test for imminent harm applied by the Ninth Circuit and other courts.[69] *See Davidson*, 889 F.3d at 969-70. Here, only one Plaintiff did not allege at all that she would consider purchasing Vital Farms eggs again.[70] If this Court deems Plaintiffs' allegations insufficient for lack of unequivocal intent to purchase Vital Farms eggs in the future, this Court should grant Plaintiffs the opportunity to amend their complaint based on its understanding of the applicable standard. *See Duran v. Creek*, 2016 WL 1191685, at *1 (N.D. Cal. Mar. 28, 2016) (granting leave to amend complaint under California Consumer Legal Remedies Act and Unfair Competition Law regarding alleged misrepresentation of vegan mayonnaise where plaintiff did not sufficiently allege they might purchase product in the future if it conformed to product label); *Seidman v. Snack Factory, LLC*, 2015 WL 1411878, at *5 (S.D. Fla. Mar. 26, 2015) (granting leave to amend complaint under Florida Deceptive and Unfair Trade Practices law where plaintiff did not sufficiently allege future intent to purchase defendant's pretzel crisps); *Silverman v. Watson Pharmaceuticals*, 2010 WL 11469548, at *3 (S.D. Tex. Dec. 8, 2010) (leave to amend is to be freely given).

Defendants further argue that Plaintiffs will need to show that monetary damages are inadequate to compensate for their injuries. MTD I at 20. Defendants err, however, in contending that Plaintiffs do not allege facts that, if true, could demonstrate the need for injunctive relief to redress their injuries. *Id.* All but one Plaintiff suggests that they will remain attentive and open to Defendants' future marketing.[71] They seek permanent injunctive relief "to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices" described above.[72]

---

[69] *See id.* at ¶¶ 16, 21-23.

[70] Compl. at ¶ 19.

[71] Compl. at ¶¶ 15-18, 20-23.

[72] *Id.* at 38 (Request for Relief at ¶ B).

Because all but one Plaintiff faces "the harm of being a consumer in the marketplace who cannot rely on the representations made by Defendants on their product labels," *Lilly v. Jamba Juice Company*, 2015 WL 1248027, at *5 (N.D. Cal. 2015), injunctive relief is necessary to fully redress their injuries.

**G.      Plaintiffs' Fraud By Omission Claim is Sufficiently Pleaded.**

Defendants concede that fraud by omission is a common law claim under Texas law. MTD I at 13-14; *see Dewayne Rogers Logging, Inc. v. Propac Industries, Ltd.*, 299 S.W.3d 374, 391 (Tex. App.—Tyler 2009, pet. denied) ("Fraud by omission is a subcategory of fraud because the omission or nondisclosure may be as misleading as a positive misrepresentation of fact…. When one makes a representation, he has a duty to disclose new information when he is aware the new information makes the earlier representation misleading or untrue.") (citing *Four Bros. Boat Works, Inc. v. Tesoro Petroleum Cos., Inc.*, 217 S.W.3d 653, 670-671 (Tex. App—Houston [14th Dist.] 2006, pet. denied)); *Blessett v. Garcia*, 816 Fed. Appx. 945, 951 (5th Cir. 2020).

Defendants argue that the fraud by omission claims pled here are precluded under a single federal court decision, *Pierce v. North Dallas Honey Co.*, 2020 WL 1047903, at *4 (N.D. Tex. Mar. 3, 2020), because in that case, in *dicta*, the district court stated that courts have recognized fraud by omission claims, "in such cases as real estate transactions, commercial contracts, or securities," and had not recognized the existence of such a claim in the DTPA context. MTD I at 14. The *Pierce* court cited no state court authority imposing such a limitation on the fraud by omission claim. The *dicta* in *Pierce* is incorrect, and state courts in Texas and other federal district court cases have not so limited the application of such claims. The Fifth Circuit in *Blessett v. Garcia*, *supra*, decided after *Pierce*, recognized the possibility of fraud by omission in a suit by a man against his ex-wife for fraud. *Blessett*, 816 Fed. Appx. at 948. While the plaintiff in that action

failed to adequately plead his claim under Rule 9(b), the court clearly recognized that fraud by omission extended to a personal fraud claim. *See id.* at 951. Accordingly, the *Pierce* decision conflicts with a later Circuit Court decision and should not be followed by this Court.

Furthermore, neither the Texas Supreme Court nor any Texas court of appeals has limited the applicability of fraud by omission claims as did the court in *Pierce*. Thus, in *Dewayne*, *supra*, 299 S.W.3d at 381, the court found that fraud by omission was pled with respect to breach of warranty and DTPA claims, similar to those pled in the instant action. Similarly, in *Hoffman v. Americahomekey, Inc.*, 23 F.Supp.3d 734, 745 (N.D. Tex. 2014), the court found that an individual employee dispute based upon misrepresentations by an employer also can serve as the predicate for a fraud by omission claim. The *dicta* in *Pierce* is inconsistent with these cases, which do not limit fraud by omission claims to the specific categories set forth in *Pierce*. Instead, these state court cases permit fraud by omission claims premised upon misrepresentations, warranty claim, DTPA claims, and personalized fraud claims.

