UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., <br><br> Movant, <br><br> v. <br><br> VITAL FARMS, INC., <br><br> Respondent. | Case No. _____ <br><br> Related Case No.: 1:21-cv-00447 (W.D. Tex.) |

## DECLARATION OF DAPHNA NACHMINOVITCH

I, Daphna Nachminovitch, declare as follows:

1. I am over eighteen years of age, have personal knowledge of the matters set forth in this declaration, except as otherwise stated; and if called and sworn as a witness could competently testify thereto.

2. I am Senior Vice President of Cruelty Investigations at People for the Ethical Treatment of Animals, Inc. ("PETA"), a position I have held for 9 years. I have worked at PETA for 25 years.

3. PETA is an animal protection and advocacy organization that opposes speciesism and believes animals are not ours to experiment on, eat, wear, use for entertainment, or abuse in any other way. In pursuit of that mission it advocates against animal cruelty and in favor of a vegan lifestyle.

4. In my role, I oversee PETA's investigations, including investigations of egg producers and other agricultural facilities. I am also responsible for helping to develop and assess campaign ideas, occasional interactions with donors and, when appropriate, working with lawyers

1

at both the PETA Foundation and outside firms as they develop, assess, and defend against litigation on behalf of PETA.

5. I have reviewed the November 18, 2022 nonparty subpoena issued by Vital Farms, Inc. ("Vital Farms") to PETA, including the eleven requests for production contained therein.

6. Complying with the Subpoena will be extremely burdensome. Substantial resources will be required to review materials for responsiveness, identify any potentially responsive documents, conduct a privilege review, and produce any responsive documents.

7. The Subpoena demands production of essentially all PETA documents related to its advocacy work regarding eggs and the animals used in egg production. For instance, among other things, the subpoena requests "ALL DOCUMENTS and COMMUNICATIONS" concerning PETA's "tactics or strategies" "to dissuade consumers from buying or eating EGGS," concerning the farm conditions for hens and hatcheries, and concerning the practices of culling and beak trimming in the egg production industry. Request 5 seeks information about all "chickens" without even limiting those to chickens related to eggs, even though I understand the underlying lawsuit is specifically about eggs and egg production operations.

8. Since the Subpoena seeks essentially all documents about PETA's vegan advocacy related to eggs and related to the conditions under which animals are raised (and killed) for egg production, it is no surprise that the Subpoena would require review of an enormous quantity of documents to comply, which would mean a large investment of resources.

9. As reflected in the accompanying Declaration of Asher Smith, PETA Foundation counsel for PETA, complying with the Subpoena would require a substantial amount of resources. A conservative estimate is over 250,000 documents, amounting to 500 attorney-days' worth of

time to review (or 4,000 attorney-hours' worth); or an estimated $450,000 or more in outside counsel fees to review such a substantial amount of documents.

10. PETA does not have its own legal department. Instead, PETA retains the legal services of the Foundation to Support Animal Protection d/b/a PETA Foundation ("PETA Foundation") and, when necessary, outside counsel, to represent it. PETA also retains the services of other administrative support functions at the PETA Foundation, such as Information Technology and Human Resources.

11. In exchange for using these support services, PETA pays the PETA Foundation.

12. If the PETA Foundation were to incur an additional cost beyond its normal budget as a result of work incurred on behalf of PETA, PETA would also compensate the PETA Foundation for those additional expenses.

13. If PETA were forced to comply with this subpoena, PETA would prefer to ask the lawyers with which it closely works to conduct the review, especially given the sensitive nature of the documents implicated. That would be the PETA Foundation legal department. However, the PETA Foundation has only eight lawyers who work full-time on litigation matters. I have been informed that, given the substantial time that would be required to review all the materials necessary to comply with this subpoena, compliance with the subpoena would likely take up at least three attorneys' full time workload for six months. I understand that this would be a substantial diversion of PETA's available legal resources (37.5% of the available litigation lawyers at the PETA Foundation for half of a year).

14. Moreover, I understand that PETA Foundation lawyers are already fully occupied with existing work. This includes existing work that the lawyers are already undertaking as counsel to PETA, in pursuit of PETA's mission, and on PETA's behalf: for instance, representing

PETA in litigation to which PETA is a party; providing PETA with legal advice regarding its efforts to pursue its mission; and attending to other legal needs of PETA.  If PETA Foundation lawyers are diverted to responding to this subpoena, I presume that they would be diverted from their other work, and unable to provide PETA with the other legal services and advice that PETA requires.

