## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., <br><br> Movant, <br><br> v. <br><br> VITAL FARMS, INC., <br><br> Respondent. | Case No. _____ <br><br> Related Case No.: 1:21-cv-00447 (W.D. Tex.) |

## **DECLARATION OF ASHER SMITH**

I, Asher Smith, declare as follows:

1. I am over eighteen years of age, have personal knowledge of the matters set forth in this declaration, and if called and sworn as a witness could competently testify thereto.

2. I am Director of Litigation with the Foundation to Support Animals d/b/a PETA Foundation ("PETA Foundation"), a position I have held since May 2021. I joined the PETA Foundation in May 2018.

3. Prior to joining PETA Foundation, I served as a litigation associate for 4 years at the law firm Paul, Weiss, Rifkind, Wharton, & Garrison LLP. I am a member in good standing of the New York bar, and have been admitted *pro hac vice* in multiple court proceedings.

4. The PETA Foundation is a separate and distinct corporate entity from People for the Ethical Treatment of Animals, Inc. ("PETA"). PETA Foundation is recognized by the Internal Revenue Service as a Section 501(c)(3) tax-exempt entity and public charity with Employer Identification Number 52-1842274. The PETA Foundation provides legal and other services to

PETA and other entities as a Section 509(a)(3) supporting organization. These support services include, *e.g.*, legal services, human resources services, accounts payable services, information technology services, audio/visual services, and mailroom services.

5. In this role, I have assisted with the review, identification, and collection of documents from among electronic and paper files in connection with subpoenas, discovery requests, and/or other requests for documents that are in the possession, custody or control of PETA Foundation. This universe of documents would presumably include the documents sought by Vital Farms' subpoena.

6. In my opinion, the operation of the PETA Foundation legal department litigators is consistent with a boutique law firm. PETA Foundation litigators frequently represent PETA as a party in both state and federal court in a manner consistent with full-time litigation counsel. PETA Foundation litigators also represent parties other than PETA, such as individual plaintiffs. My colleagues and I are currently counsel of record, in roles consistent with full-time litigation counsel, in numerous cases representing parties across the country seeking redress for cognizable injuries implicating animal protection concerns, including under the First Amendment, the Endangered Species Act, public records law, and consumer protection law.[1]

7. I am familiar with PETA Foundation's electronic and paper file storage systems.

8. I have reviewed the November 18, 2022 nonparty subpoena issued by Vital Farms, Inc. ("Vital Farms") to PETA, including the eleven requests for production contained therein.

---

[1] *See, e.g.*, *People for Ethical Treatment of Animals, Inc. v. Shore Transit*, 580 F. Supp. 3d 183 (D. Md. 2022); *People for Ethical Treatment of Animals, Inc. v. Lowe*, No. CIV-21-0671-F, 2022 WL 576560 (W.D. Okla. Feb. 25, 2022); *Collins v. Tri-State Zoological Park of W. Maryland, Inc.*, 514 F. Supp. 3d 773 (D. Md. 2021).

9. This subpoena was issued in connection with *Nicholas Usler, et al. v. Vital Farms, Inc*, Case No. 1:21-cv-00447 (W.D. Tex.) ("the Lawsuit"), a case in which Vital Farms is a defendant.

10. The subpoena appears to seek production of essentially all documents from PETA related to its vegan advocacy work related to eggs. For instance, the subpoena specifically demands production of PETA's confidential internal strategy and tactics materials in its first request, as well as any documents that might reflect such strategy and tactics: "All DOCUMENTS and COMMUNICATIONS concerning, constituting or reflecting any tactics or strategies YOU have employed, participated in, or provided assistance in to dissuade consumers from buying or eating EGGS." The other requests, which also all seek (except number 8) "All DOCUMENTS and COMMUNICATIONS concerning, constituting or reflecting" a wide range of topics related to the conditions and treatment of animals raised for egg production. These broadly drafted requests therefore will also necessarily implicate a broad range of documents related to PETA's vegan advocacy efforts regarding eggs.

11. Request number 8 seeks any document that so much as mentions or references Vital Farms.

12. Complying with these requests will require substantial resources.

13. PETA Foundation attorneys serve as counsel to PETA. In that function, I have conducted a preliminary search to assess the potential burden of complying with the subpoena's requests. As a result of that search, I believe a substantial expenditure of resources would be required to comply with this subpoena.

