**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

PEOPLE FOR THE ETHICAL
TREATMENT OF ANIMALS, INC.,

      Movant,

      v.                                Action No. 2:22mc24

VITAL FARMS, INC.,

      Respondent.

## OPINION AND ORDER

Before the Court is a joint motion by People for the Ethical Treatment of Animals, Inc. ("PETA"), and Foundation to Support Animal Protection (the "Foundation") to quash a nonparty subpoena served on PETA by Vital Farms, Inc. ("Vital"), the defendant in a deceptive trade practices lawsuit pending in the U.S. District Court for the Western District of Texas. ECF No. 25. Having considered the motion, and applicable law, and finding a hearing unnecessary, the undersigned **GRANTS** the motion to quash.

## DISCUSSION

### A.    Background

#### 1.    A group of consumer plaintiffs sued Vital in the related litigation in the Western District of Texas.

On May 20, 2021, a putative class of consumer plaintiffs sued Vital, an egg producer, in the Western District of Texas, alleging that Vital engages in deceptive trade practices in violation of several states' unfair competition or trade practices laws. *Usler, et al. v. Vital Farms, Inc.*, Case No. 1:21cv447-RP, ECF No. 1 ("Compl."). The complaint in *Usler* alleges that Vital "markets itself as an ethical company that treats animals in an ethical, humane, and transparent manner,"

but that its marketing "is false and misleading, and its consumers have been tricked into paying an unjustifiably high premium." Compl. ¶ 1. To wit, the complaint alleges that Vital holds itself out as an "ethical food company" with an "ethical mission" "exemplified by [a] focus on the humane treatment of farm animals," *id.* ¶ 39, but that, among other things, it acquires female chicks from, and thus financially supports, hatcheries that kill newborn male chicks, *id.* ¶ 43(c); forces hens to lay an egg a day, which decreases their life spans by as much as 85%, and then sells them to be killed in an inhumane fashion when they can no longer do so, *id.* ¶¶ 11, 43(a); and condones "farmer beak cutting," an industry practice of "reducing the sharp points of a hen's beak, often using blades or infra-red light," *id.* ¶ 43(b). Vital, the plaintiffs contend, has "convinced consumers . . . that its products are produced humanely and ethically, and that its humane and ethical standards are practiced consistently and transparently" and in doing so "has created a market niche for itself, whereby it charges super-premium prices for its eggs." *Id.* ¶ 5. The plaintiffs in *Usler* are consumers from various states who allegedly relied on Vital's deceptive representations and thus were lured into paying a "super-premium price" for Vital's eggs. *Id.* ¶¶ 15–23.

The complaint asserts a breach of express warranty claim under Texas and other states' laws, alleging that Vital "directly warrant[ed]" to consumers that its eggs are "produced in a humane, ethical, and transparent fashion," *id.* ¶ 76; as well as a claim for common law fraud under Texas law, *id.* ¶¶ 82–89; and claims under the Texas Deceptive Trade Practices-Consumer Protection Act, California Unfair Competition Law, the Florida Unfair and Deceptive Trade Practices Act, the Michigan Consumer Protection Act, and New York Business Laws Section 349 (relating to deceptive acts and practices) and Section 350-A (relating to false advertising), each premised on Vital's allegedly deceptive acts and practices in advertising its eggs, *id.* ¶¶ 90–125.

2

2.      **Vital subpoenaed PETA and the Foundation, nonparties to the *Usler* lawsuit.**

PETA is a "nonprofit vegan advocacy and animal protection organization." Br. in Supp. of Joint Mot. to Quash Additional Nonparty Subpoena ("Movants' Br.") 3, ECF No. 26. PETA "campaigns to promote a vegan lifestyle," *id.* at 21, and "advocates for abstention from animal products," *id.* at 5 n.3, "including forgoing eggs entirely," *id.* at 22. PETA, Vital points out, operates a consumer survey on its website that collects information from consumers who believe they have been misled by "humane" in connection with purchased food. Vital's Opp'n to Joint Mot. to Quash Additional Nonparty Subpoena ("Opp'n") 2, ECF No. 34 (citing https://www.peta.org/features/were-you-misled-by-humane-labels/ (last visited Apr. 13, 2023)). It has undertaken investigations about egg-production conditions and reported on them in articles such as "Walmart Egg Supplier Exposed: Hens Left for Dead, Crudely Gassed, and Cruelly Killed" and "Thousands of Hens Found Dead, Beaten, Gassed, or Neglected at Filthy Oklahoma Egg Farm Supplying Kroger and Others." https://investigations.peta.org/walmart-great-value-eggs-horror/ (last visited Apr.13, 2023); https://investigations.peta.org/hens-beaten-gassed-dead-egg-farm/ (last visited Apr. 13, 2023). Also, as recently as July 2022, PETA petitioned the USDA's Food Safety and Inspection Service to request that it "commence rulemaking proceedings to eliminate from its label-approval program any labels relating to claims about the conditions in which animals were raised," https://www.peta.org/wp-content/uploads/2022/06/peta-fsis-petition.pdf (last visited Apr. 13, 2023). However, PETA is not a party to the *Usler* lawsuit.