Moreover, Plaintiffs have alleged facts giving rise to a duty to disclose on Defendants' part. A duty to disclose arises when a defendant "made a partial disclosure that created a false impression" or "voluntarily disclosed some information, creating a duty to disclose the whole truth. *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 220 (Tex. 2019); *see also Holland v. Thompson*, 338 S.W.3d 586, 598 (Tex.App.—El Paso 2010, pet. denied). Plaintiffs have alleged a duty under both of these scenarios. *See, e.g.,* Compl. at ¶¶ 39-46.

## H.    Rule 9(b) Has Limited Application Here and Is Easily Satisfied.

### i.    Most of Plaintiffs' Claims Are Not Subject to Rule 9(b)

Rule 9(b) requires that: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Rule 9(b) applies only to averments of fraud or

mistake, not to averments of negligence, breach of fiduciary duty, or non-fraudulent misstatement. *Janvey v. Maldonado*, 2015 WL 1428612, at *2 (N.D. Tex. Feb. 19, 2015). "Rule 9(b)'s purpose [is] weeding out strike suits and fishing expeditions." *IAS Srvcs., L.L.C. v. Jim Buckley & Assoc's, Inc.*, 900 F.3d 640, 648 (5th Cir. 2018) ("Although date, place, and time allegations may fulfill the requirement of pleading with particularity, these types of allegations are not required to satisfy Rule 9(b), so long as the circumstances of the alleged fraud are pled sufficiently 'to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior.'") (citation omitted); *Gerbitz v. ING Bank, FSB*, 967 F.Supp.2d 1072, 1076 (D. Del. 2013) (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)). For purposes of Rule 9(b), "[t]he Fifth Circuit has recognized that '[w]hat constitutes "particularity" will necessarily differ with the facts of each case.'" *Noble Capital Fund Mgmt, LLC v. US Capital Global Investment Mgmt., LLC*, 2021 WL 1940619, at *7 (W.D. Tex. May 14, 2021) (citations omitted);[73] *see Tuchman v. DCS Communications Corp.*, 14 F.3d 1061, 1067-68 (5th Cir. 1994).

Defendants do not identify which claims they contend are subject to Rule 9(b). In fact, most of the claims pled are not subject to Rule 9(b). First, Defendants concede that the state law warranty claims are not subject to Rule 9(b). MTD I at 17-19. *See Llort v. BMW of N. Amer., LLC*, 2020 WL 2928472, at *8 (W.D. Tex. June 2, 2020) ("Under Texas law, a claim for breach of express warranty sounds in contract, not in tort. Thus, the heightened pleading standards of Rule

---

[73] Report and recommendation adopted, 2021 WL 2773015 (W.D. Tex. June 8, 2021).

9(b) do not apply.") (citation omitted);[74] *Medical City Dallas, Ltd. v. Carlisle Corp.*, 251 S.W.3d 55, 60, 62 (Tex. 2008) (breach of express warranty claims are based in contract).[75]

Second, the New York Deceptive Trade Practices claims under Section 349 of the New York General Business Law are also not subject to Rule 9(b). *See Barton v. Pret A Manger (USA) Ltd.*, --- F.Supp.3d.---, 2021 WL 1664319, at *4 (S.D.N.Y. Apr. 27, 2021) (GBL claims "are not required to meet the heightened pleading standard of F.R.C.P. 9(b).").

Similarly, Florida Deceptive Trade Practices claims are also not subject to Rule 9(b). *See, e.g., Bluegreen Vacations Unlimited, Inc. v. Timeshare Lawyers P.A.*, 2021 WL 3552175, at *7 (S.D. Fla. Aug. 11, 2021) (summarizing that Rule 9(b) does not apply to any claims arising under FDUPTA and explaining that this is the majority Rule, as has been followed in almost all recent decisions.); *Harris v. Nordyne, LLC*, 2014 WL 12516076, at *9 (S.D. Fla. Nov. 14, 2014) ("Even where a FDUTPA claim includes allegations which implicate fraudulent conduct, it need not meet the heightened pleading requirements of Rule 9(b).") (emphasis added).[76]

Likewise, a Michigan Consumer Protection Act Claim which is premised upon a breach of warranty, such as here, also need not meet the 9(b) pleading standard. *See In re Packaged Ice Antitrust Litig.*, 779 F.Supp.2d 642, 666 (E.D. Mich. 2011).

Indeed, Defendants concede that Plaintiffs' deceptive trade practice claims are not predicated upon allegations of fraud and point to none that are alleged in connection with these

---

[74] Report and recommendation adopted, 2020 WL 10054589 (W.D. Tex. June 19, 2020).