15. Loss of PETA Foundation legal resources would impose a substantial burden on PETA as it would hinder PETA's ability to advance its mission.  It would add delay to PETA's ability to obtain legal advice, and may result in PETA having to delay or entirely not pursue certain affirmative legal actions that require the assistance of counsel, such as filing demands on agencies on PETA's behalf and filing affirmative litigation to which PETA would be a party.

16. On the other hand, if PETA or PETA Foundation on its behalf were to retain outside counsel to assist with the document reviews necessary for compliance with the subpoena, I am informed this would be a substantial expense: as noted above, likely hundreds of thousands of dollars.  This is a substantial amount of money that PETA would not be able to spend in advancement of its mission, but would instead need to divert to complying with this subpoena.

17. Regardless of which entity retains the outside law firm, PETA or PETA Foundation, PETA would ultimately bear the financial cost of that retention.

18. I understand that the estimated burden I mention here is a conservative estimate and the true cost is likely to be higher, because this estimate only looks at one search term as an example. But I understand that running more search terms may be required to comply with the full scope of the subpoena and its eleven broad requests.  For instance, the accompanying Declaration of Asher Smith mentions other potential search terms.  A search of other electronic systems, not merely PETA's electronic mail system, would also need to be conducted.  And other staff time

would be required to identify potential locations that contain responsive documents; to oversee the review process; and to otherwise facilitate the production and response to Vital Farms.

19. Therefore, compliance with this subpoena would impose a substantial burden on PETA. It would divert PETA's resources from efforts in pursuit of its mission to protect animals and promote veganism. It would require the investment of a substantial amount of resources — what I understand has been estimated to be over 4,000 attorney-hours, or as much as $450,000 or more.

20. Compliance with the subpoena would also invade what I understand to be PETA's privilege, privacy and First Amendment rights by forcing production of some of PETA's most sensitive and privileged materials.

21. As noted above, PETA undertakes a variety of efforts to pursue its animal protection mission. This includes regularly seeking legal advice about potential advocacy campaigns and strategies; and seeking legal counsel and representation as PETA petitions the government or files lawsuits to promote animal welfare and combat animal abuse.

22. These broadly worded requests -- which demand all documents about PETA's advocacy efforts related to eggs -- would sweep in communications and exchanges with PETA's counsel as it discusses its legal rights and considers or ultimately pursues legal advocacy methods, related to eggs. For instance, to the extent PETA has considered any legal action or petitioning regulatory or other agencies related to egg production, these broad requests would sweep in those privileged communications with PETA's counsel.

23. In addition, forced disclosure of the materials sought by the subpoena would likely chill and discourage membership in PETA, donations to PETA, PETA's ability to effectively

strategize and plan its advocacy efforts, PETA's ability to engage in certain advocacy efforts with businesses, and PETA's ability to conduct undercover investigations.

24. PETA advances its animal protection mission in a number of ways, including but not limited to: conducting and publishing undercover investigations to expose the cruel conditions and suffering of animals raised for food; advocating and litigating to halt or mitigate animal cruelty; promoting veganism; campaigning for legislation and regulations to improve conditions for animals used for food production; public education and awareness campaigns to inform the public about the conditions of animals raised for food, as well as these animals' value and individuality; and publishing Vegan Starter Kits with plant-based recipes to encourage a switch to plant-based alternatives.

25. PETA has also advanced its advocacy efforts by filing formal requests to federal and state agencies overseeing animal welfare issues, petitioning for rulemaking, and registering public comments with those agencies regarding existing or proposed rules or regulations.

26. PETA's members are crucial to PETA's success as an organization. Members' engagement with PETA's campaigns and their financial donations enable PETA to effectively advocate in pursuit of shared animal protection goals. Members also play a crucial role in PETA's campaigns, such as through participation in letter-writing campaigns, petitions, and contacting local, state, and federal lawmakers about animal protection issues. Members have also reached out to PETA for assistance with their vegan journeys; for instance, to request a Vegan Starter Kit, which contains plant-based recipes and basic information about veganism and the treatment of animals raised for food.

27. Complying with the subpoena would require disclosing private, confidential internal documents discussing, planning, and deliberating PETA's advocacy strategy and tactics.

As noted above, Request No. 1 demands "All DOCUMENTS and COMMUNICATIONS concerning, constituting or reflecting any tactics or strategies YOU have employed, participated in, or provided assistance in to dissuade consumers from buying or eating EGGS." This would include all of PETA's internal deliberations related to its vegan advocacy efforts about eggs, including for example: strategy formulation and planning; discussions about which methods are more and less effective campaign strategies; communications concerning messaging strategies to best educate the public about conditions egg-laying hens face in order to encourage plant-based alternatives; and confidential plans for future campaigns and advocacy efforts. The other requests also seek documents and communications "concerning, constituting or reflecting" a wide variety of topics related to the conditions under which animals are raised (and killed) in relation to egg production. I would expect that these broadly written requests would sweep in essentially all PETA documents related to or discussing its vegan advocacy and animal protection efforts related to eggs.