14. For instance, using software used to coordinate email preservation I conducted a search for the term "eggs" over PETA's electronic mail records (electronic mail addresses ending

in "@peta.org"). (Given that, for instance, Request 1 seeks expansively all documents related to PETA's advocacy regarding eggs, and Requests 2-7 and 9-11 seek documents related to various conditions under which animals are raised for egg production, this is a reasonable search to initiate a review for responsive materials.) That search identified over 250,000 documents containing the term.

15. That 250,000 figure is likely conservative, since it does not include any attachments or parent emails of documents that contain the flagged term (what is commonly referred to in discovery as "full families"), it only includes the individual documents themselves. I understand that document reviews typically involve the review of "full families" (that is, not only the document that contains the responsive term, but also any documents that it is attached to or that are attached to it).

16. In addition, this number of potential documents is limited to those identified from one potential source of documents (emails). However, other potential sources would likely need to be identified and searched for potentially responsive documents, then subjected to a review and, as needed, identified and described on a privilege log. For instance, files on other electronic systems like electronic share folders, personal computers, and hard copy documents. The Subpoena's definition of "Document" included a very large range of document categories that it requests to be searched.

17. Based on my experience, I would estimate the time required to conduct this review by assuming 500 documents are reviewed per day (approximately 1 document per minute throughout an 8-hour day). This is a generous assumption, as in my experience the actual number of documents reviewed per day is usually less. Based on the assumption that 500 documents could

be reviewed per day, and based on the fact that there are over 250,000 documents, just this single search alone would require an investment of at least 500 attorney-days, or 4,000 attorney-hours.

18. The PETA Foundation currently employs eight lawyers who work full-time on litigation matters. Given the substantial time that would be required to review all the materials necessary to comply with this subpoena, this would require approximately four attorneys spending their full time only on complying with this subpoena for six months. In other words, 50% of the PETA Foundation's lawyers would be unavailable to do any work besides complying with this subpoena for the equivalent of six months.

19. Moreover, these PETA Foundation lawyers are currently fully staffed on work, and any time spent on complying with the subpoena would divert PETA Foundation's limited legal resources. This would leave these PETA Foundation lawyers unavailable to accomplish their other important legal work, including other work that assists PETA in pursuing its mission. For instance, representing PETA in litigation to which PETA is a party in pursuit of its mission; providing PETA with legal advice regarding its efforts to pursue its mission; and attending to other legal needs of PETA.

20. If PETA Foundation lawyers are not available to provide legal services to PETA, because their staff are diverted to complying with this subpoena, then PETA Foundation will likely have more delays in providing PETA legal advice, and may be entirely unavailable (due to resource constraints) to assist PETA in pursuing certain affirmative legal actions that require the assistance of counsel, such as filing demands on agencies on PETA's behalf and filing affirmative litigation to which PETA is a party.

21. Alternatively, an outside law firm could be hired to facilitate the review, but that would also be very resource-intensive and expensive. I have spoken with an outside law firm, and

they estimated that, based on the quantity of over 250,000 documents identified in my search, a review of these materials is estimated to cost upwards of $450,000.

22. Again, this estimate is based on one search term; but likely other search terms would be required to fully comply with the subpoena, and other document sources beyond email would need to be searched as well. For instance, a search of the term "hatchery" identified over 18,000 documents containing the term, and a search of the term "culling" identified over 23,000 documents containing the term. And other significant staff time would be required to identify potential locations that contain responsive document; to oversee the review process; and to otherwise facilitate the production and response to Vital Farms.

23. In light of the limitations noted above, I believe this is an extremely conservative estimate of cost, and I expect the actual cost would be higher.

24. In addition, given the broad nature of these requests and their demand for the production of any document related to PETA's vegan advocacy efforts toward eggs, I would expect that these requests will sweep in privileged materials. PETA and its counsel at PETA Foundation have privileged discussions exploring legal avenues (for instance, administrative processes or litigation) related to the mistreatment of animals used for egg production. These requests would appear to encompass PETA's seeking legal advice about potential advocacy or other litigation efforts related to eggs. *See, e.g.*, 15 U.S.C. §§ 1051 et seq. (allowing non-consumer third parties to sue for false advertising); DC Code §§ 28-3901 et. seq. (allowing non-profit standing to sue for false advertising).

25. I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 30, 2022 in New York, NY.

_____
Asher Smith