The Foundation is also not a party to the *Usler* lawsuit. It is a "nonprofit organization that provides administrative support services to animal protection organizations, including PETA." Movants' Br. 3. Its "legal department houses litigators that take on a wide variety of cases in pursuit of [its] animal protection mission, representing a range of clients." *Id.* The Foundation

has "represented PETA in many legal actions and lawsuits." *Id.* Its lawyers are also co-counsel for the consumer plaintiffs in *Usler*. *Id.*

Vital first issued subpoenas to PETA and the Foundation separately, seeking production of documents. *See* Decl. of Melissa Alpert in Supp. of PETA Mot. to Quash ¶ 4, Ex. A, ECF No. 2-2; Decl. of Melissa Alpert in Supp. of Found. Mot. to Quash ¶ 4, Ex. A, Case No. 2:22mc23 (the "Found. Dkt.") ECF No. 2-2. On December 30, 2022, PETA and the Foundation each moved to quash their respective subpoenas. ECF No. 1; Found. Dkt. ECF No. 1. They also sought sanctions in the form of attorneys' fees. *See* ECF No. 2, at 28–29; Found. Dkt. ECF No. 2, at 21–22. The Court granted those motions to quash on April 3, 2023, but deferred ruling on the requests for sanctions. ECF No. 40 ("Apr. 3 Order"), at 21. The Court found that the subpoenas asked for documents or material that was either irrelevant to the *Usler* case or for which Vital failed to articulate a suitable need. Apr. 3 Order 12–18, 20. The Court additionally found that Vital's subpoena to PETA was overbroad and created an undue burden, and that Vital's subpoena raised privilege issues because the Foundation's attorneys are co-counsel to the plaintiffs in *Usler*. *Id.* at 18–20.

On January 18, 2023, while the earlier motions to quash were pending before the Court, Vital served on PETA an additional subpoena, dated January 17, 2023, this time for testimony. Decl. of Melissa Alpert in Supp. of Joint Mot. to Quash Additional Nonparty Subpoena ¶ 4, Ex. A, ECF No. 26-2 ("Subpoena"). Although only served on PETA, the subpoena defines "PETA" to include the Foundation. Subpoena Attach. A at 2. As matters for examination the subpoena designates a broad range of topics. The subpoena demands testimony concerning, among other things, PETA and the Foundation's knowledge on various egg-related issues, including "eggs, chickens, and hens"; "egg pricing"; "the production of eggs for human consumption"; "farm

conditions for hens raised in connection" with egg production; culling and beak trimming; and "[t]he social behaviors, laying cycle, and lifecycle or life span of chickens." *Id.* at 4–5. The subpoena also demands testimony on PETA and the Foundation's knowledge of consumers' beliefs or preferences about the use of terms "ethical" and "humane" in the advertising and labeling of eggs, and consumer preferences regarding "eggs, chickens, and hens." *Id.* It demands testimony concerning or related to the *Usler* litigation and to Vital generally. *Id.* at 3–4. It demands testimony on a series of screenshots of various pages from PETA's website. *Id.* at 4 & Ex. 1. And, it demands testimony on "[a]ny and all standards issued or promulgated by any person," including but not limited to Whole Foods Market and Humane Farm Animal Care, "concerning or related to hens, eggs, culling, or beak trimming in connection" with egg production for human consumption. *Id.* at 2, 5–6.