[75] *See also Rugg v. Johnson & Johnson*, 2018 WL 3023493, at *4 (N.D. Cal. June 18, 2018); *Schouest v. Medtronic, Inc.*, 13 F.Supp.3d 692, 709 n.9 (W.D. Tex. 2014); *Gershengorin v. Vienna Beef, Ltd.*, 2007 WL 2840476, at *3 (N.D. Ill. Sept. 28, 2007); *Manhattan Constr. Co. v. Dequssa Corp.*, 2007 WL 983084, at *3 (W.D. Okla. Mar. 29, 2007); *In re Vivendi Universal, S.A. Sec. Litig.*, 2004 WL 876050, *2 (S.D.N.Y. Apr. 22, 2004).

[76] *See also Weiss v. General Motors*, 418 F.Supp.3d 1173, 1185 (S.D. Fla. 2019); *Allstate Ins. Co. v. Auto Glass Am., LLC*, 418 F.Supp.3d 1009, 1022 (M.D. Fla. 2019); *FTC v. Student Aid Center, Inc.*, 281 F.Supp.3d 1324, 1334 (S.D. Fla. 2016).

claims. Instead, Defendants argue that because Plaintiffs have also pled a fraud claim solely under Texas law that the deceptive practice claim should also be read as pleading fraud. MTD I at 17. However, that is not the rule in this Circuit, where courts are required to "disregard averments of fraud" (and there are none here with respect to the deceptive trade practices claims) in determining whether claims, which are not required to plead fraud are well pled under Rule 8. See *Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.*, 238 F.3d 363, 368-369 (5th Cir. 2001); *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 540 F.Supp.2d 800, 808 (S.D. Tex. 2007).

Here, Defendants point to no allegations of fraud required to be pled, or pled, with respect to the deceptive trade practices claims, or warranty claims. Plaintiffs merely allege misstatements with respect to the agricultural practices engaged in by Vital Farms and similar misrepresentations made by the Individual Defendants. None of these claims requires allegations of fraudulent conduct and none of such allegations contain allegations of fraudulent conduct.

### ii.    The Complaint's Allegations Satisfy Rule 9(b)

The purpose of Rule 9(b) is to "'ensure[] that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of.'" *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1277 (11th Cir. 2006) (citation omitted); *see Rigby v. State Farm*, 794 F.3d 457, 467 (5th Cir. 2017). Plaintiffs allege that Defendants engaged in a lengthy marketing campaign wherein they repeated the same false statements to consumers and potential consumers in a variety of mediums.[77] Plaintiffs identify those false statements in their Complaint, allege that they were repeated in different media (egg carton inserts, internet ads, social media posts, etc.), provide examples of Defendants' marketing containing these false statements, and

---

[77] *See* Compl. ¶¶ 4, 5, 8, 9, 11-13, 15-23, 37-39, 41-42, 45, 53, 86 & Exhibits 7-8.

allege that Plaintiffs relied upon these false statements in purchasing Vital eggs.[78] This is more than sufficient to establish that this is no strike suit, to put Defendants on notice of their alleged wrongdoing, and thus to satisfy Rule 9(b).[79]

In the context of marketing campaigns containing false statements, courts regularly hold that Rule 9(b) is satisfied where, as here, plaintiffs identify the false representations contained in defendant's marketing, and allege why they are false and that plaintiffs relied upon those representations in purchasing the product in question. *See, e.g., Chu v. Samsung Electronics America, Inc.*, 2020 1330662, at *6 (S.D.N.Y. Mar. 23, 2020) ("Requiring that Plaintiffs locate a copy of the exact advertisements they saw to plead a misrepresentation with particularity would