28.     I believe disclosure of PETA's confidential advocacy strategies and tactics (particularly to an egg-producing facility, whose business model is threatened by PETA's vegan messaging) would substantially impair PETA's ability to conduct its advocacy work in pursuit of its and its members' goals.

29.     For example, I believe it would chill debate internal to PETA about advocacy strategies, methods, and campaigns. The success of PETA's strategies and tactics depends on a free and open exchange of ideas and information among staff. PETA staff need to be able to freely assess the pros and cons of different proposed messages and advocacy methods, in order to arrive at the most effective ones. And PETA devotes substantial resources to deliberating and deciding on the strategies and tactics that further its mission.

30. Fear of disclosure of these discussions to PETA's opponents would substantially chill open debate and discussion about PETA strategy. If PETA staff fear that their correspondence will be disclosed in the future, this would hinder the free flow of ideas, and chill participation in strategy discussion. If it is known that strategy discussions can be required to be disclosed, PETA staff will hesitate to speak freely, such as to identify flaws or weaknesses in arguments or methods, out of fear that these assessments will be used against PETA later by an opponent who learned them in discovery.

31. I know this is the case for me personally, as I would be concerned about giving fuel to PETA's opponents by pointing out weaknesses in PETA strategy or messaging, and so would be less likely to articulate perceived flaws.

32. I would expect that these chilled and stifled strategy deliberations will weaken PETA's effective advocacy, since identifying and addressing weaknesses in arguments is a critical part of improving an advocacy message.

33. Moreover, by disclosing PETA's confidential strategy materials to a company whose products it advocates against consuming (eggs), compliance with the subpoena would give PETA's opponent an unfair advantage and window into PETA's deliberations and assessments of strategy. Vital Farms would, for instance, learn: confidential information about PETA's methods, strategies, and tactics to promote veganism and discourage egg consumption; PETA's perceived strengths and weaknesses of different strategic options it has considered in pursuit of those goals; and PETA's confidential plans for investigations and campaigns in pursuit of those goals. Disclosure of these materials to Vital Farms would be in essence delivering Vital Farms confidential opposition intelligence. Vital Farms could then use this intelligence to predict, oppose

and argue against PETA's messaging and campaigns, diminishing the efficacy of PETA's advocacy efforts.

34. I would also expect that required compliance with the subpoena would affect and discourage membership and membership engagement in PETA.

35. PETA depends on the input of its members to help identify examples of animal abuse and key areas of concern that PETA should focus on. This includes receiving direct communications from members that reflects their concerns and priorities for animal protection. PETA considers its members' input in planning advocacy efforts, events, and campaigns.

36. When members contact PETA, they have a reasonable expectation that these communications are not going to be made public, especially not to participants in industries that are frequently subjects of those complaints, but are instead internal to PETA. Some members may not publicly announce their affiliation with PETA, but may nevertheless share PETA's values and goals, and communicate with PETA with an expectation of privacy.

37. If members' communications with PETA were to be made public, I believe this would deter and discourage some members from communicating with and engaging with PETA, or even remaining a member of the organization. Because the subpoena's requests are extremely broad, and encapsulate topics like *all documents reflecting PETA's strategy and tactics*, Request 1, and *all documents reflecting assorted farm conditions for egg-laying hens*, Requests 9-11, and PETA regularly communicates with its members about its various advocacy efforts, these requests likely sweep in communications between PETA and its members related to eggs and the welfare of animals used for egg production.

38. If members knew their communications with PETA would be disclosed, I expect that for many members, they would be less likely to reach out to and communicate with PETA.

9

This would also result in their feeling less connected to the organization and the mission. Disclosure would therefore have a chilling effect on PETA's membership engagement.

39. For those members who share PETA's mission privately but do not publicly identify themselves with the organization, I would expect that the fear of future disclosure of their communications with or from PETA may also cause some to leave the membership. While veganism has made strides in public opinion, people who identify as vegans still in many instances face a stigma. In addition, different members of the public have different opinions about PETA as an organization, and those who disagree with the mission of PETA, or with PETA's methods, may also socially stigmatize persons who identify as members. Therefore, disclosure of membership and membership correspondence can, and I expect will, cause some members to disassociate from the organization, or discourage others from joining, out of fear of future disclosure.