After the parties met and conferred on February 3, 2023, and PETA expressed concern about the breadth of the topics designated by the subpoena, Vital sent PETA a letter on February 7 that furnished a list of "11 clarified deposition topics." Decl. of Abby H. Meyer ¶ 3, ECF No. 34-1. According to Vital, these topics "subsume" those designated in the subpoena. *See* Opp'n nn. 8–18. The reconfigured topics are not a significant departure from the topics designated in the January 17 subpoena and they are equally broad in scope. *See id.* ¶ 3, Ex. B ("Feb. 7 Letter").

On February 16, 2023, PETA and the Foundation jointly moved to quash the January 17 subpoena. ECF No. 25. They object that the designated topics would not yield relevant, probative, or proportionate information, Movants' Br. 10–14, and that the topics are overbroad and not defined with particularity, *id.* at 14–17. They argue that compliance with the subpoena would create a burden disproportionate to any benefit. *Id.* at 17–18. And, they argue that the subpoena demands (in the Foundation's case) testimony on privileged matters or (in PETA's case) on

5

activities protected by the First Amendment. *Id.* at 18–22. Also, like with their earlier motions to quash, PETA and the Foundation seek sanctions. *Id.* at 22–23.

**B.    PETA and the Foundation's Request for Judicial Notice**

PETA and the Foundation request judicial notice of an April 5, 2023, order issued by the Western District of Texas in Case No. 1:23cv194-RP (W.D. Tex. Feb. 21, 2023). ECF No. 41. In that matter, PETA and the Foundation moved for a protective order relieving them from having to testify in response to Vital's January 17 subpoena (the same subpoena currently at issue here). PETA and the Foundation had moved for a protective order, along with Noelle Grain, a former PETA employee who was also served by Vital with a subpoena to testify. ECF No. 30-1, at 1. In the April 5 order, the court in the Western District of Texas dismissed the motion for a protective order to the extent that it related to the PETA's January 17 subpoena, because the parties had agreed that the court should not rule but instead wait for this Court to rule on the joint motion to quash. ECF No. 41-1, at 2.

Vital does not object to judicial notice of the April 5 order to the extent that it relates to PETA's subpoena. ECF No. 42, at 1. It does, however, object to notice of the April 5 order "as it pertains to the deposition subpoena served on Noelle Grain," arguing that those portions of the order are irrelevant and potentially prejudicial to Vital. *Id.*

A court "may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). A court "may take judicial notice of another court's opinion--not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity." *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999) (citations omitted). The Court

**GRANTS** PETA and the Foundation's request for judicial notice of the April 5 order from the Western District of Texas. PETA and the Foundation do not ask this Court to assign any probative value to that court's findings vis-à-vis the Grain subpoena and this Court does not. As Vital correctly points out, ECF No. 42, at 1, this Court has not been briefed on the Grain subpoena; it has not even examined it.

## C.    The Joint Motion to Quash

### 1.    Legal Standards

Rule 45 directs that a party responsible for issuing and serving a subpoena "must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d). The court for the district where compliance is required must enforce this duty and *must* quash or modify a subpoena that, among other things, requires disclosure of privileged or other protected matter or that subjects a person to undue burden. *Id.* Additionally, the court *may*, on motion, quash or modify a subpoena that requires disclosing a trade secret or other confidential research, development, or commercial information. *Id.*

Subpoenas are also subject to the same requirements and limitations as discovery generally. Federal Rule of Civil Procedure 26 governs discovery and provides that parties may only "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case," considering such things as "the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Relevance is "the foundation for any request for production, regardless of the individual to whom a request is made," party or nonparty. *Cook v. Howard*, 484 F. App'x 805, 812 (4th Cir. 2012). "[C]ourts should consider not just the relevance of information sought, but the requesting party's need for it." *Va. Dep't of Corr. v. Jordan*, 921

7

F.3d 180, 189 (4th Cir. 2019). In assessing need, a court should consider not only whether the information sought will "likely (not just theoretically) have marginal benefit in litigating important issues," but also whether the information is available from other sources. *Id.* "[T]he requesting party should be able to explain why it cannot obtain the same information, or comparable information that would also satisfy its needs, from one of the parties to the litigation—or, in appropriate cases, from other third parties that would be more logical targets for the subpoena." *Id.*; *see also* Fed. R. Civ. P. 26(b)(2)(C)(i) ("On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that the discovery . . . can be obtained from some other source that is more convenient, less burdensome, or less expensive."). And naturally, discovery is also not available where it is "interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. P. 26(g)(1)(B)(ii).