---

[78] *See id.*

[79] *See, e.g., Stewart v. Kodiak Cakes, LLC*, --- F.Supp.3d ---, 2021 WL 1698695, at *14-16 (S.D. Cal. Apr. 29, 2021) (allegations of defendant's deceptive marketing statements made on packaging and in various advertisements during the class period satisfy Rule 9(b)); *Gilbert L. Loaec 2014 Trust v. Doheny*, 2019 WL 6255417, at *3 (N.D. Cal. Nov. 22, 2019) ("Rule 9(b) does not require a plaintiff to 'allege, in detail, all facts supporting each and every instance of [fraud] over a multi-year period.' … Nor does Rule 9(b) even require the plaintiff to identify representative examples to support every allegation. … Rather, the plaintiff is simply required to allege particular details of the scheme 'paired with reliable indicia that lead to a strong inference' of fraud.") (citations omitted); *S.E.C. v. Strong Investment Mgmt.*, 2018 WL 8731559, at *6 (C.D. Cal. Aug. 9, 2018) (where complaint identified fraudulent scheme, some "examples, combined with the allegations of the ongoing, overall scheme, 'establish a basis from which an inference of fraud can be drawn,'" satisfying Rule 9(b)) (citation omitted); *Federal Express Corp. v. U.S.P.S.*, 40 F.Supp.2d 943, 951-53 (W.D. Tenn. 1999) (specific examples of alleged misleading advertising which occurred over a period of time is sufficient to satisfy Rule 9(b), especially "where it is clear that Defendant is aware of the advertising campaigns referred to in Plaintiff's complaint, when those campaigns started, and how long they have run"). *See also Unitedhealthcare Ins. Co., Inc. v. Murphy*, 2019 WL 12536545, at *6-7 (W.D. Tex. Aug. 20, 2019) (fraudulent scheme alleged and examples provided sufficient to satisfy Rule 9(b)); *Gilmour*, 2018 WL 4937072, at *7 (same); *Federal Trade Commission v. Next-Gen, Inc.*, 2018 WL 5310414, at *5-6 (W.D. Mo. Sept. 10, 2018) (same); *Unitedhealthcare Srvcs., Inc. v. Next Health, LLC*, 2018 WL 3520429, at *6 (N.D. Tex. July 20, 2018) (same); *Promotional Mgmt. Grp., Inc. v. Hsieh*, 2009 WL 2849630, at *4 (W.D. Tex. Sept. 1, 2009) (plaintiff "provides enough specific examples of alleged material nondisclosures to meet the requirements of Rule 9(b)."); *Hewlett-Packard Co. v. Byd:Sign, Inc.*, 2007 WL 275476, at *4 (E.D. Tex. Jan. 25, 2007) (fraudulent scheme alleged and examples provided sufficient to satisfy Rule 9(b)); *Merix Pharmaceutical Corp. v. Glaxosmithkline Consumer Healthcare, L.P.*, 2006 WL 1843370, at *2 (N.D. Ill. June 28, 2006) (same).

set the bar too high, even for claims governed by Rule 9(b)."); *Hobbs v. Gerber Prods. Co.*, 2018 WL 3861571, at *6 (N.D. Ill. Aug. 14, 2018) (the specific date the plaintiff viewed the marketing materials "does not matter nearly so much when the offending materials were essentially ubiquitous and her alleged exposure to them routine during the period she defines."); *Click v. General Motors LLC*, 2020 WL 3118577, at *6 (S.D. Tex. Mar. 27, 2020).[80]

The Complaint easily satisfies Rule 9(b) in that it clearly identifies the **who**, Vital Farms and the Individual Defendants, and the **what,** carefully and specifically delineated misrepresentations with respect to Defendants' egg production policies, which Defendants concede were "designed … to appeal to consumer's demand for ethically produced foods."[81] The Complaint also carefully delineates the **where** (*i.e.*, where Defendants made their misstatements). Indeed, the Complaint describes Vital Farms' pervasive social media advertising, and with each carton of eggs it sells."[82] Thus, the Complaint delineates specifically the precise misstatements promulgated through pervasive advertising on a regular and continuous basis on social media, in filings with the Securities & Exchange Commission, including the Company's S-1 Registration Statement, and in-box marketing.

---

[80] *See also Ciccio v. SmileDirectClub, LLC*, 2020 WL 2850146, at *11 (M.D. Tenn. June 2, 2020); *Tershakovec v. Ford Motor Co.*, 2018 WL 3405245, at *4 (S.D. Fla. July 12, 2018); *Torrent v. Yakult U.S.A., Inc.*, 2015 WL 4335076, at *3 (C.D. Cal. July 14, 2015); *In re Milo's Dog Treats*, 9 F.Supp.3d 523, 534 (W.D. Pa. 2014); *Edwards v. Zenimax Media Inc.*, 2013 WL 5420933, at *3 (D. Colo. Sept. 27, 2013); *Gerbitz v. ING Bank, FSB*, 967 F.Supp.2d 1072, 1077-78 (D. Del. 2013); *Martinez v. Nash Finch Co.*, 886 F.Supp.2d 1212, 1216-17 (D. Colo. 2012); *Rosales v. FitFlop USA, LLC*, 882 F.Supp.2d 1168, 1175-76 (S.D. Cal. 2012); *Simpson v. FWM Laboratories, Inc.*, 2010 WL 1257714, at *5 (S.D. Fla. Mar. 29, 2010); *Walter v. Hughes Communications, Inc.*, 682 F.Supp.2d 1031, 1045 (N.D. Cal. 2010).

[81] Defendants concede the success of the misrepresentations stating, "We believe consumers have grown to trust our brand because of our adherence to our values and a high level of transparency." Compl. at ¶ 4; *id.* at ¶ 3 (Vital Farms study showed that 31% of consumers would only purchase Vital Farms eggs.).