40. PETA is also the recipient of anonymous donations, where those donors have indicated that they do not want their identities to be public. PETA's correspondence with these anonymous donors often includes reference to PETA's advocacy activities, which are supported by these donations. The Subpoena's broadly worded requests threatens to sweep in these correspondences, to the extent they mention PETA's advocacy related to eggs. (Since the communications would "reflect[ ]" PETA's advocacy "tactics or strategies" against egg consumption, Request 1, and also since they may reference the various deplorable conditions and practices identified in Requests 9-11.) And if these anonymous donors were to learn that their communications are no longer confidential, but instead subject to disclosure in response to a discovery request, I think it is likely some donors would stop donations out of concern of having their identities disclosed. Disclosure will therefore have a chilling effect on PETA's fundraising efforts.

41. In addition, I understand that the Subpoena would require disclosure of confidential information related to PETA's undercover investigations efforts. Several of the requests, particularly requests 1 and 9-11, would require disclosure of information related to PETA's undercover investigations as relate to facilities raising animals for egg production, since these require the production of all documents related to PETA's advocacy strategies and tactics, and reflecting the conditions under which animals are raised for eggs.

42. PETA personnel have engaged in, and may be currently or in the future engaged in, undercover investigations to expose abusive practices on operations raising animals for food, including egg producers. Undercover investigations are an important method that PETA uses to educate the public about abusive farm animal practices in furtherance of its mission to end animal abuse and promote a vegan lifestyle. PETA publishes findings of undercover investigations directly on its website, and issues press releases to publicize these findings as well. *See, e.g.*, *Exposés and Undercover Investigations*, PETA.org, https://www.peta.org/investigations/. PETA's investigations findings are often picked up as newsworthy and also reported on by other news sources. *See, e.g.*, Nathan Owens, *Egg farm's chickens abused, PETA says*, Arkansas Democrat Gazette (Jul. 16, 2020) https://www.arkansasonline.com/news/2020/jul/16/egg-farms-chickens-abused-peta-says/.

43. To protect the safety of its investigators, as well as to preserve the future ability to conduct such undercover missions in the future, PETA keeps information related to its undercover investigations highly confidential. PETA takes affirmative steps to protect information about its investigations methodologies and targets, as well as the identities of its investigators. Only a small subset of individuals within PETA have knowledge of these topics. The subset of individuals within PETA who are aware of the current placement of its investigators is even smaller. This

information is closely guarded and is only disseminated outside of this small group of individuals on a need-to-know basis. Dissemination of this information is rare—even within PETA—and is accompanied by an obligation to keep such information confidential.

44. Disclosure of highly sensitive materials containing this type of information would infringe on PETA's first amendment rights and particularly its freedom of speech, as it would directly impair PETA's newsgathering and educating ability. Persons would be far less likely to take on an undercover investigation if they knew that their identity would be disclosed. Further, if an investigator's identity or appearance enters the public domain, PETA's ability to use that investigator to gain access or employment with potential investigative sites may be lost entirely. This is because that investigator will likely no longer be able to effectively access or gain employment at potential investigative sites. Furthermore, placing an investigator whose name or appearance has entered the public domain with a site suspected of animal abuse may expose that investigator to significant risk of physical harm or other retaliation. To the extent information relates to current or planned future investigations, or reveals confidential information about how such investigations are carried out, exposure of these confidential operations would also threaten PETA's ability to conduct these newsgathering efforts in the future, including by alerting the target of the investigation. (Of course, the findings of investigations are shared publicly on PETA's website, and if Vital Farms wanted to see that information it would not need a subpoena but could instead go to PETA's website.)

45. As an example, a PETA undercover investigation recently identified horrific abuse at an egg supplier to Walmart. *See Walmart Egg Supplier Exposed: Hens Left for Dead, Crudely Gassed, and Cruelly Killed*, PETA.org, https://investigations.peta.org/walmart-great-value-eggs-horror/. Vital Farms' subpoena would require production of all confidential material related to

12

that investigation, such as the identity of the undercover investigator(s) and the methods by which their investigation occurred, even though these materials appear to have no relevance to the *Usler* false advertising lawsuit.

46. In addition to the First Amendment violations, disclosure of these materials will further burden PETA by invading its privacy. The documents subject to disclosure are PETA's private, confidential, and highly sensitive internal communications. These materials are not available to the public, and for good reason, as they reflect and reveal PETA's internal planning and deliberations and confidential undercover investigations.

47. I declare under penalty of perjury that the foregoing is true and correct.

Executed on __DECEMBER 30, 2022__ in __NORFOLK, VA__.
             (Date)              (Location)



Daphna Nachminovitch

13