"District courts are afforded broad discretion with respect to discovery generally, and motions to quash subpoenas specifically." *Cook*, 484 F. App'x at 812. In assessing a motion to quash, a court should be mindful that "[n]onparties faced with civil discovery requests deserve special solicitude." *Jordan*, 921 F.3d at 194. "They should not be drawn into the parties' dispute unless the need to include them outweighs the burdens of doing so, considering their nonparty status." *Id.*; *see also Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998) ("[C]oncern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs" in the rule 45 inquiry.). Although a nonparty on a motion to quash, "bears the burden of proof and of persuasion," "they are not terribly difficult burdens to meet if the requesting party cannot articulate its need for the information and address obvious alternative sources." *Jordan*, 921 F.3d at 189 n.2.

## 2.    Analysis

As with its earlier subpoenas to PETA and the Foundation, Vital fails to demonstrate the relevancy of the matters it has designated for examination with its January 17 subpoena or that it is entitled to that information *from PETA or the Foundation*.  This is true whether considering those matters designated in the January 17 subpoena or the 11 reconfigured topics that Vital articulated in its February 7 letter.[1]  Part of assessing need is assessing whether a requesting party can obtain the same or comparable information from one of the parties or a more logical third-party source, or whether the requesting party can obtain the information itself.  In Vital's February 7 letter (whose topics Vital asserts subsumed those in the January 17 subpoena), topic 4 together with portions of topics 2, 6, 7 and 10 demand testimony about PETA and the Foundation's understandings about consumers' beliefs or understandings about egg labels, egg production industry practices generally, and practices that Vital engages in; whether consumers consider Vital's practices as "more ethical or more humane" than those of other companies; and PETA's "experience trying to impact consumer purchasing of eggs."  Feb. 7 Letter at 1–3.   Vital claims that PETA and the Foundation's understandings about consumer beliefs are "relevant to plaintiffs' burden of proof at class certification of demonstrating the reasonable consumer's understanding of the challenged label statements," and that the challenged statements are "material to consumers."  Opp'n at 10 (citing *In re KIND LLC "Healthy & All Natural" Litig.*, No. 15MC2645, 2022 WL 4125065, at *7 (S.D.N.Y. Sept. 9, 2022); *Schneider v. Chipotle Mexican Grill, Inc.*, 328

---

[1] In its opposition to the joint motion to quash, Vital reproduces in full the 11 topics stated in the February 7 letter, and it addresses the relevancy of and need for those topics while asserting that they "subsume" the topics in the January 17 subpoena. *See* Opp'n at 4–7, 9–13 & nn. 8–18. Thus, to the extent that Vital did not address any topics designated in the January 17 subpoena that did not carry over to the February 7 letter, the Court deems Vital to have waived its defense of those topics.

F.R.D. 520, 536 (N.D. Cal. 2018)).   But Vital presumably already has comparable information on these topics.   Investor Relations, https://investors.vitalfarms.com/investor-relations (last visited Apr. 13, 2023) (referencing Vital as "the leading U.S. brand of pasture-raised eggs by retail dollar sales" with its products being "sold in over 22,000 stores nationwide").   If it does not, it has not explained why it needs PETA and the Foundation to furnish this information instead of conducting its own research, through consumer surveys or other means.   Relatedly, Vital has not explained why PETA or the Foundation are better positioned than it to compile such research.   Vital is, after all, in the business of labelling and selling eggs.   Because Vital does not articulate its need for this information from PETA or the Foundation or address alternative sources, these topics should be quashed.   *See Cameron v. Apple, Inc. (In re Apple iPhone)*, No. 11-CV-06714, 2020 WL 5993223, at \*5 (N.D. Cal. Oct. 9, 2020) (quashing request for documents concerning things such as "consumer preferences for any handheld device" and "the reasons consumers selected one competitor's devices over another's" because party was "equally able to expend its own resources to obtain information responsive to this request, and probably already has"); *In re eBay Seller Antitrust Litig.*, No. C09-735RAJ, 2009 WL 5205961, at \*3 (W.D. Wash. Dec. 23, 2009) (quashing subpoena and finding that eBay, the issuing party, did "not have a substantial need to force Amazon to turn over market analyses that [it] could conduct on its own"); *Act, Inc. v. Sylvan Learning Sys., Inc.*, No. CIV.A. 99-63, 1999 WL 305300, at \*2 (E.D. Pa. May 14, 1999) (quashing subpoena, in part, because issuing party "wholly failed" to show "substantial need," where it did "not deny that similar market assessment information [was] available from its own resources . . . and from third parties," nor "offer any argument for why [the subpoena target's] 'perspective' on the market in particular [was] relevant or necessary to [its] claims").