[82] Compl. at ¶ 4; *see id.* at ¶ 12) (describing Defendants' use of digitally integrated media, social media, and other owned media channels)

With respect to the in-box marketing claim, Plaintiffs attached to their Complaint several exemplary copies of the so-called "*Vital News*," a Vital Farms created written supplement which was included in every box of Vital Farms eggs. Each such *Vital News* supplement contains a Volume No. and an Issue No. These numbers correspond to specific dates on which such misrepresentations were made. Moreover, key challenged misrepresentations regarding the "humane treatment of farm animals" appear in every attached issue of *Vital News*—leaving no ambiguity regarding whether these precise misrepresentations were seen by Plaintiffs. Thus, Plaintiffs have identified even the specific date of such misrepresentations. Furthermore, each Plaintiff is alleged to have reasonably relied upon the misrepresentations and omissions alleged in purchasing Vital Farms eggs.[83] That alone is sufficient to satisfy the **when** prior to each Plaintiff's purchases of Vital Farms eggs. Plaintiffs have also specifically identified Vital Farms' July 9, 2020 S-1 Registration Statement as one of the sources through which the misrepresentations were promulgated publicly and on the internet.

Plaintiffs have specifically identified the exact misrepresentations in detail and the form in which they were advertised, including several of the dates on which they are advertised, and Plaintiffs are required to do no more, as courts have recognized that when Defendants engaged in systemic, longer-term marketing involving misrepresentations, plaintiffs do not have to plead each alleged fraudulent misstatement, nor the date thereof, but instead many simply generally refer to such misrepresentations and provide exemplars thereof, as Plaintiffs clearly do.[84] *See Davis v. Lockheed Martin Corp.*, 2010 WL 4607411, at *3 (N.D. Tex. Nov. 15, 2010) ("[I]n cases where

---

[83] *Id.* at ¶¶ 15-23.

[84] In Paragraph 42 of the Complaint, Plaintiffs describe Vital's advertising through social media tools, and other media channels, which Vital Farms admits to using "to educate consumers on our ethical values in order to generate further demand for our products and ultimately expand our consumer base."

the plaintiff is alleging that the fraud occurred over a period of years, the plaintiff is not required to allege all facts supporting every instance where the defendant engaged in fraud."); *Griggs v. Credit Solutions of Amer., Inc.*, 2010 WL 2976209, at *3 (N.D. Tex. July 28, 2010) (to satisfy Rule 9(b), the plaintiff must "provide some representative examples of [defendant's] alleged fraudulent conduct."); *King v. Alcon Labs., Inc*., 232 F.R.D. 568, 570 (N.D. Tex. 2005) (in circumstances where the fraud occurred over a multi-year period, "the specificity requirements of Rule 9(b) are applied less stringently."); *Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 557 (8th Cir. 2006) (permitting representative samples of misrepresentations where there is a systemic pattern of fraud by defendant).[85]

Here, although Rule 9(b) does not apply to most of the claims, Plaintiffs have satisfied this pleading standard with respect to all of them.[86]

## I.       The Individual Defendants Can Be Held Directly Liable for the Misrepresentations Alleged in Plaintiffs' Complaint.

Defendants O'Hayer, Diaz-Canseco, and Marcus have each moved to dismiss under Rules 12(b)(6) and 9(b) on the grounds that they are not liable for the deceptive trade practices, warranty and fraud claims because they were not "speakers", and because Defendants have not attempted

---

[85] *See also* n.80, *supra.*

[86] Defendants' Rule 9(b) arguments are in large part premised upon the mistaken legal argument that the UDAP claims at issue require a showing of individual reliance and/or a demonstration of such reliance in the subject pleading. Defendants are incorrect because New York, Florida, California, and Michigan statutes do not require the pleading of individual reliance, nor proof thereof.  Thus, Defendants' persistent contention that Plaintiffs must each plead "what they relied upon" is incorrect. *See De Lacour v. Colgate-Palmolive Co.*, 338 F.R.D. 324, 341 (S.D.N.Y. 2021) (New York Business Laws Section 349 requires no proof of individual reliance); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 409 (S.D.N.Y. 2015) (same); *De Lacour*, *supra*, 338 F.R.D. at 342 (California UDAP employs classwide presumption of reliance based on objective test); *In re McCormick & Company, Inc., Litig.*, 422 F.Supp.3d 194, 244-45 & n.77 (D.D.C. 2019) (same); *De Lacour*, *supra*, 338 F.R.D. at 343 (same for Florida); *Flynn v. FCA US LLC*, 327 F.R.D. 206, 218-19 (S.D. Ill. 2018) (no reliance needed for Michigan UDAP claim based on omissions.).

to pierce the corporate veil in order to hold them liable as officers and/or directors. MTD II at 6-13. These arguments are based upon misstatements of fact and law.