The same reasoning applies to other topics that Vital has designated. Topic 5, for example, demands testimony about PETA or the Foundation's conclusions about egg pricing and consumer beliefs about egg pricing; topic 6, testimony about Humane Farm Animal Care, Whole Foods, and other third-party "standards for egg industry practices" and "any analysis of these standards that PETA has undertaken"; and topic 7, testimony about "practices germane to the production of eggs," and PETA and the Foundation's understanding of Vital's practices. Feb. 7 Letter at 2. For each of these topics, Vital says only that the information is relevant to the plaintiffs' burden of proof in the class action. *Id.* at 2–3; Opp'n at 9, 11. Putting aside the question of relevance, Vital fails to explain why it cannot obtain this industry insight on its own (if not already possessed). Nor does it explain why PETA's conclusions about "pricing for Vital Farms' and other companies' eggs," Opp'n at 11, and egg industry practices including *Vital's own practices*, would be more germane or probative than information Vital can furnish. Likewise, PETA is in no apparent special position to furnish probative evidence on topics such as standards for egg industry practices at Whole Foods (which is a more obvious third-party source) or Vital's own egg-pricing decisions.

For other topics, Vital has not demonstrated need and, furthermore, has not persuasively articulated relevance. Topic 9, for example, directs testimony on information PETA and the Foundation have collected about Vital's egg production practices; "any press releases about the Vital Farms litigation"; and whether PETA or the Foundation has reached any conclusions as to whether consumers distinguish between Vital's pasture-raised eggs and other eggs. Feb. 7 Letter at 3. Topic 9 also seeks testimony on a dozen or so emails from November 2016 to January 2018 from Noelle Grain, PETA's former employee, to Matt O'Hayer (who, judging by the emails, is or was Vital's CEO) and other Vital employees. *Id.* (citing Subpoena Attach. A, Ex. 2). Vital does not attempt to explain the relevance of this information, proclaiming that topic 9 "covers facts or

information underlying the litigation" without saying anything further. Opp'n at 13. Yet, it is not apparent how PETA's press releases about the *Usler* lawsuit can have any bearing on the case. The same is true for a series of presumably private emails between PETA and Vital from three years before the plaintiffs filed suit. There is also no obvious significant probative weight to information PETA has collected about Vital's practices when Vital can clearly furnish this information itself and/or seek discovery about plaintiffs' knowledge of Vital's practices directly from plaintiffs. And, to the extent Vital means to collect evidence about whether consumers can distinguish between Vital's eggs and those of its competitors, Vital has not explained why the onus should fall on PETA and the Foundation to furnish that evidence.

Similarly, with topic 3, Vital has not convincingly argued relevancy. Topic 3 directs that PETA provide a corporate designee to testify on PETA and the Foundation's "views about 'ethical' and 'humane' production of eggs (from hatchery through end of life), and the bases therefor." Feb. 7 Letter at 2. In justifying this topic, Vital argues that, "[t]o the extent that PETA's view is a minority view . . . and the plaintiffs[] in their depositions adopt or espouse that minority view, Vital Farms will have developed relevant evidence needed for undercutting class certification." Opp'n at 10. Vital does not explain how PETA and the plaintiffs having consistent views on the meaning of "ethical" or "humane" would undercut class certification, and at this juncture the Court does not see how it would. In its February 7 letter, Vital offered a different justification for topic 3: that PETA's views on "'ethical' and 'humane' production of eggs" "shows what one segment of the population believes about these claims in the context of egg production." Feb. 7 Letter at 2. This explanation also is not tenable. Vital recognizes that what matters in *Usler* is the "reasonable consumer's understanding of challenged label statements." Opp'n at 10 (citing *In re KIND*, 2022 WL 4125065, at *7). PETA is an advocacy organization rather than a consumer. To

12

the extent it has views on the meaning of "ethical" and "humane," those views appear to have no bearing on the claims or defenses at issue in *Usler*. And, to the extent Vital needs information on what a reasonable consumer's understanding of those terms are, that again raises the issue of Vital's failure to articulate why PETA should have to produce that information.