First, as to "speaker" liability, both Defendant Diaz-Canseco (President, Chief Executive Officer and Director of Vital Farms) and Defendant O'Hayer (Executive Chairman and Director of Vital Farms), on or about July 9, 2020, and subsequently in each amendment of the Vital Farms S-1 Registration Statement, made statements directly to the public contained in such Registration Statement for which they are legally liable. *See, e.g.*, *In re American Int'l Grp. Inc. 2008 Sec. Litig.*, 741 F.Supp.2d 511, 538 (S.D.N.Y. 2010) (signors are liable for misstatements contained in the registration statement.); *In re Interlink Electronics, Inc. Sec. Litig.*, 2008 WL 4531967, at *5 (C.D. Cal. Oct. 6, 2008) (same). Because the Registration Statement itself is referred to and incorporated by reference in the Complaint, these statements are properly considered on a motion to dismiss.

Almost all of the misrepresentations contained in the Complaint were repeated by Defendants Diaz-Canseco and O'Hayer in the Registration Statement, which they both signed and for which they both have liability as speakers. O'Hayer also makes the same misrepresentations in his "internal" letter included within the Registration Statement. In sum, both O'Hayer and Diaz-Canseco made direct misstatements to the public and are personally liable therefore.

Second, as to the Individual Defendants' liability for overseeing or participating in the alleged misrepresentations, Defendants misstate the applicable law. They incorrectly state that Plaintiffs must pierce the corporate veil in order to hold the individual directors and officers liable. MTD II at 10-12. Defendants also incorrectly argue that they cannot be held liable for overseeing and participating in the misrepresentations herein if they were not actual "speakers" who

communicated with consumers. *Id.* at 6-13. Plaintiffs show below on a state-by-state basis how Defendants are wrong.

Plaintiffs allege that each of the Individual Defendants "exercises a high degree of control and/or influence over the advertising, marketing, and business operations of Vital Farms—and given its small management team—effectuated day-to-day control over its business and marketing.[87] Specifically, with respect to Defendant Marcus, the Complaint alleges that as "chief marketing officer" Marcus was responsible for the false and misleading marketing materials described herein. As shown, Defendants Diaz-Canseco and O'Hayer were direct speakers. However, even if they were not, these allegations are sufficient to impose direct liability upon them without corporate veil piercing under state law in New York, Florida, Texas, Michigan, and California.

### i.   New York Law

New York law imposes liability on a corporate officer without piercing the corporate veil if such officer "participates in the commission of a tort," or supervised tortious conduct, or approved the policies that caused the tort. *See Abbott v. Tonawanda Coke Corp.*, 104 A.D.3d 1188, 1189-90 (N.Y. Ct. App. 2013); *Fletcher v. The Dakota, Inc.*, 99 A.D.3d 43, 49 (N.Y. Ct. App. 2012) (an officer or director who controlled, approved, or ratified a decision which resulted in a tortious injury is personally liable.); *Sisino, Jr. v. Island Motocross of N.Y., Inc.*, 41 A.D.3d 462, 464 (N.Y. Ct. App. 2007) (overseeing a policy which causes tortious injuries is sufficient to impose individual liability on an officer or director); *Polonetsky v. Better Homes Depot, Inc.*, 760 N.E.2d 1274, 1278-79 (N.Y. Ct. App. 2001) (participation in marketing operations, which created the misrepresentations, is sufficient to impose liability on individual officers and/or directors).

---

[87] Compl. at ¶¶ 25-27.

Defendants do not cite or address this dispositive case law. Instead, they improperly rely upon an unreported decision from the Civil Court of New York, *Teamwikit, Inc. v. Douglas*, 2016 WL 6806996 (N.Y. Civ. Ct. Oct. 31, 2016), which offers no serious analysis of this issue, and which was decided on the basis of the fact that the individual defendant was not liable for a distinct claim of breach of contract. *See* MTD II at 113. Given the Defendants' roles as speakers and their roles in overseeing, participating in, and directing the offensive marketing, they clearly have liability individually under New York law.

## ii.      Florida Law

Under Florida law, officers and directors are personally liable for tortious activity of a corporation if they "participate in the tort" or are "actively negligent" in failing to carry out their responsibilities in overseeing other parties who commit such tortious activity. *See, e.g., Lancaster v. The Bottle Club, LLC*, 2017 WL 3008434, at *7 (M.D. Fla. July 14, 2017) (participation in decision-making or creation of false advertising is sufficient to impose personal liability); *see also Baumann v. Circle K Stores, Inc.*, 2021 WL 825152, at *1 (M.D. Fla. Mar. 4, 2021). Defendants rely solely upon *Aboujaoude v. Poinciana Development Co. II*, 509 F.Supp.2d 1266, 1277 (S.D. Fla. 2007), which is consistent with the cases cited by Plaintiffs, holding that individual participants in FDUTPA violators are personally liable.