Vital's proffered justifications for topic 8 are also not persuasive. Topic 8 directs PETA to provide a corporate designee "who can identify where certain images were taken," including two photos in the complaint in *Usler* purportedly showing maceration, which according to the complaint is an "industry-standard" of killing newborn male chickens. Feb. 7 Letter at 3 (citing Compl. at 21); *see* Compl. ¶ 43(c). As Vital recognizes, Opp'n at 12, the complaint does not attribute these photos to PETA, but instead indicates that the photos were posted on youtube.com, by a user called "Kstips" with no apparent link to PETA. *See* Compl. ¶ 43(c) (citing https://youtu.be/xPbeh67VVnk). Vital argues that, "[w]hile the Complaint may indicate that these photos *were posted* on youtube.com . . . it is critical to Vital Farms' defense to show that these photos were not *taken* at any Vital Farms facility." Opp'n at 12. Vital neglects to explain why. The complaint does not allege that the relevant photos were taken at a Vital facility; it alleges that they "depict[] one industry-standard method," and that "Vital and its farmer network *financially support* the killing of male newborn chickens" through several methods including maceration. Compl. ¶ 43(c) (emphasis added). Therefore, at this juncture, Vital appears to argue that it will need to disprove a fact that has not been alleged. Similarly, topic 8 references three other photos attached as exhibit 5 to the *Usler* complaint and Vital claims that it "seeks to confirm whether the images are of a Vital Farms farm/facility." Feb. 7 Letter at 3. But, here too the complaint does not allege that the photos were taken at a Vital facility. Instead, it associates the images with "hatcheries from which Vital purchases hens." Compl. ¶ 11(d) & Ex. 5. Also, even if Vital did

13

need to prove that the photos were not taken at one of its facilities, there is nothing to suggest that PETA would or should be the entity to help it do so. The complaint does not allege that plaintiffs obtained the photos from PETA, and Vital points to nothing in the images or accompanying them to suggest that PETA would know from where they came. Vital argues that PETA and the Foundation might have knowledge of the source of the photos because one of the Foundation's lawyers claimed in a podcast interview recently that attorneys in an unrelated class action lawsuit in the Southern District of New York had used a "photo collage I put together so many years before." Opp'n at 12 (citing ECF No. 23-12, at 2). However, the Foundation's lawyer was discussing how the photos were used in a *different* lawsuit against a *different* company. *See* ECF No. 23-12, at 2. At least one more obvious source for Vital to obtain information about the origin of the photos used in the complaint is to seek that information from plaintiffs themselves, through ordinary discovery, not by subpoenaing the entity employing plaintiffs' attorney.[2] Lastly, topic 8 demands testimony on a series of pictures in a collection of screenshots that Vital took from PETA's website. Feb. 7 Letter at 3 (citing Subpoena Attach. A, Ex. 1). It is not clear to the Court what relevance these images have to the *Usler* lawsuit, and Vital makes no attempt to explain.

Topic 11 demands testimony on "any dealings that PETA (or the Foundation) has had with the named plaintiffs in the litigation, outside the context of the litigation." Feb. 7 Letter at 3. In its February 7 letter, Vital contended that this information "is relevant to the issue of how plaintiffs have formed beliefs about Vital Farms' labeling practices and to whether they can show detrimental reliance on Vital Farms' egg labels." Feb. 7 Letter at 3. Vital now argues, however, that this information would "determine whether there are adequacy issues or means for impeaching

---

[2] If, as Vital contends, the plaintiffs are "uncertain about the location of these photos," Opp'n at 12, then that is presumably a problem for the plaintiffs, not Vital.