## iii.     Texas Law

Texas law, like the New York and Florida law, imposes liability upon a corporate officer or director who participates in tortious or fraudulent acts, even though he/she acted as an agent of the corporation and does not require direct communication between such officer and the injured third parties. *Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 201, 210 (Tex. App.—Houston [1st Dist.] 2014, pet. denied); *Odela Grp., LLC v. Double-R Walnut Mgmt. LLC*,

2017 WL 1360209, at *4-5 (Tex. App.—Dallas Apr. 13, 2017, no pet.) (Individual corporate officials are liable for their own misrepresentations.). Neither of the cases cited by Defendants[88] holds that an officer or director who participates in but does not directly communicate misrepresentations, does not have personal liability. Instead, the cases address the issue of whether or not an officer has corporate immunity solely on the basis that he/she is an officer of a corporation, concluding that no such immunity exists.

### iv. Michigan Law

Michigan law, like that of the other states referenced above, holds that corporate officers are liable if tortious conduct was engaged in by them, regardless of whether or not they were acting on their own behalf or on behalf of the corporation. Moreover, Michigan law has specifically addressed the issue of whether participation in drafting and promulgating false and misleading statements concerning a corporate entity imposes personal liability on the participating officer and has found that such is the case. *See Hauf v. Life Extension Foundation*, 547 F.Supp.2d 771, 783 (W.D. Mich. 2008); *Altobelli v Hartmann*, 861 N.W.2d 913, 923-24 (Mich. Ct. App. 2014). The cases Defendants cite simply address the requirements for piercing the corporate veil in Michigan, which Plaintiffs are not attempting to do.[89] Plaintiffs do not suggest or argue that piercing the corporate veil is necessary to hold an officer liable for his/her own participation in tortious conduct simply because he/she is an officer of a corporation.

---

[88] *Weitzel v. Barnes*, 691 S.W.2d 598, 601 (Tex. 1985) and *Miller v. Keyser*, 90 S.W.3d 712, 714-715 (Tex. 2002)

[89] *Machay v. Meyer*, 2006 WL 141681, at *2 (Mich. Ct. App. Jan. 19, 2006) and *Pizzo v. Unicorn Developers & Engineering Inc.*, 2002 WL 31450794, at *4 (Mich. Ct. App. Nov. 1, 2002).

### v. California Law

California permits corporate executives to be held liable for participating in or overseeing another's fraudulent misrepresentations. *See PMC, Inc. v. Kadisha* 78 Cal. App. 4th 1368, 1380 (2000) (negligent or knowing consent, which results in approval of tortious or unlawful acts, is sufficient to impose personal liability.); *see also Social Diesel, Inc. v. Extrasensory Software, Inc.*, 2021 WL 1731704, at *8 (Cal. Ct. App. May 3, 2021).

### J. The Court Should Reject Defendants' Request to Rewrite the Law of Limitations Such That Inquiry Notice Permits Causes of Action to be Extinguished Before They Even Accrue.

Defendants offer an ill-considered statute of limitations argument. In essence, Defendants argue that Plaintiffs were on inquiry notice of some of the multiple misrepresentations made by Defendants in their description of their business model and egg production practices as outlined in the Complaint, based upon the existence of **two** obscure agricultural journals which briefly referenced Vital Farms in connection with articles not directly related to Vital Farms. MTD I at 14-17.

Each Plaintiff purchased Vital Farms eggs well within the applicable statute of limitations for the Plaintiffs' various UDAP, warranty, and common law fraud claims. Defendants do not argue otherwise. Instead, Defendants ask the Court to rewrite the law of statutes of limitations such that limitations can begin to run even before a plaintiff's claim arises. *See id.* The Court should decline to rewrite this law.

Statutes of limitations begin to run when the cause of action first arises. *See Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 105 (2013); *Cutting v. State Farm Lloyds*, 2021

WL 3148867, at *2 (S.D. Tex. July 9, 2021).[90] A statute of limitations does not begin to run for any purpose until the subject cause of action accrues; and it accrued here, at the earliest, when Plaintiffs or Class members purchased Vital Farms eggs based upon Defendants' misrepresentations. None of the statutes of limitations at issue have run because all Plaintiffs purchased their products within the subject statute of limitations, all of which are two years or longer. Defendants do not and cannot dispute this. *See* TEX. BUS. & COM. CODE § 17.565 (TX DTPA);[91] *id.* § 2.725(a) (breach of express warranty); *id.* § 16.005(a)(4) (fraud by omission); Cal. Code Civ. Proc. § 338(h) (CA claims); Fla. Stat. § 95.11(3)(f) (FL claims); Mich. Comp. Laws § 445.911(9) (MI claims); N.Y. Consol. Laws § 214(2) (NY claims).