the plaintiffs' deposition testimony." Opp'n at 13. Neither explanation justifies permitting this discovery. To understand how the plaintiffs in *Usler* formed their beliefs about Vital's labelling and whether they relied on those labels, the plaintiffs are the logical source. As to Vital's other explanation, Vital raised the same Rule 23 adequacy argument in trying to justify its earlier subpoenas to PETA and the Foundation, ECF No. 23, at 16; Found. Dkt. ECF No. 27, at 14, but Vital does not offer any support for this argument. Rule 23(a)(4) requires that, as a prerequisite to class certification, the putative representatives "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Fifth Circuit instructs that the adequacy requirement "mandates an inquiry into the zeal and competence of the representative's counsel and into the willingness and ability of the representative to take an active role in and control the litigation and to protect the interests of absentees. . . [It] also serves to uncover conflicts of interest between the named plaintiffs and the class they seek to represent." *Jones v. Singing River Health Servs. Found.*, 865 F.3d 285, 294 (5th Cir. 2017) (internal quotation marks and citations omitted); *see also 1988 Trust for Allen Children v. Banner Life Ins. Co.*, 28 F.4th 513, 528 (4th Cir. 2022) (Rushing, J., concurring) ("To be adequate, the named representatives 'must be part of the class and possess the same interest and suffer the same injury as the class members.'") (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997)). PETA is not a party to the *Usler* lawsuit. Up to this point, after briefing on three motions to quash, Vital has offered only unsupported conjecture about PETA being involved with the litigation or the plaintiffs. Vital's theory that deposing PETA might reveal issues with the plaintiffs and their attorneys' adequacy to represent the proposed class is unsubstantiated. Similarly, Vital's reference to unspecified, speculative "means" that PETA might provide to impeach the *Usler* plaintiffs does not justify imposing on PETA, a nonparty with no

15

demonstrated connection to the lawsuit, the burden of having to prepare for and sit through an extensive deposition.

Lastly, topic 1 demands testimony on PETA and the Foundation's mission and organizational structure, and topic 2 on the categories and types of information that PETA and the Foundation collect concerning information covered by the other topics. Feb. 7 Letter at 1. Vital explains that topics 1 and 2 "seek foundational information to facilitate the deposition regarding the organizations' missions and organization structures (Topic 1), and about the categories and types of information that the organizations collect on certain subjects (Topic 2)." Opp'n at 9; *see also* Feb. 7 Letter at 1 (the purpose of the requests is "to provide foundation understanding, to facilitate the deposition"). Because Vital has failed to establish relevance plus need for any of its other topics, topics 1 and 2 are similarly irrelevant.

Vital fails to demonstrate relevancy or a need to depose PETA or the Foundation for any of its designated topics. The Court need not address PETA and the Foundation's remaining arguments about overbreadth, proportionality, and privilege. Nevertheless, Vital's January 17 subpoena implicates all those issues. Vital's designated topics are expansive, seeking testimony on topics ranging from PETA's or the Foundation's "experience trying to impact consumer purchasing of eggs," Feb. 7 Letter at 3, going back to May 2015 (the relevant time period), Subpoena Attach. A at 3; to egg production practices "from hatchery through the end of life," Feb. 7 Letter at 2; to egg pricing, *id.*; to third-party "standards for egg industry practices," *id.*; to any information PETA and the Foundation have on Vital's egg production practices, *id.* at 3; to any information PETA or the Foundation have on what consumers think about topics as diverse as third-party certification standards, egg production industry standards, Vital's practices, and egg label claims such as "ethical" and "humane," *id.* at 2. Preparing for a deposition on these topics

16

would impose a substantial burden on PETA. *See* Decl. of Asher Smith in Supp. of Mot. to Quash ¶¶ 12–17, ECF No. 26-7. Vital insists that PETA has a "trove of information" about egg production alone, and that it is a "leader in challenging ethical claims," Opp'n at 2, suggesting that Vital is aware that PETA would have no small amount of work to do to prepare to testify. The January 17 subpoena is substantially overbroad, and compliance would be unreasonably burdensome on PETA and the Foundation. *See Progressive Emu Inc. v. Nutrition & Fitness Inc.*, 785 F. App'x 622, 628 (11th Cir. 2019) (finding a nonparty subpoena was "grossly overbroad and unduly burdensome" where it required the production of "'any and all documents' that 'refer to, relate to, or evidence' 10 categories of documents over a ten-year period").

Furthermore, because the subpoena demands testimony from a corporate designee of the Foundation concerning the Foundation's knowledge of topics directly related to the *Usler* lawsuit, that testimony would plainly implicate matters covered by work-product or other privileges. Vital claims that it is "not asking for privileged or protected information," Feb. 7 Letter at 3, but it is hard to reconcile that claim with the fact that Vital is subpoenaing testimony from the organization whose lawyers represent the plaintiffs in *Usler* about matters like consumers' beliefs about "humane" and "ethical" egg labels or consumers' knowledge about Vital's egg production practices. *See* Feb. 7 Letter at 2. Even if Vital had managed to show relevance and need for some topics it designated for testimony, which it has not, its subpoena would be quashed in whole or substantial part for being overbroad and not proportional to the needs of the case, creating an undue burden on PETA and the Foundation, and demanding testimony on privileged matters.