Defendants' argument in effect is that, with regard to claims based upon misrepresentations, statutes of limitations run from the time when there is some form of public notice regarding the subject matter of the misrepresentation, regardless of whether a plaintiff saw such notice, and even if such notice occurred years before the plaintiff's claim accrued. Thus, under Defendants' argument, Plaintiffs' claims were barred by the statutes of limitations before

---

[90] *See also Wallace v. Kato*, 549 U.S. 384, 391 (2007) ("The cause of action accrues, and the statute of limitation commences to run, when the wrongful act or omission results in damages."); *Yukos Capital S.A.R.L. v. Feldman*, 977 F.3d 216, 246 (2d Cir. 2020) ("[I]t is the fact of harm or damage to the plaintiff which completes the tort and creates the legal right to damages."); *Ries v. Arizona Beverages USA, Inc.*, 287 F.R.D. 523, 534 (N.D. Cal. 2012) (limitations runs from the date when the consumer purchased the product at issue.).

[91] The discovery rule included in TEX. BUS. & COM. CODE §17.565 and other statutes at issue is an exception to the general rule that a cause of action accrues when facts come into existence authorizing a claimant to seek a judicial remedy. Moreover, under the discovery rule, the statute of limitations is extended and does not begin to run until the claimant discovers, or in the exercise of reasonable intelligence, should have discovered the facts establishing a cause of action. *See St. John's United Methodist Church v. Delta Electronics, Inc.*, 2012 WL 3205043, at *2-3 (S.D. Tex. Aug. 3, 2012) (discovery rule delays start of two-year statute of limitations until plaintiff discovers its injury); *Falk v. General Motors Corp.*, 496 F.Supp.2d 1088, 1100 (N.D. Cal. 2007) (absent application of the delay discovery rule, the statute of limitations would have begun to run on the date the car was purchased).

they accrued. But again, no statute of limitations commences before the related cause of action accrues.

Moreover, as alluded to above, Defendants' contention that Plaintiffs even had inquiry notice is baseless and not resolvable on a motion to dismiss.[92] Defendants' arguments with respect to inquiry notice are based on two unconnected articles contained in trade journals of limited circulation, which make passing reference to Vital Farms, which are clearly not in general circulation, and which cannot be said as a matter of law to provide "inquiry notice" to a reasonable consumer who purchased Vital Farms eggs years later.[93]

In any event, such a fact-based issue could not be resolved for Defendants on a motion to dismiss. *See Gallier v. Woodbury Fin'l Servs., Inc.,* 2016 WL 4765059, at *5 (S.D. Tex. Sept. 13, 2016) ("Determining when a plaintiff was on inquiry notice of fraud is a 'fact intensive inquiry…typically appropriate for a jury.'") (quoting *Margolies v. Deason*, 464 F.3d 547, 553 (5th Cir. 2006)) (alterations in original); *In re Dynegy, Inc. Sec. Litig.*, 339 F.Supp.2d 804, 846 (S.D. Tex. 2004) ("Because determining when a plaintiff is on inquiry notice requires the development of facts, and even then courts may weigh facts differently, the determination is 'often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6).'") (citation omitted); *Burns v. Thomas*, 786 S.W.2d 266, 267 (Tex. 1990) ("Defendant [] bears burden of establishing as a matter of law that [] plaintiff either discovered or should have discovered the acts giving rise to the cause of action."). Here, Defendants bear the burden of proving that as a matter of law a reasonably prudent

---

[92] Defendants' inquiry notice issue is also a red herring: Plaintiffs all purchased Vital Farms eggs within the applicable statute of limitations, without the benefit of an extended inquiry notice based on the statute of limitations.

[93] In order to even become aware of the existence of this passing reference to Vital Farms in these articles, Plaintiffs would have had to have been normal readers of the entire journals at issue (*i.e.*, obscure agricultural journals). They were not, nor are ordinary reasonable consumers. Defendants make no argument to the contrary.

person would have had been on inquiry notice with respect to the two passing references to Vital Farms in obscure journals, and they cannot do so on a motion to dismiss.

## VI.    **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' Motions to Dismiss.

Dated: September 24, 2021          Respectfully submitted,

         **EDMUNDSON SHELTON WEISS PLLC**

         By: _/s/ Jesse Z. Weiss_
         Jesse Z. Weiss (SBN: 24013728)
         Ryan Shelton (SBN: 24037484)
         317 Grace Lane, Suite 210
         Austin, Texas 78746
         Telephone: (512) 596-3058
         Facsimile: (512) 532-6637
         Email: jesse@eswpllc.com
                ryan@eswpllc.com

         **BLACKNER STONE & ASSOCS.**
         Richard L. Stone (admitted _pro hac vice_)
         609 South Beach Road
         Jupiter Island, Florida 33469
         Telephone: (561) 804-9569
         Email: rstoneesq@rstoneesq.com

         **PETA FOUNDATION**
         Asher Smith (admitted _pro hac vice_)
         1536 16th Street, NW
         Washington, DC 20036
         Telephone: (202) 483-7382
         Email: AsherS@petaf.org

         ***Attorneys for Plaintiffs***

45