PETA and the Foundation's motion to quash is **GRANTED**.

D.    **PETA and the Foundation's Requests for Sanctions**

PETA and the Foundation both request sanctions in the form of attorney's fees pursuant to

rule 45(d)(1), which states:

> A party or attorney responsible for issuing and serving a subpoena must take
> reasonable steps to avoid imposing undue burden or expense on a person subject to
> the subpoena. The court for the district where compliance is required must enforce
> this duty and impose an appropriate sanction—which may include lost earnings and
> reasonable attorney's fees—on a party or attorney who fails to comply.

Fed. R. Civ. P. 45(d)(1).   Where a discovering party does not avoid imposing undue burden or

expense, "attorney's fees can constitute an expense shifted to the discovering party." *Hinterberger*

*v. Am. Nurses Assn. (In re Am. Nurses Assn.)*, 643 F. App'x 310, 314 (4th Cir. 2016).   Attorney's

fees pursuant to rule 45(d)(1) are discretionary. *Legal Voice v. Stormans, Inc.*, 738 F.3d 1178,

1185 (9th Cir. 2013).   Undue burden can be assessed "considering such factors as relevance, the

need of the party for the documents, the breadth of the document request, the time period covered

by it, the particularity with which the documents are described and the burden imposed." *New*

*Prods. Corp. v. Dickinson Wright PLLC (In re Modern Plastics Corp.)*, 890 F.3d 244, 251 (6th

Cir. 2018) (internal quotation marks and citations omitted).   A court however may impose

sanctions pursuant to rule 45(d)(1) when "a party issues a subpoena in bad faith, for an improper

purpose, or in a manner inconsistent with existing law." *Legal Voice*, 738 F.3d at 1185 (citations

omitted). However, rule 45(d)(1) does not carry a bad-faith requirement. *In re Modern Plastics*

*Corp.*, 890 F.3d at 251 (discussing *Legal Voice*, 738 F.3d at 1185).

Vital served on PETA and the Foundation, who are both nonparties, three overbroad and

unduly burdensome subpoenas.   Vital's January 17 subpoena alone would impose a substantial

burden on PETA and the Foundation.   And problematically, despite the undue burden that the

subpoenas would place on PETA and the Foundation, Vital failed to articulate need and relevance

for *any* of the documents or testimony it demanded in any of the three subpoenas. In several instances, Vital did not *attempt* to explain relevance or need for the documents or testimony it demanded, and it never addressed obvious alternative sources. *See, e.g.*, *supra*, pages 12, 15; Apr. 3 Order 12, 20. Furthermore, Vital's subpoenas to the Foundation, whose lawyers are co-counsel to the plaintiffs in *Usler*, demanded documents and communications directly related to the lawsuit. This created obvious privilege issues. In sum, Vital forced PETA and the Foundation "to incur substantial expenses . . . including outside counsel fees," Movants' Br. 23, defending against overly broad and burdensome subpoenas, for which Vital failed to establish relevance or need. Vital has imposed significant undue and unnecessary expense on PETA and the Foundation.

Accordingly, the Court **GRANTS** PETA and the Foundation's requests for fees in the three motions to quash as noted below.

<u>**CONCLUSION**</u>

For the reasons stated herein, the Court **GRANTS** PETA and the Foundation's joint motion to quash additional nonparty subpoena. ECF No. 25. Additionally, the Court **GRANTS** PETA and the Foundation's requests for fees. ECF No. 26 at 22–23; ECF No. 2 at 28–29; Case No. 2:22mc23, ECF. No. 2 at 21–22.

The Court **ORDERS** that Vital shall pay the reasonable attorneys' fees PETA and the Foundation incurred in briefing their motions to quash, memoranda in support of the motions, replies, and responses to sur-replies in the matters before this Court. PETA and the Foundation's counsel are directed to disclose to Vital's counsel the total fees incurred in briefing these documents by April 19, 2023, and the parties are directed to confer regarding the fees not later than April 26, 2023. If the parties are unable to agree, PETA and the Foundation shall file a fee request substantiating their reasonable attorneys' fees, including any supporting affidavits,

consistent with the factors enumerated in *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243–44 (4th Cir. 2009), not later than May 5, 2023.  Vital shall file any opposition to the request by May 19, 2023, and PETA and the Foundation shall file any reply by May 25, 2023.

_____
Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

April 13, 2023
Norfolk, Virginia